IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HENRIETTA MIDDLETON,
*Plaintiff*,

  v.

Civil Action No. ELH-20-3536

BALTIMORE CITY POLICE DEPARTMENT,
*et al.*
*Defendants*.

## MEMORANDUM OPINION

In this civil rights action, plaintiff Henrietta Middleton, an African American police officer

with the Baltimore City Police Department (the "BPD" or the "Department"), alleges, *inter alia*,

that in August 2018, while she was off duty, she was "assaulted, battered, and abused" by a fellow

BPD Officer, Sergeant Marlon Koushall. ECF 28 (Amended Complaint), ¶ 2. Further, she claims

that she was arrested and detained on false charges. *Id.* ¶¶ 4, 15. According to plaintiff, Koushall

was "acting within the scope of his employment" at the time of the incident, and he was "motivated

by racial and gender animus . . . ." *Id.* ¶¶ 4, 19; *see also id.* ¶ 13.[1]

As a result of the events in issue, Middleton has sued the Baltimore City Police Department

("BPD" or "Department"); the Mayor & City Council of Baltimore (the "City" or "MCC"); Gary

Tuggle, the former interim Police Commissioner for Baltimore City, in his individual and official

---

[1] As discussed, *infra*, plaintiff asserts that Koushall was subsequently convicted in the
Circuit Court for Baltimore City of second degree assault and misconduct in office. ECF 28, ¶ 25.

Pursuant to Fed. R. Evid. 201, I may take judicial notice of matters of public record,
including docket entries, pleadings, and papers in other cases. *See Schultz v. Braga*, 290 F. Supp.
2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state court proceeding).
Judicial records reflect that Koushall noted an appeal, and his convictions were affirmed by the
Maryland Court of Special Appeals. *See Koushall v. State*, 249 Md. App. 717, 246 A.3d 764
(2021), *cert. granted*, 474 Md. 718, 255 A.3d 1090 (2021).

capacity; Koushall, in his individual and official capacity; and BPD Lieutenant Jason Yerg, individually and in his official capacity.  I shall sometimes refer to Koushall and Lieutenant Yerg collectively as the "Officer Defendants," and I shall refer to BPD, the City, and Tuggle collectively as the "City Defendants."

The Amended Complaint (ECF 28) contains ten counts.  In particular, plaintiff lodges claims of battery (Count I); false imprisonment (Count II); malicious prosecution and abuse of process (Count III); violation of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV); intentional infliction of emotional distress (Count V); false arrest (Count VI); a § 1983 claim for violation of plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution (Count VII); false light invasion of privacy (Count VIII); civil conspiracy (Count IX); and a conspiracy claim under 42 U.S.C. § 1985(3) (Count X).[2]

It is not entirely clear which counts are lodged as to which defendants.  For example, Count I makes no mention of a particular defendant, and refers instead to "Defendant Officer."  *See id.* ¶¶ 28, 30.  However, each count includes an *ad damnum* clause in which Middleton asks for compensatory and punitive damages from all defendants.  *See*, *e.g.*, *id.* at 9, 10.[3]

---

[2] Jurisdiction is founded on 28 U.S.C. § 1331, based on plaintiff's claims arising under 42 U.S.C. §§ 1983 and 1985(3).  ECF 28, ¶ 9.  And, the Court has supplemental jurisdiction with respect to plaintiff's State law causes of action, pursuant to 28 U.S.C. § 1367.

[3] The Amended Complaint was filed on May 10, 2021, twenty-one days after the Officer Defendants moved to dismiss (ECF 26) the initial Complaint (ECF 1), but more than two months after the City Defendants had moved to dismiss (ECF 19).  Surprisingly, plaintiff did not move for leave to amend.

Under Fed. R. Civ. P. 15(a), a plaintiff may amend a pleading once, as a matter of course, within 21 days after service of a responsive pleading or a Rule 12(b) motion.  As best as I can determine, in a multi-defendant case, the 21-day window begins upon the filing of the *first* Rule 12(b) motion, not the *last*.  *See United States ex rel. Carter v. Halliburton Co.*, 144 F. Supp. 3d 869, 878 (E.D. Va. 2015) ("[T]he twenty-day one period to amend as a matter of course begins on

The City Defendants have moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6) (ECF 29), supported by a memorandum of law.  ECF 29-1 (collectively, the "City Motion").  The Officer Defendants have filed a partial motion to dismiss (ECF 31), pursuant to Rule 12(b)(6), along with a memorandum of law.  ECF 31-1 (collectively, the "Officer Motion"). Yerg seeks dismissal of Counts I, II, IV, and VI.  The Officer Defendants also seek dismissal of Counts V, VIII, IX, and X.  And, they seek dismissal of Count IV and Count VII to the extent that these counts concern a claim for denial of medical care.  As to Count VII, the Officer Defendants also seek dismissal to the extent the claim is lodged against them in their official capacity.

Middleton opposes the City Motion (ECF 35), accompanied by a memorandum of law. *See* ECF 35-1 (collectively, the "Opposition/City").  Plaintiff also opposes the Officer Motion

---

the date of the earliest defense action."); *LM Insur. Corp. v. L&K Coffee LLC*, 1:20-cv-806, 2021 WL 4704836, at **1-2 (W.D. Mich. Apr. 28, 2021) (finding the same); *Kieffer v. Tundra Storage, LLC*, 2015 WL 5009012, at *3 (D. Minn. Aug. 21, 2015) (explaining that the 21-day window does not "reset when subsequent pleadings and motions [are] filed"); *Williams v. Black Entm't Television, Inc.*, 13-CV-1459(JS)(WDW), 2014 WL 585419, at **3-4 (E.D.N.Y. Feb. 14, 2014) (finding that "[f]ollowing the 2009 amendments to Rule 15, it is apparent that the 'Rule 15(a)(1)(B) . . . period runs from the *earlier* action by defendants . . . .'") (emphasis and alterations in *Williams*) (quoting *Brown v. W. Valley Envtl. Servs., LLC*, No. 10-CV-0210, 2010 WL 3369604, at *9 (W.D.N.Y. Aug. 24, 2010)).

In my view, plaintiff should have filed a motion for leave to amend.  Had one been filed, however, I would have granted it.  The court has "broad discretion concerning motions to amend pleadings."  *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *Labor v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc).  A court may deny leave to amend in three circumstances "'when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile.'"  *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010)); *see Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2013); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).  These criteria do not apply here.

Thus, I shall consider the Amended Complaint (ECF 28) as the operative pleading. Accordingly, I shall address here the motions that challenge ECF 28, and I shall deny, as moot, the earlier motions to dismiss (ECF 19, ECF 26).

(ECF 36), supported by a memorandum of law.  ECF 36-1 (collectively, the "Opposition/Officer").

And, defendants have replied.  *See* ECF 39 (Officer Defendants); ECF 40 (City Defendants).

No hearing is necessary to resolve these motions.  *See* Local Rule 105.6.  For the reasons

that follow, I shall grant the City Motion (ECF 29).  And, I shall grant the Officer Motion (ECF

31) in part and deny it in part.

## I.     Factual Background[4]

Middleton is "an African-American female" who is "a sworn member of the Baltimore

City Police Department . . . ."  ECF 28, ⁋ 2.  At the relevant time, Koushall and Yerg were also

officers with the BPD.  *Id.* ⁋ 3.  According to Middleton, Yerg was a supervisor and thus "exercised

final policy making authority for BCPD . . . ."  *Id.* ⁋ 5.  At the time, Tuggle served as the Interim

Commissioner of the BPD.  *Id.* ⁋ 8.

The events underlying plaintiff's claim began on the early morning of August 26, 2018.

*Id.* ⁋ 11.  Ms. Middleton was a guest at a pre-wedding celebration in Baltimore held at "Norma

Jean's Club" (the "Club").[5]  *Id.*  At about 1:20 a.m., Ms. Middleton and a group of her friends left

the Club.  *Id.*  Thereafter, "a member of Ms. Middleton's group informed Ms. Middleton that she

had forgotten her personal belongings inside of the establishment."  *Id.* ⁋ 12.[6]  Plaintiff responded

---

[4] Given the posture of the case, the Court assumes the truth of the allegations in the
Amended Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  I note, however,
that in *Koushall v. State*, 249 Md. App. 717, 246 A.3d 764 (2021), the Maryland Court of Special
Appeals presented a summary of the underlying incident that differs in some respects from
plaintiff's account.

[5] Middleton usually refers to Norma Jean's as the "establishment."  ECF 28, ⁋ 11.
According to the Maryland Court of Special Appeals, Norma Jean's is a "strip club."  *See Koushall*,
269 Md. App. at 723, 246 A.3d at 768.

[6] It is not entirely clear whether "she" referred to Ms. Middleton or the group member.

that "she would retrieve the member's personal belongings and began to walk back to the front door of the establishment."  ECF 28, ¶ 12.

However, "[a]s soon as Ms. Middleton got to the entrance of the establishment, Defendant Koushall told her to back up."  *Id.* ¶ 13.  Before she could do so, "Defendant Koushall suddenly, without provocation and unexpectedly, struck her three (3) times in her face/head/ear."  *Id.* Middleton "attempted to retreat," but "Koushall continued to pursue her, threw her to the ground, and then grabbed her by her hair and clothing."  *Id.*  And, according to the Amended Complaint, "Koushall's physical attack did not cease until another officer grabbed Defendant Koushall and stopped him from further assaulting and beating Middleton."  *Id.*

As a result of the assault, plaintiff "sustain[ed] injuries to her face, temple, and head, and experienced severe pain and suffering, . . . physical injury, and substantial emotional distress."  *Id.* ¶ 14.  According to plaintiff, Koushall "has a history of physically assaulting other African American women."  *Id.* ¶ 13.  And, she asserts that the assault at issue "was motivated by racial and gender animus as [she] is an African American female."  *Id.*

Immediately following the assault, plaintiff "was arrested, handcuffed, and further publicly humiliated when she was forced to walk up the public street from the site of the attack to the Baltimore City Police Department's Central District."  *Id.* ¶ 15.  Specifically, plaintiff contends that the incident "was observed by no less than 50 people and was captured on CCTV, cell phone footage, and body-worn camera."  *Id.* ¶ 16.

Upon plaintiff's arrival at "Central Headquarters," plaintiff was "handcuffed to the wall," where she remained "for approximately ten consecutive (10) hours prior to being released . . . ."

ECF 28, ¶ 16.[7]   During Middleton's period of detention, "Defendant Koushall . . . continue[d] his abuse" of Middleton by "remaining in her presence and not seeking medical attention for her injuries that he caused."   *Id.*   Further, plaintiff asserts that even after another BPD official, Detective Dominique Wiggins, "told Koushall that Ms. Middleton needed medical attention," he "refused to provide it to her."   *Id.*   By the time Middleton was released, "Koushall's shift [had] ended." *Id.*

Prior to plaintiff's release, she was "served with two criminal citations: (i) Failure to Obey the lawful command of an officer designed to keep the peace and (ii) Disorderly Conduct . . . ." ECF 28, ¶ 16.  Both citations were "hand-written by . . . Koushall."   *Id.*   Further, plaintiff alleges that "Koushall intentionally failed to timely file a use of force report pursuant to Baltimore City Police Department General Orders."  *Id.* ¶ 17.

Plaintiff sought medical care following her release.  *Id.* ¶ 18.  According to the Amended Complaint, Middleton "was treated for numerous injuries, including a concussion, post-traumatic headaches, and injuries to her neck and back."   *Id.*   Moreover, plaintiff "required physical therapy and multiple doctor's appointments for several months . . . ."  *Id.*

Some unspecified time later, "Lietenant [sic] Yerg was placed on notice by the State's Attorney's Office that they were no longer going to pursue Middleton's charges and instead pursue Sergeant Koushall for multiple charges . . . ."  *Id.* ¶ 19.  According to plaintiff, "Yerg and Koushall remained in constant communication via telephone and email" in order to "coordinate with each other and concoct a way to keep Defendant Koushall free from criminal charges and/or intradepartmental discipline . . . ."  *Id.*  Further, Middleton asserts that Yerg and Koushall sought

---

[7] Plaintiff refers to "Central Headquarters" and "Central District" interchangeably.  *See id.* ¶¶ 15, 16.

to "damage Middleton in her own criminal case and assure she would not be given an objective, fair assessment within the department." ECF 28, ⁋ 19.  Again, plaintiff contends that the conduct of Koushall and Yerg was "motivated by racial and gender animus based on Ms. Middleton being an African American female." *Id.*

On December 1, 2018, Koushall "drew up and filed additional charges against Middleton," including "Assault 2nd Degree and Resist/Interfere with Arrest." *Id.* ⁋ 20.  Plaintiff asserts that "[t]hese new criminal charges were sworn out by Defendant Koushall with the advice and guidance of Defendant Yerg," who "was assigned to investigate Middleton's allegations of wrongdoing by Koushall . . . ." *Id.*

Moreover, Middleton alleges that the BPD "broadcast a public statement, wrongfully asserting that Ms. Middleton was intoxicated and charged with being drunk and disorderly." *Id.* ⁋ 22.  According to plaintiff, a BPD spokesperson, T.J. Smith, offered an "official statement to the 11 News I-Team that Middleton [had been] suspended." *Id.*  Moreover, Smith said, *id.*:

> "'When officers arrived, they observed the patron acting in a disorderly manner. The female patron approached an officer and refused to comply.  She was arrested and charged on a criminal citation for drunk and disorderly conduct.  She was identified as Henrietta Middleton, a 12-year veteran of the Baltimore Police Department, who is currently assigned to the Inspector General's Office.'"

Thereafter, "numerous media outlets, print and television, aired stories about the attack on Middleton casting her in a negative and disparaging light; including a report that she was drunk and disorderly." *Id.* ⁋ 23.  Further, plaintiff's "police powers [were] suspended as a result of this incident from August 2018-September 2019 . . . ." *Id.* ⁋ 24.  And, she was "removed from her prior assignment as a Sergeant in the Special Investigation Response Team (SIRT)," and "transferred to administration at the Northern District." *Id.*  Consequently, Middleton "suffer[ed] from reduced wages because she was unable to work overtime while her police powers were

suspended . . . ." *Id.*  And, Middleton indicates that "her career path trajectory was negatively affected." ECF  28, ⁋ 24.

Ultimately, "all four charges . . . were entered *nolle prosequi* against Ms. Middleton." *Id.* ⁋ 20.  However, plaintiff complains that in the interim she "was forced to spend substantial money and hire private counsel to defend her against the criminal charges lodged by defendants Koushall and Yerg." *Id.* ⁋ 21.

Koushall "was subsequently charged with 2nd Degree Assault and Misconduct in Office for his attack on Ms. Middleton." *Id.* ⁋ 25.  Following a bench trial in the Circuit Court for Baltimore City, Koushall was convicted of both charges.  *See Koushall v. State*, 249 Md. App. 717, 722, 246 A.3d 764, 767 (2021), *cert. granted*, 474 Md. 718, 255 A.3d 1090 (2021).  And, the judge "sentenced Mr. Koushall to three years' imprisonment, all suspended except time served for the assault charge, and six years' imprisonment, all suspended except time served for the misconduct charge." *Id.* at 726, 246 A.3d at 769-770.[8]

Koushall subsequently noted an appeal to the Maryland Court of Special Appeals, asserting that his convictions were not supported by sufficient evidence, and that the trial court erred by failing to merge his convictions for purposes of sentencing.  *Id.*, 246 A.3d at 770.  The Maryland Court of Special Appeals rejected Koushall's claims and affirmed the trial court.  *Id.* at 738, 246 A.3d at 775.  Thereafter, the Maryland Court of Appeals granted certiorari.  *See Koushall v. State*, 474 Md. 718, 255 A.3d 1090 (2021).  Oral argument was held on November 11, 2021, and the court's decision is pending.  *See Cases Pending Before the Court of Appeals*, MARYLAND COURTS, https://mdcourts.gov/coappeals/pendingcases (last visited Jan. 27, 2022).

---

[8] Curiously, the Amended Complaint alleges that Koushall "was sentenced to a combined sixteen (16) years' incarceration; all active incarceration time suspended, followed by three (3) years of supervised probation."  ECF 28, ⁋ 25.

## II.    Legal Principles

### A.  Fed. R. Civ. P. 12(b)(6)

A defendant may test the legal sufficiency of a complaint by filing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Services Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions'. . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir.

2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 11 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is

not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion.  *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'"  *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).

Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg. v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows. Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, ___ F. App'x ___, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). And, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 882 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict

between an attached exhibit and the allegations of a complaint." *Id.* at 165.  But, "in cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.* at 167.

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro*, 930 F.3d at 248; *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __U.S.__, 138 S. Ct. 558   (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

And, as mentioned, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Plaintiff submitted two exhibits with her initial opposition to the earlier motion to dismiss. *See* ECF 20-3; ECF 20-4.  The first reflects various provisions of the Public Local Laws, which concern the establishment of Baltimore's Civilian Review Board and its authority over the BPD. ECF 20-3.  The second exhibit includes a portion of Baltimore City's "Preliminary Budget Plan" for Fiscal Year 2021.  ECF 20-4.  Plaintiff references both exhibits in the Opposition/City.  ECF 35-1 at 6.  However, she failed to resubmit the exhibits with her Opposition/City.  Nevertheless, both exhibits are matters of public record.[9]  Therefore, I may consider them in resolving the motions.

### B.  Sovereign Immunity

Both the City Motion and the Officer Motion turn, in part, on the defense of sovereign immunity.  *See* ECF 29-1 at 6-8; ECF 31-1 at 15.  Sovereign immunity is "a weighty principle, foundational to our constitutional system."  *Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."

The Supreme Court has explained: "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suit for damages by citizens against their own States."  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases); *see, e.g.*, *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of Regents of Univ. Sys. of*

---

[9] The preliminary budget plain is available on the Internet.  *See Preliminary Budget Plan, Fiscal 2021*, DEP'T OF FINANCE, BUREAU OF THE BUDGET AND MGMT. RESEARCH, https://bbmr.baltimorecity.gov/sites/default/files/fy21_prelim_web.pdf  (last visited Jan. 2, 2022).

*Georgia,* 535 U.S. 613, 618 (2002); *Kimmel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000). Thus, "the ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 531 U.S. at 363; *see Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, __ U.S.__, 140 S. Ct. 903 (2020).

In *Pense v. Md. Dep't of Public Safety and Correctional Services*, 926 F.3d 97 (4th Cir. 2019), the Fourth Circuit said, *id.* at 100: "The Supreme Court 'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" (Quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see Lapides*, 535 U.S. at 618 ("The Eleventh Amendment provides that the 'Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the . . . States' by citizens of another State, U.S. Const., Amdt. 11, *and (as interpreted) by its own citizens*.") (emphasis added; ellipses in *Lapides*); *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012).

Accordingly, absent waiver by the State or a valid congressional abrogation of sovereign immunity, the states enjoy immunity from suits for damages brought in federal court by their own citizens, even though the text of the Eleventh Amendment does not explicitly address such a scenario. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Garrett*, 531 U.S. at 363 ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal

- 15 -

jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted).

Notably, the Supreme Court has construed the Eleventh Amendment to embody the broader principles of state sovereign immunity.  The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002); *see Garrett*, 531 U.S. at 363. The doctrine of state sovereign immunity from private suit predates the enactment of the Eleventh Amendment, and is "a broader doctrine . . . ."  *See Williams v. Morgan State Univ.*, 850 F. App'x 172, 174 (4th Cir. 2021) (per curiam) (citing *Alden v. Maine*, 527 U.S. at 724 (1999); *Hans*, 134 U.S. at 3).[10]

Of import here, sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).  Put another way, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of

---

[10] In *Williams*, 850 F. App'x at 174, the Fourth Circuit described the text of the Eleventh Amendment as a "rather narrow and precise provision . . . ."  *Id.*

subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).

Moreover, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted); *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  In contrast, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by and through Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).

The Fourth Circuit has made clear that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'"  *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___U.S. ___, 139 S. Ct. 417 (2018).  However, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction."  *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)); *see DiCocco v. Garland*, 18 F.4th 406, 414 (4th Cir. 2021).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state.  In *Lee-Thomas*, 666 F.3d 244, the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.  *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . .  Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . .  Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court.  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

Pertinent here, sovereign immunity has not been congressionally abrogated for claims under § 1983.  In *Quern v. Jordan*, 440 U.S. 332, 345 (1979), the Supreme Court concluded that § 1983 suits by individuals against a state for money damages are barred by the Eleventh Amendment.  It said: "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"

Without question, a state may waive its sovereign immunity and permit suit in federal court.  *See Lapides*, 535 U.S. at 618; *see also Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249.  But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 926 F.3d at 101.  Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

**C. Section 1983**

The Amended Complaint is styled, in part, as an action brought under 42 U.S.C. § 1983. ECF 28, ¶¶ 54-56.  In particular, Count VII asserts a § 1983 claim for violation of plaintiff's rights under the Fourth and Fourteenth Amendments.  Middleton contends, *inter alia*, that she was subjected to an illegal search and seizure, an illegal arrest, illegal detention and prosecution, and use of excessive force.

Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).  Notably, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*,

635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

### III.   Discussion

The City Defendants and the Officer Defendants are not represented by the same lawyers. But, they sometimes advance similar arguments in their challenges to various counts.  In other instances, their grounds are distinct.

For convenience, I have organized the analysis by the groups of defendants.  On occasion, this gives rise to some repetition.

### A.  City Motion

The City Defendants, *i.e.*, the MCC, Tuggle, and the Department, contend that they are not proper defendants to this suit.  They argue that the City "is not liable for the acts or omissions of BPD or its officers as a matter of law," because the BPD is a State agency.  ECF 29-1 at 5.  Further, they assert that, to the extent Middleton's various State law claims are lodged against the BPD and Tuggle, in his official capacity, they are barred by sovereign immunity.  *Id.* at 6-8.  And, they

contend that the BPD and Tuggle cannot be liable for claims arising under 42 U.S.C. § 1983 because the Amended Complaint is devoid of any allegation that they "engaged in the alleged tortious conduct," and "there is no *respondeat superior* or vicarious liability in a § 1983 action." *Id.* at 8.  According to the City Defendants, the conduct of Koushall and Yerg cannot be imputed to them.  *Id.*

In addition, the City Motion asserts that, to the extent plaintiff's claim under § 1985(3) applies to the City Defendants, it is not viable because plaintiff does not assert facts to show that the City Defendants "formed or participated [in] any illegal agreement or conspiracy. . . ."  *Id.* at 9.  They note: "The allegations pleaded in the Amended Complaint to support Middleton's conspiracy claim under § 1985(3) never even mention MCC, BPD, or Tuggle."  *Id.*  Further, the City Defendants contend that Count X fails to state a claim because it is foreclosed by the intracorporate conspiracy doctrine.  *Id.* at 9-11.

And, the City Motion maintains that plaintiff's State law claims must be dismissed against Tuggle in his individual capacity.  In this regard, the City Defendants contend that the Amended Complaint fails to allege that Tuggle was involved in the conduct at issue.  *Id.* at 11-12.

I shall address each argument, in turn, as to MCC, BPD, and Tuggle.

### 1. The City

The City contends that it cannot be liable for the alleged misconduct of the BPD or its officers because it is well established that the BPD and its officers are not agents or employees of the City.  ECF 29-1 at 5, 6.  Rather, the Department is a State agency, not a local one.  *Id.*

Since 1867, the BPD has been regarded as a State agency under Maryland law.  *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008).  In *Clark*, the Maryland high court said, *id.* at 28, 944 A.2d at 1131: "[N]otwithstanding the Mayor's role in

appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency." *See also Ashton v. Brown,* 339 Md. 70, 104 n. 18, 660 A.2d 447, 464 n. 18 (1995) (stating that "the Baltimore City Police Department, for purposes of Maryland law, is a state agency"); *Clea v. Mayor & City Council of Balt.,* 312 Md. 662, 668, 541 A.2d 1303, 1306 (1988) ("Unlike other municipal or county police departments which are agencies of the municipality or county . . . the Baltimore City Police Department is a state agency.") (citations omitted). To that end, PUB. LOCAL LAWS OF MD. ("PLL"), Art. 4, § 16-2(a) (2021) states: "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland."

Nevertheless, plaintiff points out: "The City purchases police uniforms, issues weapons and equipment (also purchased and maintained by MCC staff and money); ride in the MCC owned, insured and/or leased police vehicle[s]; occupy MCC owned police station buildings; communicate on MCC owned and maintained two-way radios; receive MCC funded paychecks and pensions. Their ability to operate is solely as a result of MCC's power over them . . . ." ECF 35-1 at 6. She also directs the Court's attention to portions of Baltimore City's budget plan for the fiscal year 2021, which reflects that the City expended substantial sums in support of the Department. *Id.*; *see* ECF 20-4 at 4-5. Further, Middleton posits that "even when police misconduct lawsuits are brought, such as this one, and either settled or won, it is the MCC that pays the settlements and/or judgments on behalf of the citizens of Baltimore." ECF 35-1 at 6.

In addition, plaintiff urges the Court to consider that the MCC staffs the BPD's Civilian Review Board, which "reviews complaints brought by civilians against Baltimore City Police officers for abuses to the public, reviews policies of the BPD, and holds periodic meetings with the Office of the City Solicitor and the Community Relations Commissions." ECF 35-1 at 6; *see*

ECF 20-3.  And, Middleton invokes the Maryland Court of Appeals's decision in *Mayor & City Council of Balt. v. Silver,* 263 Md. 439, 283 A.2d 788 (1971), to argue that MCC's funding of and authority over the BPD should render the City liable for the misconduct alleged in the Amended Complaint.  ECF 35-1 at 6-7.

However, it is well settled that the City does not "regulate or supervise the BPD." *Nicholson v. Balt. Police Dep't*, DKC-20-3146, 2021 WL 1541667, at *10 (D. Md. Apr. 20, 2021). Despite the fact that the Department's operations are partially funded by the City, the BPD "is constituted as an agency of the State."  *Beca v. City of Baltimore*, 279 Md. 177, 180-81, 367 A.2d 478, 480 (1977).

Notably, it is the State of Maryland, not the MCC, that is vested with the power to set rules and regulations regarding BPD discipline.  *See* PLL, Art. 4, § 16-7(7) (empowering the Police Commissioner of Baltimore City "[t]o appoint, promote, reduce in rank, grade or position, reassign, reclassify, retire and discharge all members of the Department in the manner prescribed by law"); *id.*, Art. 4, § 16-11 (providing for the procedures by which members of the Baltimore City Police Department may be disciplined as well as specifying the sanctions that may be imposed against them); *see generally* Md. Code (2018 Repl. Vol., 2021 Supp.), §§ 3-101 *et seq.* of the Public Safety Article ("P.S.") (outlining the "Law Enforcement Officers' Bill of Rights," which governs disciplinary proceedings instituted against State law enforcement officers, including officers of the Baltimore City Police Department); Baltimore City Charter, Art. II, § 27 (explicitly prohibiting any "ordinance of the City or act of any municipal officer" from attempting to "conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner").

Middleton's reliance on the MCC's funding of the BPD does not change the calculus.  In *Silver*, 263 Md. 439, 283 A.2d 788, the City had been sued by citizens and corporations seeking

to recover for damages to real and personal property resulting from the civil disorder that engulfed the City following the assassination of Dr. Martin Luther King, Jr. *Id.* at 443-44, 283 A.2d at 790. The City filed a petition for declaratory judgment against two plaintiffs, challenging the City's liability for damages. *Id.* at 444, 283 A.2d at 791. In support of its motion for summary judgment, the City argued that the BPD was an agency of the State, and thus the City was not responsible for the failures of the BPD in responding to the riot. *Id.* at 445, 283 A.2d at 791.

The Maryland Court of Appeals concluded that the City's argument was without merit. The *Silver* Court recognized that City funding alone "could not be construed as a method of indirect control over the police department by the City . . . ." *Id.* at 451, 283 A.2d at 794. But, the court indicated that it was for the trier of fact to determine whether the City breached its own duty, independent of the BPD. The court explained, *id.* at 452-53, 283 A.2d at 795:

> [A]lthough the City of Baltimore had no authority over the police department we think that among the various courses of action that the Mayor might have taken, and perhaps did take, was to have conferred with the police commissioner and made requests for specific kinds of police action . . . . [T]he question as to whether such action was taken, or whether other action was taken by the Mayor in his capacity as a conservator of the peace, as well as the practical effect of such action, may well be questions which should be determined by the trier of facts at a hearing on the merits of the case . . . . [F]ailure to have control over a municipal police force does not excuse a municipality from endeavoring to suppress or contain riots or tumultuous actions by using other reasonable means available.

Thus, the circumstances in *Silver* differ dramatically from those presented by this case. Here, Middleton does not allege that MCC failed to take action that would have prevented her alleged injuries. Rather, she asks the Court to find the City liable solely on the ground that it exercises sufficient control over the BPD to subject itself to liability based on the actions of individual BPD officers. *See* ECF 35-1 at 5-7. *See also Chae Brothers, LLC v. Mayor & City Council of Balt.*, SAG-17-1657, 2021 WL 3784865, at *7 (D. Md. Aug. 26, 2021) (finding that plaintiffs' claims brought against the City under the Riot Act, P.S. §§ 14-1001 *et seq.*, could

survive summary judgment where plaintiffs did "not attempt to hold the City liable for the BPD's actions," but instead "attempt[ed] to hold the City liable for *the City's* actions or inactions") (emphasis in *Chae Brothers, LLC*); *Earl v. Taylor*, CCB-20-1355, 2021 WL 4458930, at *3 (D. Md. Sept. 29, 2021) (explaining that *Silver* does not support the proposition that the "City is responsible for [the] BPD" merely because it "appropriated resources and provided equipment and buildings for the Department").

Under 42 U.S.C. § 1983, an individual may sue a person who violates her constitutional rights while acting under the color of law.  A  plaintiff may sue a local government, like the City, under 42 U.S.C. § 1983, but only if the alleged constitutional violation occurred while the defendant was executing a local government policy or custom.  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  In other words, "[m]unicipal liability" under § 1983 "is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).  And, for a § 1983 claim against policymakers, the court must look to state law to determine which officials are legally responsible.  *St. Louis v. Praprotnik,* 485 U.S. 112, 124 (1988) ("We begin by reiterating that the identification of policy making officials is a question of state law").

Plaintiff has not sued the City under *Monell*.  And, "[p]ut simply, because the BPD is not controlled, managed, or supervised by the City," plaintiff cannot satisfy the criteria for a *Monell* claim against the City under § 1983.  *Nicholson*, 2021 WL 1541667, at *10; *see also Bradley v. Balt. Police Dep't*, 887 F. Supp. 2d 642, 647-48 (D. Md. 2012) (dismissing plaintiff's § 1983 claims against the City because the City does not exercise sufficient control over BPD to be liable for its actions).

Moreover, plaintiff cannot pursue a respondeat superior claim against the City based on the conduct of the BPD Officers.  As Judge Chasanow explained in *Nicholson*, 2021 WL 1541667, at \*10, to impose respondeat superior liability, the City "must have an agency or employment relationship with the alleged wrongdoer."  However, under Maryland law, the BPD is an agency of the State, not the City.  *Id.*  Thus, the City "'does not employ the police officers and is not liable for their conduct under state law.'"  *Id.* (citation omitted).

In *Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639, 646 (D. Md. 2014), Judge Russell pointedly explained:

> Try as they may, Plaintiffs cannot avoid the mountain of law insisting the City does not sufficiently control the BPD or Baltimore police officers. . . .  Baltimore police officers are state employees free from the City's supervision and control.  The City sets no policy or custom that Baltimore police officers execute, and the City cannot be liable for the conduct of [BPD Officer Defendants] under § 1983 . . . a § 1983 claim cannot be brought against the City for Baltimore police officer conduct because it does not sufficiently control the BPD and cannot be considered to employ Baltimore police officers.  Municipal liability under *Monell* cannot attach to the City for the unconstitutional actions of Baltimore police officers.

Given the absence of the City's power to control the Department, "liability cannot attach to the City for actions taken by [BPD] police officers."  *Nicholson*, 2021 WL 1541667, at \*10.  Middleton's attempts to suggest otherwise are wide of the mark.  Because the City "has no power" over the BPD, Middleton's claims against the City necessarily fail.  *Clark*, 404 Md. at 26, 944 A.2d at 1130.

## 2.  The BPD and Tuggle

### a.  Counts I-VI, VIII, IX

The City Defendants contend that the BPD and Tuggle, in his official capacity, "are entitled to the protections of sovereign immunity against Middleton's state and common law claims."  ECF 29-1 at 6.  They recognize that the Local Government Tort Claims Act ("LGTCA"), Md. Code

(2020 Repl. Vol., 2021 Supp.), §§ 5-301 et seq. of the Courts and Judicial Proceedings Article ("C.J."), prohibits the BPD from claiming "'governmental or sovereign immunity to avoid [its] duty to defend or indemnify an employee.'" ECF 29-1 at 7 (quoting *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 323, 780 A.2d 410, 431 (2001)). The City Defendants posit, however, that plaintiff "has not alleged a claim for indemnification, and any such claim would be premature at this stage of litigation." ECF 29-1 at 7 (citing *Grim v. Balt. Police Dep't*, ELH-18-3864, 2019 WL 5865561, at *28 (D. Md. Nov. 8, 2019)).

In her Opposition/City, plaintiff asserts that "'numerous decisions in this District have said that the BPD is not entitled to Eleventh Amendment immunity in regard to a claim under § 1983.'" ECF 35-1 at 7 (quoting *Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1026 (D. Md. 2019)). She argues that the "Baltimore City Police Department and Former Interim Commissioner Tuggle are only entitled to Eleventh Amendment Immunity in State actions in their official capacity." ECF 35-1 at 7.

But, as the City Defendants note, this argument "conflates [plaintiff's] state and common law claims with the sole federal § 1983 claim in her Amended Complaint." ECF 40 at 4. In their view, Middleton's "argument also grossly distorts the analyses and applications of Eleventh Amendment immunity and common law state sovereign immunity," which are "two separate and distinct principles . . . ." *Id.*

The doctrine of State sovereign immunity is "firmly embedded in the law of Maryland." *Katz v. Wash. Suburban Sanitary Comm'n*, 284 Md. 503, 512-13, 397 A.2d 1027, 1032-33 (1979); *see Bd. of Educ. of Balt. Cty. v. Zimmer-Rubert*, 409 Md. 200, 240, 973 A.2d 233, 211 (2009) (describing the State doctrine of sovereign immunity as "a rule of policy which protects the State from burdensome interference with its governmental functions and preserves its control

over State agencies and funds") (citation and internal quotation marks omitted); *Bd. of Howard Cmty College v. Rugg*, 278 Md. 580, 584, 366 A.2d 360, 362-63 (1976) (declining to abrogate sovereign immunity by judicial fiat); *Jekofsky v. State Roads Comm'n*, 264 Md. 471, 474, 287 A.2d 40, 41-42 (1972) (same).  And, as explained, State sovereign immunity "'is applicable not only to the State itself, but also to its agencies and instrumentalities . . . .'" *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 709, 990 A.2d 1048, 1058 (2010) (quoting *Katz*, 284 Md. at 507-08, 397 A.2d at 1030); *see Clea*, 312 Md. at 669-70, 541 A.2d at 1306-07.  Therefore, unless the Maryland General Assembly has waived immunity, State sovereign immunity bars an individual from maintaining a suit for money damages against the State of Maryland or one of its agencies for violations of State law.  *See State v. Sharefeldin*, 382 Md. 129, 140, 854 A.2d 1208, 1214 (2004); *Cherkes*, 140 Md. App. at 306, 780 A.2d at 424; *see also Samuels v. Tschechtelin*, 135 Md. App. 483, 522, 763 A.2d 209, 230 (2000).[11]  Notably, this "immunity protects the State not only from damage actions for ordinary torts but also from such actions for State constitutional torts."  *Cherkes*, 140 Md. App. at 306, 780 A.2d at 424 (citing *Ritchie v. Donnelly*, 324 Md. 344, 369 597 A.2d 432, 444 (1991)).

As earlier explained, the BPD is generally regarded as a State agency, and thus enjoys sovereign immunity as to State law claims.  *See Chin v. Cty. of Balt.*, 241 F. Supp. 2d 546, 548-49 (D. Md. 2003); *Cherkes*, 140 Md. App. at 302-03, 326, 780 A.2d at 422, 436.  Likewise, defendant Tuggle, in his official capacity, is extended the same immunity, because a suit against a public official in his official capacity is "essentially a claim against the [State] . . . ."  *Love-Lane*, 355

---

[11] The State of Maryland has waived its sovereign immunity for certain cases.  *See* Md. Code (2021 Repl. Vol.), § 12-202(a) of the State Government Article.

F.3d at 783; *see Graham*, 473 U.S. at 166 (stating that "an official capacity suit is, in all respects other than name, to be treated as a suit against the entity").

The LGTCA provides, in part, that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." C.J. § 5-301(b)(1). And, as the City Defendants observe (*see* ECF 29-1 at 7), C.J. § 5–303(b)(2) prohibits a local government from "assert[ing] governmental or sovereign immunity to avoid the duty to defend or indemnify an employee," as established in C.J. § 5–303(b)(1). *See Cherkes*, 140 Md. App. at 318, 780 A.2d at 431.

But, of import here, the LGTCA does not waive the defense of State sovereign immunity as to suits brought against the State, or an instrumentality of the State, for the misconduct of its employees. To the contrary, C. J. §§ 5–303(d) and (e) expressly reserve preexisting common law and statutory defenses and immunities of local governments and their employees, and the right of the local government to assert such defenses and immunities, as follows:

> (d) Notwithstanding the provisions of [§ 5-303(b),] this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government.

> (e) A local government may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle.

To be sure, the BPD is included in the list of local governments that falls within the ambit of the LGTCA. *See* C.J. § 5-301(d)(21). And, this has been a source of "[c]onfusion." *Nicholson*, 2021 WL 1541667, at *9 n.8. But, as Judge Chasanow has succinctly explained, *id.*: "Put simply, the LGTCA only prohibits the BPD from asserting sovereign immunity to avoid its statutorily

imposed duty to defend or indemnify its employees.  Even under the LGTCA, plaintiffs cannot bring state law claims directly against the BPD for the actions of Baltimore police officers acting within the scope of their employment."

Accordingly, Counts I through VI as well as Counts VIII and IX must be dismissed as to the BPD and Tuggle, in his official capacity, on the basis of State sovereign immunity.

### b. Count VII

In Count VII, plaintiff lodges a claim against the BPD and Tuggle under 42 U.S.C. § 1983. *See* ECF 28, ¶¶ 54-56.  The City Defendants urge dismissal of the § 1983 claim, stating that "Middleton does not allege any facts to support that BPD or Tuggle engaged in the alleged tortious conduct that caused her injury," and "neither BPD nor Tuggle can be held vicariously liable" under § 1983, "as a matter of law."  ECF 29-1 at 8.

Middleton counters that she lodged a § 1983 claim against the BPD and Tuggle under a theory of supervisory liability, not vicarious liability.  ECF 35-1 at 8.  She points out that the Amended Complaint "includes a direct quote from an official police spokesperson on behalf of Defendant Baltimore City Police Department, while the BCPD was under the leadership of Former Interim Commissioner Tuggle."  *Id.* at 9.  Further, she contends that this statement "incorrectly and maliciously describe[d] Middleton's conduct at the time of the incident as being illegal . . . ." *Id.*  Moreover, she avers, for the first time, that "even after reviewing the video recordings of the incident, witness statements, and other evidence," the BPD and Tuggle did not "recommend charging Koushall for his misconduct," and that "[a]fter the complained of incident, not only did Tuggle and BCPD not condemn the actions of Koushall and Yerg, but they also condoned that behavior by merely indefinitely suspending Koushall with full pay."  *Id.*

The City Defendants maintain that the Amended Complaint includes no allegations that speak to the decisions made by BPD and Tuggle with respect to the pursuit of disciplinary sanctions against Koushall or lodging charges against him.   ECF 40 at 6.   Further, the City Defendants contend that, even if the Amended Complaint included such an assertion, the mere allegation that "BPD and Tuggle did not do 'enough' . . . cannot satisfy the high standard of deliberate indifference" required to state a claim for supervisory liability under § 1983.  *Id.* at 7. Thus, in their view, the Amended Complaint fails to state a § 1983 claim—either for vicarious or supervisory liability.  *Id.*

As discussed, the BPD is a State entity for purposes of Maryland law.  But, for purposes of 42 U.S.C. § 1983, it is considered a municipal entity.  And, as mentioned, the doctrine of State sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'"  *Ram Ditta*, 822 F.2d at 457 (quoting *Lake Country Estates, Inc.*, 440 U.S. at 401).  *See Nicholson*, 2021 WL 1541667, at *6.  Indeed, as judges of this court have consistently explained, the BPD does not enjoy Eleventh Amendment sovereign immunity for purposes of a § 1983 claim because it is "sufficiently concerned with local matters, independently funded, interconnected with local government, and autonomous from state government . . . ."  *Earl*, 2021 WL 4458930, at *3; *see Fish v. Mayor and City of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Chin*, 241 F. Supp. 2d at 548; *Alderman v. Balt. Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997).  To the contrary, BPD is a "person" subject to suit under § 1983.  *Fish*, 2018 WL 348111, at *3.

However, a § 1983 suit against a municipality must "be brought under the standard set forth in *Monell*."  *Nicholson*, 2021 WL 1541667, at *10; *see Fish*, 2018 WL 348111, at *3.  And,

liability as to a municipality attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017). "In suing a municipal government under *Monell*, a plaintiff must establish both the existence of a constitutional violation on the part of the police officer and that any constitutional violation was proximately caused by a policy, custom, or practice of the defendant municipality." *Nicholson*, 2021 WL 1541667, at *10 (citing *Monell*, 436 U.S. at 694) .

The Amended Complaint does not state a *Monell* claim, either as to the BPD or Tuggle. Rather, Count VII is styled as a claim for supervisory liability. Moreover, a suit brought under § 1983 against a municipal officer in his official capacity is the same as suing the municipality itself. Therefore, plaintiff's § 1983 claim against the BPD, as well as Tuggle in his official capacity, is subject to dismissal. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" and that "[b]ecause the real party in interest in an official-capacity suit [against a municipal officer] is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law") (internal quotation marks and citations omitted); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION, § 8.6 at 515 (4th ed. 2003)).

Concerning plaintiff's § 1983 claim against Tuggle in his individual capacity, the Amended Complaint alleges that Tuggle held a supervisory role in the BPD at all relevant times. ECF 28, ¶ 8. In that capacity, according to Middleton, Tuggle "exercised final policy making authority" for the BPD, and "established the duties, standards of conduct, and discipline of officers," as well as "policies regarding hiring, screening, training, monitoring, supervision, and discipline of officers

employed" by the BPD.  *Id.*  But, the Amended Complaint includes no further mention of Tuggle, other than in passing reference in the *ad damnum* clause that follows each count of the Complaint. *See, e.g., id.* at 10, 11, 12.

As mentioned earlier, to state a claim for supervisory liability under § 1983, a plaintiff must allege facts that, if proven, would show: "(1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  *Shaw*, 13 F.3d at 799.

The Amended Complaint is devoid of any allegations pertaining to Tuggle's knowledge, actual or constructive, regarding the Officer Defendants' misconduct.  Nor are there facts to show that Tuggle's response to the events constituted deliberate indifference that caused Middleton's constitutional injuries.  Therefore, these allegations are insufficient to state a claim against Tuggle for supervisory liability under 42 U.S.C. § 1983.

To be sure, in her Opposition/City, plaintiff includes additional assertions that Tuggle and the BPD failed to do enough to sanction Koushall for his misconduct.  ECF 35-1 at 9.  However, these allegations were not included in the Amended Complaint.  And, it is well established that "'a complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Sager v. Hous. Comm'n of Anne Arundel County,* 855 F. Supp. 2d 524, 557 (D. Md. 2012) (quoting *Arbitraje Casa de Cambio, S.A. v. U.S. Postal Serv.,* 297 F. Supp. 2d 165, 170 (D.D.C .2003)).

But, even considering the additional facts alleged in the Opposition/City, Middleton still fails to state a claim for municipal or supervisory liability under 42 U.S.C. § 1983.  She

acknowledges that Koushall was suspended from the BPD for his alleged misconduct, although she regards this as insufficient punishment.  ECF 35-1 at 9.  She also alleged that he was prosecuted for his conduct.  ECF 28, ¶ 25.  Her view of the sanctions is of no legal significance.  Regardless, plaintiff did not plead facts that, if proven, would establish that her constitutional injuries were the result of the actions of Tuggle.

In sum, the Amended Complaint fails adequately to assert that the BPD or Tuggle had any role in the alleged deprivation of plaintiff's constitutional rights, so as to establish the liability of Tuggle or the BPD's municipal liability.  Accordingly, I am persuaded that, as to the BPD and Tuggle, Count VII is subject to dismissal.

### c.  Tuggle:  State Law Claims, Individual Capacity[12]

To the extent that plaintiff asserts State law claims against Tuggle in his individual capacity, the City Defendants contend: "Middleton . . . fails to provide any fact to support that Tuggle was directly or personally involved with Middleton's injury."  ECF 29-1 at 11.  Plaintiff counters that Tuggle may be found liable because he served as the Interim Commissioner of the BPD at the time of the incident.  ECF 35-1 at 14.  She asserts: "Even after receiving evidence clearly refuting the statements and allegations made by Koushall, Yerg, and the [BPD] against Middleton, Tuggle failed to use his authority and power over the [BPD] to clear Middleton's name

---

[12] When assessing a State law claim, the Court must apply the law of the forum state (including as to choice of law), whether proceeding under supplemental or diversity jurisdiction.  *See, e.g.*, *Nash v.* Montgomery *Cty.*, GJH-20-1138, 2021 WL 1222874, at *7 n.7 (D. Md. Mar. 31, 2021); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008).  In tort actions, Maryland adheres to doctrine of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred.  *Ben-Joseph*, 529 F. Supp. at 606 (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648-49 (2007)) (other citations omitted).  Because plaintiff's claim is premised on events that occurred in Maryland (ECF 28, ¶ 10), Maryland law applies.

by failing to cease the criminal and internal investigations and proceedings against her." ECF 35-1 at 14-15.

Plaintiff's allegations fail entirely to implicate Tuggle in the claims for battery (Count I); false imprisonment (Count II); violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV); intentional infliction of emotional distress (Count V); or false arrest (Count VI) Thus, these counts are subject to dismissal as to Tuggle, in his individual capacity.

As to Counts III and VIII, which assert claims for malicious prosecution/abuse of process as well as false light invasion of privacy, respectively, the Court must assume the truth of the allegations in the suit, and draw all reasonable inferences in plaintiff's favor. Even so, plaintiff's allegations are insufficient, as a matter of Maryland law, to survive a motion to dismiss for failure to state a claim.

To state a claim for malicious prosecution in Maryland, a plaintiff must allege that the defendant instituted or continued a criminal proceeding; the proceeding was resolved in favor of the accused; there was no probable cause for the proceeding; and the defendant acted with malice, or for the primary purpose other than that of bringing an offender to justice. *See*, *e.g.*, *Okwa v. Harper*, 360 Md. 161, 183, 757 A.2d 118, 130 (2000). Notably, "[w]here a party instigates, aides or assist [sic] in a criminal prosecution he/she may be liable even where he/she did not swear out a warrant." *Smithfield Packing Co., Inc. v. Evely*, 169 Md. App. 578, 593, 905 A.2d 845, 854 (2006). Conversely, a person is not liable for malicious prosecution "for relying upon the independent judgment of a prosecutor or attorney where the defendant has made a full disclosure of all material facts relative to the charges being made." *Id.* at 593-94, 905 A.2d at 854.

In *Southern Management Corp. v. Taha*, 378 Md. 461, 473, 836 A.2d 627, 633 (2003), the Maryland Court of Appeals said:

A person is responsible for starting a criminal proceeding who . . . directs or requests a prosecution based on information which the person knows is false or withholds information which a reasonable person would realize might affect the decision to prosecute, . . . or gives inaccurate or incomplete information to those who prosecute.

But, "the plaintiff must establish that the defendant committed the tort with some improper purpose or motive.  Mere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element." *Montgomery Ward v. Wilson*, 339 Md. 701, 719, 664 A.2d 916, 925 (1995).

Similarly, to establish a claim for abuse of process, plaintiff must prove the (1) willful use of process for an illegal purpose, after process has been issued; (2) with an underlying ulterior motive; and (3) resulting damages.  *Humphrey v. Herridge*, 103 Md. App. 238, 243, 653 A.2d 491, 493 (1995); *see also Allen v. Bethlehem Steel Corp.*, 76 Md. App. 642, 650, 547 A.2d 1105, 1109 (1988), *cert. denied sub nom. Green and Vernon Green Assocs. v. Allen*, 314 Md. 458, 550 A.2d 1168 (1988).  The tort occurs only when a person uses criminal or civil process for an illegal purpose after process has issued.  *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 511, 471 A.2d 297, 310-11 (1984); *see One Thousand Fleet Ltd. v. P'ship v. Guerriero*, 346 Md. 29, 38, 694 A.2d 952, 956 (1997) ("Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required . . . .") (internal citation omitted).

"The mere issuance of the process itself, however, is not actionable, even if it is done with an 'ulterior motive' or 'bad intention.'  Rather, '[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required . . . .'" *Campbell v. Lake Hallowell Homeowners Ass'n*, 157 Md. App. 504, 530, 852 A.2d 1029, 1044 (2004).  Moreover, with respect to the element of damages, "the injuries contemplated by this particular tort (and an indispensable element of it) are limited to an improper arrest of the

person or an improper seizure of property." *Herring v. Citizens Bank and Trust Co.*, 21 Md. App. 517, 536, 321 A.2d 182, 193 (1974); *accord One Thousand Fleet Ltd. v. Guerriero*, 346 Md. 29, 45-46, 694 A.2d 952, 956 ("The plaintiff [must] establish that an arrest of the person or a seizure of property of the plaintiff resulted from the abuse of process.").

As to Count III, Middleton offers neither facts nor legal authority suggesting that Tuggle took steps to impede the criminal or internal investigation of a BPD officer. Indeed, under Maryland law, an internal investigation of a law enforcement officer is regulated by the State. *See* P.S. §§ 3-104-3-113 (providing the procedural requirements concerning an internal investigation into alleged misconduct of a law enforcement officer).

And, the torts of malicious prosecution and abuse of process, as set forth above, require an allegation that the defendant took affirmative actions that subjected plaintiff to an abuse of process or wrongful prosecution. Yet, there is simply no assertion in the Amended Complaint that Tuggle was personally involved in the events underlying Count III. Thus, plaintiff fails to state a viable claim as to Tuggle; the claim is subject to dismissal, without prejudice and with leave to amend.

Middleton also fails to state a claim against Tuggle in Count VIII, alleging the tort of false light invasion of privacy. In order to establish a claim in Maryland for this tort, a plaintiff must allege that a defendant has given "publicity to a matter concerning another that places the other before the public in a false light . . . if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Chinwuba v. Larsen*, 142 Md. App. 327, 359 n. 8, 790 A. 2d 83, 102 n. 8 (2002), *rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003); *see Furman v. Sheppard*, 130 Md. App. 67, 77, 744 A. 2d 583, 587 (2000); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665

A.2d 297, 318 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also Holt v. Camus*, 128 F. Supp. 2d 812, 816 (D. Md. 1999).

The Amended Complaint includes an assertion that a BPD spokesperson, T.J. Smith, released a "wrongful" statement to a media organization that indicated Middleton was "'acting in a disorderly manner'" at the time of her arrest and that "'she refused to comply.'"  ECF 28, ¶ 22. The suit implies that Tuggle is liable because he failed to correct media reports that suggested Middleton somehow acted inappropriately or unlawfully.  *Id.*  ¶¶ 57-60; ECF 35-1 at 14.  But, plaintiff offers no facts that suggest Tuggle knew at the time of the media report that the statement to the media was false or even inaccurate.  Nor does Middleton assert any facts that, if proven, would show that Tuggle was involved in the statement's dissemination.  In short,  she does not claim that Tuggle "had knowledge of or acted in reckless disregard as to the falsity" of the statement at the time it was issued.  *Chinwuba*, 142 Md. App. at 359 n.8, 790 A. 2d 83, 102 n.8 (2002).

In Count IX, Middleton brings a State law claim against Tuggle, in his individual capacity, for civil conspiracy.  ECF 28, ¶¶ 61-64.  However, like plaintiff's other State law claims, it is subject to dismissal, because Middleton has failed to allege any facts showing that Tuggle was involved in the alleged unlawful conduct.

To state a claim for civil conspiracy in Maryland, a plaintiff must plead facts that, if proven, would establish: "'(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of lawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damages resulting to the plaintiff.'"  *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007) (quoting *Van Rogen v. Lacey,* 262 Md. 94, 97-98, 277 A.2d 13, 14-15 (1971)); *see also Bellezza v. Greater*

*Havre De Grace Yacht Club, Inc.*, No. 0367, Sept. Term 2014, 2015 WL 6394418, at *9 (Md. Ct. Spec. App. Oct. 22, 2015), *cert. denied*, 446 Md. 291, 132 A.3d 194 (2016). But, in Maryland "civil conspiracy is not a 'separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Bellezza*, 2015 WL 6394418, at *9 (quoting *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1045 (1995)); *see also Alexander and Alexander, Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 645 n.8, 650 A.2d 260, 265 n.8 (1994).

Accordingly, a plaintiff must allege that she was injured by an overt act done in furtherance of the conspiracy. *Alleco, Inc.*, 340 Md. at 190, 665 A.2d at 1045. In other words, "'it is not . . . for simply conspiring to do the unlawful act that the action [of conspiracy] lies. It is for doing the act itself, and the resulting actual damage to the plaintiff, that afford the ground of the action.'" *Id.* (quoting *Kimball v. Harman and Burch*, 34 Md. 407, 409 (1871)).

In short, the Amended Complaint includes no facts to suggest that Tuggle was a party to an unlawful conspiracy. Thus, I am persuaded that Counts I through VI, Count VIII, and Count IX are subject to dismissal as to Tuggle in his individual capacity, based on plaintiff's failure to allege facts that show Tuggle's participation in the events underlying these claims. Given that plaintiff has already amended her suit, and her attorneys are experienced in cases of the kind involved here, I decline to grant leave to amend.

### 3. City Defendants: 42 U.S.C. § 1985(3)

Count X asserts a claim under 42 U.S.C. § 1985(3). Plaintiff appears to direct the claim to Koushall and Yerg, asserting that they conspired to deprive her of the equal protections of the law. ECF 28, ¶ 67. Although the City, the Department, and Tuggle are not expressly named in Count

X, they have nonetheless moved to dismiss Count X, presumably out of an abundance of caution, and perhaps because they are included in the *ad damnum* clause at the close of Count X.

The City Defendants contend that Count X fails to state a claim as to them because the "Amended Complaint does not plead any facts to support that MCC, BPD, or Tuggle . . . participated [in] any illegal agreement or conspiracy . . . ."  ECF 29-1 at 9.

The Fourth Circuit has explained that, in order to state a claim for civil conspiracy under § 1985(3), "Depriving persons of rights or privileges," a plaintiff must set forth the following:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Society Without A Name*, 655 F.3d at 346; *see also Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).

In addition, the plaintiff "'must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights.'"  *A Society Without A Name*, 655 F.3d at 346 (quoting *Simmons*, 47 F.3d at 1377).   The *Simmons* Court has said, *id.*: "[W]e have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."

In *A Society Without A Name*, 655 F.3d 342, the Fourth Circuit considered, among other things, the adequacy of a claim under 42 U.S.C. § 1985(3).   It said, *id.* at 346: "[W]here a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."   (Citing *Twombly*, 550 U.S. at 556-57).   The Court added that "factual

allegations must plausibly suggest agreement, rather than being merely consistent with agreement." *Id.*

In my view, Amended Complaint does not plead facts that, if proven, would establish liability against the City Defendants under § 1985(3). Indeed, Count X does not even mention the City Defendants, let alone allege that they conspired with the Officer Defendants. *See* ECF 28, ¶¶ 65-71.

In an apparent attempt to remedy this deficiency, Middleton sets forth several new facts in her Opposition/City. She alleges that on the night of the incident, Tuggle had two telephone conversations with Edward C. Jackson, then the Baltimore Police Inspector General and Middleton's supervisor. ECF 35-1 at 11-14. Among other things, plaintiff avers that, after reviewing video footage of Koushall's attack on Middleton, Jackson came to "believe[ ] that Koushall's actions were unjustified, and furthermore, his decision to keep [Middleton] hand-cuffed to the wall at Central District Station was problematic." *Id.* at 12. Soon after, Jackson called Tuggle and advised him of "the Department's need to adhere to the letter of the law in addressing this incident." *Id.* Further, plaintiff contends that "Jackson believed that Middleton should have already been provided with medical assistance and released." *Id.* According to plaintiff, Tuggle responded by indicating that he "had already been directly briefed on the matter and that he wanted the Inspector General's Office to 'stay out of it.'" *Id.*

Middleton also claims that seven hours later, Jackson called Tuggle for a second time, and urged him to release plaintiff from Central District as soon as possible. *Id.* at 13. Tuggle allegedly responded by "shout[ing] that the Inspector General was 'ordered to stay out of this investigation.'" *Id.* And, according to plaintiff, Tuggle followed up on their conversation by emailing Jackson to instruct him again to "cease investigating this incident." *Id.*

As earlier stated, a brief in opposition to a motion to dismiss may not amend the allegations in a complaint.  *See Sager*, 855 F. Supp. 2d at 557.  But, even considering the additional allegations, plaintiff fails to state a claim in Count X as to the City Defendants.

Simply put, the assertions, if proven, would not establish that the City Defendants were party to an unlawful conspiracy that was formed for the purposes of depriving Middleton of her "equal enjoyment of rights secured by the law to all." *Simmons*, 47 F.3d at 1376.  Rather, as the City Defendants point out, they show only that there was "a heated disagreement between a former interim Baltimore Police Commissioner and the then-Baltimore Police Inspector General—who also happened to be Middleton's supervisor."  ECF 40 at 9.

Accordingly, I shall dismiss Count X as to the City Defendants.

## B.  Officer Motion

The Officer Motion urges the dismissal of several counts.  In particular, the Officer Defendants urge the Court to dismiss Count V, which alleges intentional infliction of emotional distress; Count VIII, asserting false light invasion of privacy; and Count IX and Count X, which lodge claims for civil conspiracy under Maryland law and federal law, respectively.  ECF 31-1 at 1-2.  In addition, the Officer Defendants seek dismissal of Count I (Battery); Count II (False Imprisonment); Count IV (Violation of Maryland Declaration of Rights); and Count VI (False Arrest), to the extent the claims are lodged against Yerg.  *Id.* at 2.  The Officer Defendants also contend that plaintiff's § 1983 claim (Count VII) is subject to dismissal to the extent that it is brought against the Officer Defendants in their official capacity.  *Id.*  And, they seek dismissal of Count IV and Count VII, to the extent that the claims assert the denial of medical care.  *Id.*

As to Koushall, the Officer Motion does not challenge the viability of Count I (Battery), Count II (False Imprisonment), or Count VI (False Arrest).  Further, the Officer Motion does not

seek dismissal of Count III (Malicious Prosecution/Abuse of Process) as to Koushall or Yerg. And, with the exception of the arguments delineated above, the Officer Motion does not seek dismissal of Count IV (Violation of Maryland Declaration of Rights) as to Koushall, or Count VII (§ 1983) as to either Koushall or Yerg.

### 1. Abandoned Claims

As an initial matter, plaintiff failed to respond to several of the arguments advanced in the Officer Motion.  In particular, Middleton has not challenged the proposed dismissal of plaintiff's claims against Yerg for battery (Count I) or intentional infliction of emotional distress (Count V). Further, she does not challenge the dismissal of the § 1983 claim (Count VII), to the extent it is lodged against the Officer Defendants in their official capacity, or the false light invasion of privacy claim against them (Count VIII).  And, as to the claim for denial of medical care under Maryland law (Count IV) or federal law (Count VII), Middleton does not challenge the Officer Defendants' contention that the claim as to Yerg is subject to dismissal.

A plaintiff who fails to respond to an argument for dismissal is deemed to have abandoned the claim.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010)); *see also Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (explaining that plaintiff's failure to address an argument raised in defendant's opening brief constitutes abandonment of the challenged claim).  Accordingly, as to Yerg, I shall dismiss Count I and Count V.  And, I shall dismiss Count IV and Count VII as to any claim against Yerg for failure to provide medical care.  Further, I shall dismiss Count VII against the Officer Defendants to the extent it is lodged against them in their official capacity.  I shall also dismiss Count VIII as to both Officer Defendants.

### 2.  Koushall: Intentional Infliction of Emotional Distress

Count V of the Complaint asserts a claim against Koushall for the tort of intentional infliction of emotional distress ("IIED").  ECF 28, ¶¶ 45-49.  He contends that plaintiff's allegations are insufficient to sustain such a claim.  ECF 31-1 at 6.  In particular, he argues that the only assertions included in the Amended Complaint to support plaintiff's claim include: "'(1) she sought medical treatment and was treated for numerous injuries'; (2) her police powers were temporarily suspended and she was transferred to administration at the Northern District; and (3) she 'suffer[ed] from reduced wages because she was unable to work overtime while her police powers were suspended' and 'her career path trajectory was negatively affected.'"  ECF 31-1 at 7 (alterations in the Officer Motion) (quoting ECF 28, ¶¶ 18, 24).  In the Officer Defendants' view, such facts are "woefully deficient," particularly when "juxtaposed with factual scenarios Maryland courts have deemed sufficient to continue IIED claims."  ECF 31-1 at 7; *see also* ECF 39 at 5 ("Plaintiff's alleged emotional distress does not rise to the level of severity required under Maryland law.").

Middleton contends that the Officer Motion overlooks the allegations that Koushall punched her in the face three times and continued to attack her until another officer intervened.  ECF 36-1 at 5.  Moreover, she points out that the Complaint alleges that Koushall then "outrageously arrested her, handcuffed her, and forced her to walk up the public street in front of no less than 50 people . . . ."  *Id.*  And, plaintiff notes that she "suffered emotionally from mental anguish, humiliation, and traumatic stress" as a result of Koushall's conduct.  *Id.* at 6.

In Maryland, in order to prevail on a claim for IIED, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's wrongful conduct and the emotional distress

suffered; and (4) the emotional distress was severe.  *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); *accord, e.g.*, *Caldor, Inc. v. Bowden*, 330 Md. 632, 641-42, 625 A.2d 959, 963 (1993); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

Notably, a defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"  *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614).  Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'"  *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

Generally, claims for IIED are disfavored, difficult to establish and, as such, "rarely viable" under Maryland law.  *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011); *see Arsham*, 85 F. Supp. 3d at 850;  *Manikhi v. Mass. Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95, 113 (2000); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of intentional infliction of emotional distress is "difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also* DAVID CRUMP, RETHINKING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, 25 GEO. MASON L. REV. 287, 297 (2018) (noting that an IIED claim is "a kind of vituperative epithet" that "adds little that can be the subject of a separate or additional recovery" but "makes [the litigation] more expensive").  Indeed, since the Maryland Court of Appeals first recognized the tort of IIED in 1977, *Harris*, 281 Md. 560, 380 A.2d 611, it has repeatedly advised that "recovery" for IIED "will be meted out

sparingly[.]" *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991); *see Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191, 1216 (1992); *Caldor, Inc.*, 330 Md. at 642, 625 A.2d at 963.

Assuming the truth of plaintiff's allegations, Koushall's conduct was arguably outrageous. However, the Amended Complaint fails to state a claim for intentional infliction of emotional distress because Middleton did not plead facts that, if true, would constitute severe emotional distress.

*Vincent v. Prince George's County, Md.*, 157 F. Supp. 2d 488 (D. Md. 2001), is instructive. There, the plaintiff was accused of stealing flowers from a vendor at a nightclub. *Id.* at 590-91. Three uniformed police officers forcibly removed plaintiff from the nightclub's premises, beat plaintiff, and sprayed plaintiff in the eyes with pepper spray, which inflicted injuries sufficiently serious to warrant medical attention. *Id.* at 591.

In the ensuing lawsuit, plaintiff brought a claim, *inter alia*, for intentional infliction of emotional distress, asserting that he "suffered severe emotional distress, mental anguish, anger and anxiety" and that "he wears visible scars from the incident with the individual officers and now fears Prince George's County Police Officers." *Id.* at 596 (citation and internal quotation marks omitted). Judge Chasanow granted summary judgment to the defendants on the IIED claim, explaining that the plaintiff "failed to establish the severity prong" because he had not offered "any proof that he suffered a disabling emotional response as a result of Defendants' conduct." *Id.* at 596.

In this case, Middleton has likewise failed to plead any facts that, if proven, would show that "her emotional distress is so severe as to have disrupted her ability to function on a daily basis." *Bryant v. Better Business Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 750 (D. Md.

1996).  Rather, the Amended Complaint indicates only that defendants' conduct caused Middleton to feel "fear, fright, humiliation, inconvenience, and embarrassment for the totality of events that she was forced to endure both past, present, and in the future."  ECF 28, ⁋ 49.  Such an allegation, on its own, cannot sustain a claim for intentional infliction of emotional distress.   *Cf. Krell v. Queen Anne's County*, JKB-18-637, 2018 WL 6523883, at \*14 (D. Md. Dec. 12, 2018) (finding that plaintiff had plausibly stated a claim for intentional infliction of emotional distress where plaintiff alleged that he "became suicidal and underwent three psychiatric hospitalizations," which "evinc[ed] an inability to function daily").

Accordingly, Count V shall be dismissed, without prejudice and with leave to amend.

### 3.  Yerg:  Counts II, IV, VI

The Amended Complaint lodges claims against Yerg for false imprisonment (Count II), violation of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV), and false arrest (Count VI).  *See* ECF 28, ⁋⁋ 32-34, 40-44, 50-53.  As to Yerg, the Officer Motion contends that these claims must be dismissed because plaintiff fails to allege facts that, if proven, would establish Yerg's involvement; he was not present when plaintiff was arrested or during Middleton's detention.  ECF 31-1 at 5.

According to Middleton, Yerg coordinated with Koushall to embark on a "'campaign to disparage Ms. Middleton.'"  ECF 36-1 at 4 (quoting ECF 28, ⁋ 5).  Further, plaintiff alleges in the Amended Complaint that Yerg "'drew up and filed additional charges against Middleton,'" which were "'sworn out by Defendant Koushall with the advice and guidance of Defendant Yerg.'"  ECF 36-1 at 4 (quoting ECF 28, ⁋ 20).   And, Middleton alleges that Yerg was "Koushall's supervisor and active participant in the charging process," and he failed "to stop Koushall from falsely arresting and imprisoning Middleton . . . ."  ECF 36-1 at 4.

In order to prevail on a claim for false arrest under Maryland law, "the plaintiff must prove that the defendant deprived him or her of his or her liberty without consent and without legal justification." *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 1000, 1003 (1997), rev'd on other grounds, 345 Md. 21, 690 A.2d 1000 (1997); *see Wilson*, 339 Md. at 721, 664 A.2d at 926; *Fine v. Kolodny*, 263 Md. 647, 651, 284 A.2d 447, 411 (1971), *cert. denied*, 406 U.S. 928 (1972); *Fleisher v. Ensminger,* 140 Md. 604, 620, 118 A. 153, 158 (1922); *Lewis v. Uzuber,* 65 Md. 341, 348-49, 4 A. 285, 289 (1886); *Mitchell v. Lemon,* 34 Md. 176, 180 (1871).

"The elements of false imprisonment are the same as the elements for false arrest." *Davis v. DiPino*, 121 Md. App. 28, 38, 708 A.2d 357, 383 (1998), *aff'd* in part, rev'd in part on other grounds, 354 Md. 18, 729 A.2d 354 (1999).   Liability for the torts of false arrest and false imprisonment attaches only where an individual acts so as to create a "'present restraint of liberty' of another." *DiPino,* 121 Md. App. at 82, 708 A.2d at 384 (quoting Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 11, at 51 (5th ed.1984)).

"Legal justification" was defined by the Maryland Court of Appeals in *Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 261 A.2d 731 (1970).  The court explained, *id.* at 655, 261 A.2d at 738 (internal citations omitted):

> When the cases speak of legal justification we read this as equivalent to legal authority . . . .   Whatever technical distinction there may be between an "arrest" and a "detention" the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest.

Thus, "[w]here the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest." *Wilson,* 339 Md. at 721, 664 A.2d at 926.[13]

Plaintiff does not assert that Yerg was at the scene of her arrest or at Central District during the ten-hour period when she was detained. Further, there are no allegations that he directed Koushall to arrest or detain plaintiff. Accordingly, to the extent that plaintiff persists in her claims against Yerg for false arrest or false imprisonment, the claims are patently specious because the Amended Complaint is devoid of any allegations that Yerg was in any way involved with plaintiff's arrest or subsequent detention.

To the extent that plaintiff's false imprisonment claim relies on plaintiff's contention that Yerg assisted Koushall in bringing additional false charges against Middleton, such a claim asserts malicious prosecution, rather than false imprisonment. *See Wilson*, 339 Md. at 723-24, 664 A.2d at 927 ("'False imprisonment is the invasion of the interest in freedom from unlawful confinement, while malicious prosecution is the unlawful use of legal procedure to bring about a legal confinement.'") (quoting HARPER, JAMES & GRAY, THE LAW OF TORTS, § 3.9 at 297 (2d ed. 1986)); *Lewis*, 65 Md. at 348, 4 A. at 289 (explaining that a claim for false imprisonment "can be maintained only when the arrest is without legal process; and [malicious prosecution] where the process of the law has been perverted and improperly used"). And, the Officer Motion does not challenge plaintiff's malicious prosecution claim at this juncture.

In her Opposition/Officer, plaintiff asserts for the first time that Yerg is liable for Koushall's conduct under Counts II and VI because he was Koushall's supervisor. ECF 36-1 at 4.

---

[13] "An arrest made under a warrant which appears on its face to be legal is legally justified in Maryland, even if unbeknownst to the arresting police officer, the warrant is in fact improper." *Ashton,* 339 Md. at 120, 660 A.2d 447. But, this case does not involve a warrant.

But, the Amended Complaint alleges only that "Yerg was a supervisor" within the BPD, not that he specifically was Koushall's supervisor.  ECF 28, ¶ 5.  Moreover, plaintiff did not indicate that she was pursuing a theory of supervisory liability in regard to Counts II or VI.  And, as stated, "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Mylan Laboratories, Inc. v. Akzo,* 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd,* 2 F.3d 56 (4th Cir.1993).  Accordingly, Counts II and VI shall be dismissed as to Yerg.

In Count IV, Middleton asserts that Yerg violated her "right, privileges, and immunities," as guaranteed by Articles 24 and 26 of the Maryland Declaration of Rights.   ECF 28, ¶ 44.

Article 24 is the State's constitutional guarantee of due process and equal protection of the law.  *Town of Easton v. Pub. Serv. Comm'n,* 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003).  Thus, it "is the state law equivalent of the Fourteenth Amendment of the United States."  *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted).  And, Article 24 is ordinarily interpreted *in pari materia* with its federal analog.  *See, e.g., Littleton v. Swonger*, 502 F. App'x. 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Tyler v. City of College Park*, 415 Md. 475, 499-500, 3 A.3d 421, 435 (2010) (recognizing that Maryland courts "interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution."); *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (same).

In other words, Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the

Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v. Comptroller of Treasury,* 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 941 (1981)). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins,* 955 F. Supp. 2d at 496.

Article 26 is the State's analog to the Fourth Amendment. *Padilla v. State*, 180 Md. App. 210, 225, 949 A.2d 68, 77 (2008); *see Dent*, 745 F. Supp. 2d at 661 ("Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . .") And, "the cases are legion in which Maryland Courts have construed Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution." *Padilla,* 180 Md. App. at 226, 949 A.2d at 78. *See, e.g., Parker v. State,* 402 Md. 372, 400, 936 A.2d 862, 878 (2007); *Patterson v. State,* 401 Md. 76, 113, 930 A.2d 348, 372 (2007); *Byndloss v. State,* 391 Md. 462, 465 n. 1, 893 A.2d 1119, 1121 n. 1 (2006); *Davis v. State,* 383 Md. 394, 408, 859 A.2d 1112, 1120 (2004); *Scott v. State,* 366 Md. 121, 139, 782 A.2d 862, 873 (2001); *Richardson v. McGriff,* 361 Md. 437, 452–53, 762 A.2d 48, 56 (2000); *Purnell v. State,* 171 Md. App. 582, 607, 911 A.2d 867, 882 (2006), *cert. denied,* 398 Md. 315, 920 A.2d 1060 (2007). Notably, Article 26 "'does not accord appellant any greater protection than the Fourth Amendment to the United States Constitution.'" *Blasi v. State,* 167 Md. App. 483, 511 n. 12, 893 A.2d 1152, 1168 n. 12 (2006) (citation omitted), *cert. denied,* 393 Md. 325, 900 A.2d 751 (2007).

As mentioned, to bring a viable claim under 42 U.S.C. § 1983 for the deprivation of plaintiff's federal constitutional rights, a plaintiff must assert that the defendant was personally involved in the alleged violation at issue. *See Iqbal*, 556 U.S. at 676 (explaining that a viable claim arising under § 1983 depends, in part, on the inclusion of allegations that "each Government-

official defendant, through the official's own individual actions, has violated the Constitution."). Accordingly, to plausibly state a claim under Article 24 or Article 26 of the Maryland Declaration of Rights as to Yerg, Middleton must plead that Yerg was personally involved in the pertinent conduct.

However, Middleton grounds Count IV solely on Koushall's actions, asserting that "[b]y illegally seizing, and detaining Ms. Middleton without a warrant, by punching her in her face; and, dragging her by her hair Defendant Officer and Baltimore City Police Department" violated her rights under Articles 24 and 26 of the Maryland Declaration of Rights.   ECF 28, ¶ 44.   Further, plaintiff posits that she "suffered damage by being unlawfully held against her will for an extended period of time . . . ."   *Id.*   In other words, Count IV is predicated on the same conduct underlying Middleton's claims for battery, false arrest, and false imprisonment.   And, that is the conduct of Koushall, not Yerg.

As explained earlier, plaintiff fails to plead facts that, if proven, would establish that Yerg engaged in the alleged misconduct.   Nor do these counts suggest that plaintiff intended to bring a claim against Yerg for supervisory liability, or even that Yerg was Koushall's supervisor. Accordingly, Count IV must be dismissed as to Yerg.

### 4. Koushall:  Denial of Medical Care

The Officer Motion seeks dismissal of plaintiff's claim under Article 24 of the Maryland Declaration of Rights (Count IV) and 42 U.S.C. § 1983 (Count VII), to the extent that those counts seek to allege a claim based on Koushall's failure to obtain medical care for plaintiff.   *See* ECF 31-1 at 15-18.

As a pretrial detainee, plaintiff's claim is analyzed under the Due Process Clause of the Fourteenth Amendment to the Constitution.   *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir.

2001); *Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001); *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992).   In contrast, if Middleton had been serving a sentence after a conviction, her claim alleging the failure to provide adequate medical care would be analyzed under the Eighth Amendment.   But, of import here, pretrial detainees "possess at least the same rights as convicted prisoners."  *Williamson v. Stirling*, 912 F.3d 154, 177 (4th Cir. 2018); *see Bell v. Wolfish*, 441 U.S. 520, 545 (1979).

The Eighth Amendment to the Constitution proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein,* 825 F.3d 206, 218 (4th Cir. 2016).   But, the Eighth Amendment "proscribes more than physically barbarous punishments."  *Estelle*, 429 U.S. at 103.  It also "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . . .'" *Id.* (citation omitted).  It "protects inmates from inhumane treatment and conditions while imprisoned."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  Moreover, the protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates."  *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016); *cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 989 U.S. 189, 199-200 (1989) (stating that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *John Doe 4 v. Shenandoah Valley Juvenile Center Comm'n*, 985 F.3d 327, 338 (4th Cir. 2021) (same).

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v.*

*Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley*, 475 U.S. at 319-20).  The deliberate indifference standard applies to cases alleging failure to safeguard an inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance.  *See Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson*, 501 U.S. at 297).  "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'"  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

The Fourth Circuit has determined that the Eighth Amendment's deliberate indifference standard, applicable to convicted prisoners, also applies to claims of inadequate medical treatment made by pretrial detainees under the Fourteenth Amendment.  *Hill*, 979 F.2d at 991-92 ("[P]rison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs.") (citations omitted); *see Young*, 238 F.3d at 575 ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) ("Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs."); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right

of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.") (citation omitted).[14]

In order to state a constitutional claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008).  The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see Moskos v. Hardee*, ___ F.4th ___, 2022 WL 175659, at *5 (4th Cir. Jan. 20, 2022); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017).

_____

[14] In *Hill*, 979 F.2d at 991, the Fourth Circuit applied the deliberate indifference standard for a pretrial detainee but recognized that the constitutional protections for pretrial detainees could arguably be "greater" than those afforded to convicted prisoners.   Since *Hill*, the Supreme Court has called into question the equivalence between the standards applied to claims by pretrial detainees and those applied to claims by convicted inmates. In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Court said that, unlike the standard applied to post-conviction excessive force claims under the Eighth Amendment, the standard for a pretrial detainee's excessive force claim under the Fourteenth Amendment does not include a subjective component.  *Id*. at 296-97.

Several circuits have extended this reasoning to hold that the standard for claims of pretrial detainees alleging  inadequate medical care under  the Fourteenth Amendment should not include a subjective component.  *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118,1124-25 (9th Cir. 2018).  But, courts in this circuit, including courts in this district, have declined to extend the holding of *Kingsley* to claims of deliberate indifference to a serious medical need, noting that "neither this Court nor the Fourth Circuit  has  applied *Kingsley* to  a pretrial detainee's claim  of  failure  to  protect  or  deliberate indifference to a serious medical need, where there are no allegations of force applied by the defendants." *See Perry v. Barnes*, No. PWG-16-705, 2019 WL 1040545, at *3 n.3 (D. Md. Mar. 5, 2019); *accord Mays v. Sprinkle*, No. 7:18CV00102, 2019 WL 3848948, at *1 (W.D. Va. Aug. 15, 2019), rev'd and remanded on other grounds, 992 F.3d 295 (4th Cir. 2021); *Wallace v. Moyer*, CCB-17-3718; 2020 WL 1506343, at 6*n.9 (Mar. 30, 2020).

As indicated, a deliberate indifference claim has both an objective component and a subjective component.  Objectively, the plaintiff must prove "a 'deprivation of a basic human need' that is 'sufficiently serious.'" *Moskos*, 2022 WL 175659, at *5 (citation omitted).  And, the plaintiff "must prove a subjective element; 'that the officials acted with a sufficiently culpable state of mind.'" *Id.* (citation omitted).  In other words, plaintiff most prove, objectively, that she was suffering from a serious medical need and that, subjectively, the defendants were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was made available.  *See Farmer*, 511 U.S. at 837; *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Schilling*, 937 F.3d at 357; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219.  The Fourth Circuit has characterized the applicable standard as an "exacting" one.  *Lightsey*, 775 F.3d at 178.

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  Proof of an objectively serious medical condition, however, does not end the inquiry.  As the Court explained in *Heyer*, 849 F.3d at 209-10, "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

In the context of a claim concerning the adequacy of medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind."  *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  Reckless disregard occurs when a defendant "knows of and disregards

an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Similarly, the Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

As the *King* Court reiterated, 825 F.3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'"  (Citation omitted).  Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*); *see Farmer*, 511 U.S. at 839-40; *Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including     intentionally *denying* or *delaying* medical care,    or    intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

A plaintiff can meet the subjective knowledge requirement through direct evidence of an official's actual knowledge.  Or, the plaintiff can rely on circumstantial evidence tending to establish such knowledge, including evidence that an official "'knew of a substantial risk from the very fact that the risk was obvious.'"  *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *see also Gordon,* 937 F.3d at 357; *Scinto*, 841 F.3d at 225.  In other words, if a risk is obvious, an official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury.  Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'"  *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98.  But, in a case involving a claim of deliberate indifference to a serious medical need, a detainee must show a "significant injury."  *Danser v. Stansberry,* 772 F.3d 340, 346 n.8 (4th Cir. 2014); *see De'Lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013).

The Supreme Court has recognized that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844; *accord Brown,* 240 F.3d at 390-91.  The Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]"  *Farmer,* 511 U.S. at 845 (citations and quotation marks omitted).  Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard.  *Id*.; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable

under the deliberate indifference standard, even when further precautions could have been taken but were not); *Brown*, 240 F.3d at 390-91. Reasonableness must be judged in light of the risk the defendant actually knew at the time. *See Brown*, 240 F.3d at 390 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Of relevance here, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225. Indeed, mere negligence or medical malpractice does not rise to the level of a constitutional violation "merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see Moskos*, 2022 WL 175659, at \*5; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000), is pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate indifference claim requires more than a showing of "mere negligence"); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").

Concerning Koushall, the Officer Motion posits that plaintiffs' assertions are insufficient to state a claim for failure to provide medical care. The Officer Defendants state: "Plaintiff fails to establish there was an objectively serious medical need that warranted any medical attention."

ECF 31-1 at 17.  Further, the Officer Defendants contend that Middleton does not allege that Koushall had "the subjective knowledge necessary for this Court to determine that [he] subjectively knew of a serious medical need but chose to ignore it."  *Id.*

Plaintiff avers that her need for medical care was patent, given that "Koushall struck Middleton three times in her face, threw her to the ground, and then grabbed her by her hair and clothing . . . ."  ECF 36-1 at 9.  And, she indicates that Koushall was subjectively aware of her need for medical attention because he was her "assailant" and, moreover, Detective Wiggins told Koushall as much.  *Id.*

Given the posture of the case, Middleton has the better of the argument.  *Krell v. Braightmeyer,* 828 F. App'x 155, 158-59 (4th Cir. 2020) (per curiam), albeit in the context of summary judgment, is informative.  In that case, the plaintiff showed that the defendant officer "entered [plaintff's] residence," tackled plaintiff "to the ground and smashed [plaintiff's] face into the tile floor . . . ."  *Id.* at 158.  Thereafter, the officer "declined [plaintiff's] request to reposition his handcuffs in order to alleviate his shoulder pain" and "refused to provide [plaintiff] with medical treatment, despite [plaintiff's] repeated complaints about his visibly injured shoulder."  *Id.* The Fourth Circuit affirmed the district court's denial of defendant's summary judgment motion as to plaintiff's claim that the officer failed to provide medical care for a serious medical need.  It said, in relevant part, *id.* at 159 (citations omitted):  "A plaintiff can maintain a deliberate indifference claim based solely on the theory that the defendant withheld, delayed, or interfered with medical treatment . . . .  As a result, even if Krell did not suffer a new or exacerbated injury,

evidence that Defendants failed to provide medical care for Krell's substantial pain is enough to prevail on a claim of deliberate indifference."[15]

*Harrison v. Prince William County Police Dep't*, 640 F. Supp. 2d 688 (E.D. Va. 2009), is also instructive.  There, the plaintiff, Harrison, was driving with a companion when he was stopped by a plainclothes police officer.  *Id.* at 697.  A second police officer, John Mora, approached Harrison's vehicle, "grabbed Plaintiff's arm, pulled him out of [his] car, and threw him against it." *Id.*  Two other officers arrived on the scene and "picked Plaintiff up bodily while Officer Mora put him into a headlock."  *Id.*  Mora "then dropped to the ground, causing Plaintiff's head to hit the pavement," and "ground Plaintiff's head into the pavement . . . ."  *Id.*

Following the assault, Harrison stated that he was seeing double and requested medical attention.  *Id.* at 697.  Further, plaintiff's companion noticed that Harrison did not look well and asked the officers for medical attention on Harrison's behalf.  *Id.* at 705.  Harrison was then driven to a detention center where he again requested medical care.  *Id.* at 697.  However, an officer at the detention center refused to help, instead telling Harrison to wash his face.  *Id.*  Plaintiff was released from the detention center the following morning.  Soon thereafter, he collapsed and had a seizure.  *Id.*

In ruling on a motion to dismiss, Judge Cacheris determined that Harrison plausibly stated a claim under 42 U.S.C. § 1983 for denial of medical care.  *Id.* at 705.  He explained, *id.* (emphasis added):

_____

[15] However, the Fourth Circuit recently explained that "[m]ere delay is . . . not enough. Rather, '[t]he objective prong requires [the plaintiff] to show that the alleged delay . . . put [her] at a substantial risk of serious harm.'"  *Moskos*, 2022 WL 175659, at *6 (quoting *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (some internal quotation marks and citation omitted)).  Notably, a "commonplace medical delay such as that experienced in everyday life will only rarely suffice to constitute an Eighth Amendment violation . . . ."  *Moskos*, 2022 WL 175659, at *6.

The Complaint states that Plaintiff was tackled and hit his head, that he was seeing double, and that *he made repeated requests for medical care*. Compl. at ¶¶ 19, 22. One could fairly infer from the Complaint that the injuries were visibly serious enough for . . . Plaintiff's companion[ ] to notice their severity and request medical assistance for Plaintiff. *Id.* at ¶ 19. While the Complaint does not allege that Plaintiff was bleeding profusely, it does indicate that there were at least some visible signs of trauma to Plaintiff's face. *Id.* at ¶ 22. At the pleading stage, which is governed by the notice pleading standard of Rule 8, these allegations are sufficient to allege that a reasonable officer would have realized that there was a "substantial risk of serious injury" or a "serious need for medical care." *Young,* 238 F.3d at 576.

Unlike the plaintiffs in *Harrison* and *Krell*, Middleton does not assert that she exhibited obvious physical signs of serious trauma. Moreover, she does not allege that she asked for medical assistance, but her request was ignored.

On the other hand, the Amended Complaint makes clear that Koushall struck plaintiff multiple times, threw her to the ground, and picked her up by her hair. *See* ECF 28, ¶ 13. In addition, Middleton states that Koushall's assault resulted in "injuries to her face, temple, and head," and by inference these injuries would have been visible. *Id.* ¶ 14. Moreover, when plaintiff was finally able to obtain medical care, she was diagnosed, among other things, with a concussion and post-traumatic headaches. *Id.* ¶ 18. And, Middleton required "physical therapy and multiple doctor's appointments for several months after the assault . . . ." *Id.*

At this stage of litigation, I must assume the truth of the allegations and draw all reasonable inferences in favor of the plaintiff. *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted). And, plaintiff's assertions make plain that Koushall attacked Middleton, and at least some of her injuries were sufficiently serious and obvious, so as to alert Koushall to the need for medical care. ECF 28, ¶¶ 13-14, 18-19. In addition, plaintiff claims to have experienced "severe pain" (*id.* ¶¶ 14, 16), and Koushall was in a position to observe Middleton's condition for an extended period of time during her detention at Central District. Moreover, Middleton claims that

another BPD officer told Koushall that Middleton required medical care.  *Id.* ¶ 16; *see Iko*, 535 F.3d at 242 (imputing officers' subjective awareness of a prisoner's serious need for medical attention where the officers saw prisoner doused in pepper spray and collapse minutes later). Accordingly, I am satisfied that the allegations plausibly assert that Koushall's failure to obtain medical attention for plaintiff, in the face of her condition and her pain, would satisfy the objective and subjective components of the deliberate indifference standard.

In other words, plaintiff has plausibly claimed that Koushall was deliberately indifferent to plaintiff's "substantial risk of injury" and "serious need for medical care."  *Young*, 238 F.3d at 576.  As a result, I shall deny the Officer Motion as to Koushall with respect to Count IV and Count VII, to the extent that they assert claims for failure to provide medical care.

### 5.  Counts IX and X

In Counts IX and X, Middleton asserts a claim for civil conspiracy and violation of 42 U.S.C. § 1985(3), respectively.  ECF 28, ¶¶ 61-64, 65-71.  The Officer Defendants posit that these claims are barred by the intracorporate conspiracy doctrine because both Koushall and Yerg are officers of the BPD.  ECF 31-1 at 14.

The elements of a claim for civil conspiracy under Maryland law and under 42 U.S.C. § 1985(3) were set forth earlier.  *See Lloyd*, 397 Md. at 154, 916 A.2d at 284 (delineating the elements of a State law claim for civil conspiracy in Maryland); *Simmons*, 47 F.3d at 1376 (outlining the elements of a claim for violation of 42 U.S.C. § 1985(3)).  I need not repeat them, but I incorporate them here.

Of import, the intracorporate conspiracy doctrine may preclude a plaintiff from pursuing a conspiracy claim under either State or federal law, in certain circumstances.  Pursuant to this doctrine, "an agreement between or among agents of the same legal entity, when the agents

act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, __U.S.__, 137 S. Ct. 1843, 1867 (2017); *see Painter's Mill Grille*, 716 F.3d at 352; *see ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002); *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985). The doctrine derives from the nature of a conspiracy and the legal conception of a corporation.

On the one hand, "[c]onspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons." *Ziglar*, 137 S. Ct. at 1867; *see, e.g.*, *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (to establish a conspiracy under § 1983, a plaintiff must provide "evidence that each member of the alleged conspiracy shared the same conspiratorial objective"). On the other, under common law agency principles, the acts of a corporation's agents are regarded as acts of a single legal actor. *See Ziglar*, 137 S. Ct. at 1867; *see, e.g.*, *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008) (recognizing corporation can be liable for criminal acts of its employees). Therefore, the doctrine "recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own." *Painter's Mill Grille*, 716 F.3d at 352; *see ePlus Tech, Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002).

Although the doctrine originally developed in the antitrust context, it has been extended to civil rights claims. *See Buschi*, 775 F.2d at 1251-52 (observing that the doctrine "has been applied in the civil rights area, involving 'officials of a public body who act within the scope of their employment'") (internal citations omitted); *accord Hicks v. Ferreyra*, 396 F. Supp. 3d 564, 580 (D. Md. 2019) (applying intracorporate conspiracy doctrine to plaintiff's claims arising under § 1983); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019) (same); *see Burgess v. Balt. Police Dep't*, RBD-15-0834, 2016 WL 795975, at **10-11 (D. Md. Mar. 1, 2016) (same). However, two exceptions exist to this general rule. First, the doctrine

does not apply "'where a co-conspirator possesses a personal stake independent of his relationship to the corporation.'" *Painter's Mill Grille*, 716 F.3d at 352 (quoting *ePlus Tech.*, 313 F.3d at 179). Second, a plaintiff may assert a conspiracy claim "where the agent's acts were not authorized by the corporation." *Painter's Mill Grille*, 716 F.3d at 352 (citing *Buschi*, 775 F.2d at 1252-53).

In arguing that the intracorporate conspiracy doctrine bars plaintiff's claims, the Officer Motion points out that the Amended Complaint expressly states that "'that at all times relevant hereto," both Koushall and Yerg were "'duly authorized agent[s], servant[s], and/or employee[s] of the Baltimore City Police Department who [were] acting within the scope of [their] employment and for the benefit of the City of Baltimore.'" ECF 31-1 at 14 (alterations added) (quoting ECF 28, ¶¶ 4, 5). Plaintiff counters that the intracorporate conspiracy doctrine has no bearing here because the Officer Defendants' conduct was clearly unlawful and the "unlawful conspiracy was not for the purpose of adopting a policy for the [BPD] . . . ." ECF 36-1 at 6. Further, Middleton points out that the Amended Complaint alleges that Koushall and Yerg "'remained in constant communication'" in order to "'coordinate with each other and concoct a way to keep Defendant Koushall free from criminal charges and/or intradepartmental discipline as well as to damage Middleton in her own criminal case and assure she would not be given an objective, fair assessment within the department.'" ECF 36-1 at 8 (quoting ECF 28, ¶ 19). Thus, according to Middleton, Koushall and Yerg had a personal stake independent of their relationship to the BPD: ensuring that Koushall avoided criminal liability for his misconduct. ECF 36-1 at 8. And, in plaintiff's view, "it would be reasonable to infer that such illegal activity was not authorized by the police department." *Id.*

In reply, the Officer Defendants argue that plaintiff's assertion contradicts the Amended Complaint, which indicates that Koushall and Yerg were, at all times, acting within the scope of

their employment.  ECF 39 at 9.  And, in their view, given the inclusion of this allegation in the Amended Complaint, the Fourth Circuit's decision in *Painter's Mill Grille,* 716 F.3d 342, controls. ECF 39 at 9-10.  In particular, the Officer Defendants point out that the plaintiff in that case alleged that the "individual defendants were acting at all times as 'agent[s], servant[s] and/or employee[s],' of the corporate defendants and that the corporate defendants are therefore vicariously liable." ECF 39 at 9 (quoting *Painter's Mill Grille*, 716 F.3d at 353) (alterations in *Painter's Mill Grille*)).

In my view, the Officer Defendants have engaged in a blinkered reading of *Painter's Mill Grille*.  In that case, the owner of a restaurant and its principals sued the landlord and its agents, alleging interference with the business based on racial animus.  *Painter's Mill Grille*, 716 F.3d at 346.  The claims were based on 42 U.S.C. §§ 1981, 1982, 1985(3) as well as Maryland law.  *Id.* Of relevance here, as to the § 1985(3) claim, the trial court granted a motion to dismiss, based on the intracorporate conspiracy doctrine.  *Id.* at 347.  The Fourth Circuit affirmed.  *Id.* at 354.

The Fourth Circuit rooted its decision in the fact that plaintiff's § 1985(3) claim was solely predicated on an allegation that the individual defendants possessed an independent personal stake, separate from their employer, because they were acting on their "personal racial animus."  *Id.* at 353.  The Court reasoned that such a motive was insufficient to overcome the intracorporate conspiracy doctrine, because "it would 'render[ ] the . . . doctrine meaningless' in the context of § 1985(3) claims 'because every claim under that statute depends on a showing that the conspirators shared an invidiously discriminatory motivation.'"  *Id.* (quoting *Hartman v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993)).

As I see it, the allegations included in the Amended Complaint are distinguishable from those at issue in *Painter's Mill Grille*.  Middleton has alleged that the Officer Defendants' conspiracy was motivated by their desire to protect Koushall from criminal liability.  ECF 28, ¶

63.  And, in furtherance of that alleged conspiracy, the Officer Defendants filed additional charges against Middleton for the purpose of "overshadow[ing] Defendant Koushall's wrongdoing."  *Id.* In this light, plaintiff has pled facts that fit both exceptions to the intracorporate conspiracy doctrine.  *See Painter's Mill Grille*, 716 F.3d at 353 (stating that the doctrine does not apply where employees are motivated solely by personal bias).

Other courts have found similar actions sufficient to find that the intracorporate conspiracy doctrine does not bar a conspiracy claim from proceeding beyond the motion to dismiss stage.  *See Bright v. City of Killeen, Texas*, 532 F. Supp. 3d 389, 402 (W.D. Tex. 2021) (explaining that the intracorporate conspiracy doctrine did not bar plaintiff's conspiracy claims, brought under § 1983, where plaintiff alleged that officers agreed among themselves to cover up their actions during a police raid); *Pena v. Ortiz*, 521 F. Supp. 3d 747, 752-53 (N.D. Ill. 2021) (finding that the intracorporate conspiracy doctrine did not bar plaintiff's § 1983 and State law conspiracy claims that officers conspired to falsify police reports about plaintiff's arrest); *Heyward v. Tyner*, 2:17-01545-DCN, 2018 WL 1391434, at *5 (D.S.C. Mar. 20, 2018) (concluding that the intracorporate conspiracy doctrine did not apply where plaintiff asserted that defendant officers "purposefully filed false police reports" and that the "other moving defendants made false statements to substantiate [the officers'] narrative"); *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 34 (D.D.C. 2015) ("The Court believes that the decision to falsely charge [plaintiff] with assault on an officer in order to retaliate against him and cover up the officers' own misconduct can hardly be said to fall within the ambit of routine police-department decisionmaking that the [intracorporate conspiracy] doctrine is meant to cover.").

Accordingly, I conclude that the intracorporate conspiracy doctrine does not bar plaintiff's conspiracy claims as to the Officer Defendants.  And, the Officer Motion makes no further argument as to the viability of these claims.

## IV.  Conclusion

In light of the foregoing, I shall grant the City Motion (ECF 29).  Accordingly, the MCC, the BPD, and Tuggle shall be dismissed from the suit.

Further, I shall grant the Officer Motion (ECF 31) in part and deny it in part.  In particular, Count V shall be dismissed as to the Officer Defendants.  However, with respect to Koushall, the dismissal of Count V is without prejudice and with leave to amend.  Count VII shall be dismissed as to the Officer Defendants in their official capacities, and as to Yerg in his individual capacity, to the extent it is based on a claim for denial of medical care. Counts I, II, IV, and VI shall also be dismissed as to Yerg.  And, Count VIII shall be dismissed.  The Motion is otherwise denied.

I shall also deny, as moot, defendants' initial motions to dismiss, docketed at ECF 19 and ECF 26.

An Order follows.

Date: January 28, 2022                                          _____/s/_____

                                                                            Ellen L. Hollander
                                                                            United States District Judge