# EXHIBIT 2



# Transcript of Sgt. Marlon Koushall

**Date:** October 5, 2023
**Case:** Middleton -v- Baltimore City Police Department, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1            UNITED STATES DISTRICT COURT
2              DISTRICT OF MARYLAND
3               NORTHERN DIVISION
4    ----------------------------x
5    HENRIETTA MIDDLETON,        :
6         Plaintiff,             :   Case No.
7    vs.                         :   1:20-cv-03536-ELH
8    BALTIMORE CITY POLICE       :
9    DEPARTMENT, et al.          :
10        Defendants.            :
11   ----------------------------x
12
13
14        DEPOSITION OF SGT. MARLON KOUSHALL
15             Baltimore, Maryland
16          Thursday, October 5th, 2023
17                 12:57 p.m.
18
19
20   Job No.: 510428
21   Pages: 1 - 89
22   Recorded By: Shawn Cavaliere
```

**Page 2**

```
1        Deposition of SGT. MARLON KOUSHALL, held at
2    the offices of:
3
4
5             BALLENGER & ROCHE, LLC
6             401 E. Pratt Street
7             Suite 2341
8             Baltimore, Maryland 21202
9
10
11
12
13        Pursuant to Agreement, before Shawn Cavaliere,
14   Notary Public in and for the State of Maryland.
15
16
17
18
19
20
21
22
```

**Page 3**

```
1                A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4        ALLAN B. RABINEAU, ESQUIRE
5        AARRON N. JOHNSON, ESQUIRE
6        BALLENGER & ROCHE, LLC
7        401 E. Pratt Street, Suite 2341
8        Baltimore, Maryland 21202
9        410.837.9150
10       (Present via videoconference)
11
12   ON BEHALF OF THE DEFENDANTS:
13       CONSTANTINE "GUS" THEMELIS, ESQUIRE
14       SABRINA MARQUEZ, ESQUIRE
15       BAKER DONELSON
16       Legg Mason Building
17       100 Light Street, 19th Floor
18       Baltimore, Maryland 21202
19       410.685.1120
20
21   ALSO PRESENT:
22       JASON YERG
```

**Page 4**

```
1                C O N T E N T S
2    EXAMINATION OF SGT. MARLON KOUSHALL      PAGE
3        By Mr. Rabineau                        5
4
5
6                E X H I B I T S
7
8    KOUSHALL DEPOSITION EXHIBIT             PAGE
9        Exhibit 1   Photo of Incident         32
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**5**

1   P R O C E E D I N G S
2 Whereupon,
3       SGT. MARLON KOUSHALL,
4 being first duly sworn or affirmed to testify to
5 the truth, the whole truth, and nothing but the
6 truth, was examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8 BY MR. RABINEAU:
9   Q   Okay. For the record, would you please
10 state your full name?
11   **A   Marlon Sampson Koushall.**
12   Q   And you were present yesterday during
13 Henrietta Middleton's deposition; correct?
14   **A   Yes.**
15   Q   In fact, I think you took notes during
16 the deposition --
17   **A   Yes.**
18   Q   -- which is perfectly proper. And you
19 heard the instructions that were given at that
20 time by Mr. Themelis to her regarding the
21 procedure of the deposition?
22   **A   To be honest, if you could repeat it.**

**6**

1   Q   Well, basically, the fact -- I'm not
2 going to be as extensive as he is, but --
3   **A   Okay.**
4   Q   -- or was, but -- but, basically, I'm
5 going to ask you serious questions. If you don't
6 know the answer to anything, we prefer that you
7 not guess. On the other hand --
8   **A   Oh, that's what you meant? Yes.**
9   Q   Yeah; right.
10   **A   Okay.**
11   Q   Okay. And --
12   **A   I wasn't --**
13   Q   -- if you don't understand any question
14 of mine -- because sometimes we do garble up a
15 question -- tell me you don't understand and I'll
16 be happy to rephrase it. If you need a break,
17 tell us, take a break.
18   **A   Yes.**
19   Q   Do you have any questions?
20   **A   No.**
21   Q   Okay. And would you tell me, please,
22 your date of birth?

**7**

1   **A   July 13th, 1988.**
2   Q   Your place of birth?
3   **A   Guyana, South America.**
4   Q   And you came to the US at what age?
5   **A   14.**
6   Q   Been living here continuously ever
7 since?
8   **A   Yes.**
9   Q   And you are a US citizen?
10   **A   Yes.**
11   Q   What is your height and weight?
12   **A   Six feet, 210 pounds.**
13   Q   Have you ever engaged in boxing?
14   **A   No, just in the academy.**
15   Q   In the academy, but not outside of that?
16 Not as a hobby or --
17   **A   No.**
18   Q   -- growing up boxing or anything?
19   **A   No.**
20   Q   Ever work out in a gym on a regular
21 basis?
22   **A   No.**

**8**

1   Q   And what county do you reside in
2 presently?
3   **A   Carroll County.**
4   Q   Okay. Prior to coming here today, have
5 you reviewed any documents?
6   **A   My -- the reports that I took that**
7 **night.**
8   Q   Is that it?
9   **A   Yes.**
10   Q   When you say reports, you're -- you're
11 talking plural. Can you more specific?
12   **A   It's the reports -- follow-up reports.**
13   Q   Has your deposition ever been taken
14 before?
15   **A   First time. No.**
16   Q   Have you ever been a plaintiff or a
17 defendant in a civil case other than this one?
18   **A   Yes.**
19   Q   On how many other occasions?
20   **A   I believe it's all job-related. Twice.**
21   Q   Twice. And when was the most recent
22 time?

9

1      A    Well, this will be the most recent.
2      Q    Well, other than this.
3      A    Oh.  Other than that, to be honest, I'm
4  not sure the year.  I -- I remember it was a -- I
5  don't remember her name; it was a female.  But I
6  -- I was a part -- it wasn't, like, me personally;
7  it was a couple of people.  I was just looped in
8  -- into -- into that.
9      Q    With the same people?
10     A    Officers.  I remember it was Officer
11 Uruschima, O'Connor -- I don't remember the
12 female's name -- and it happened on Northern
13 Parkway, if that helps.
14     Q    That -- that won't help.
15     A    It was off the road.
16     Q    I'm sorry.  I don't mean to interrupt.
17     A    Years, years ago.  I don't -- don't
18 remember the -- the year, honestly.  It would have
19 to have been prior to 2015 or 2016.
20     Q    Now, you said in addition to that, was
21 there another one, or were you talking about this
22 present case?

10

1      A    I don't know if she sued the police
2  department or myself.  It was in reference to a --
3  a dog, an officer involved, myself, where I had to
4  use force to protect myself and the suspect
5  against a pit bull.
6      Q    You shot the dog?
7      A    Yes.
8      Q    But you don't recall whether a suit was
9  filed?
10     A    I know she -- it made the news, but I'm
11 not sure if she filed a suit or not, but I -- I
12 think she did.  But I don't remember going, like,
13 something like this, like, as far as, like, a
14 deposition and so on and so forth.
15     Q    Were you actually the shooter?
16     A    Yes.
17     Q    Okay.  Now, in the first one that you
18 described to us that you -- I thought you said it
19 happened around Harford Road?
20     A    Yes.  So it was Harford and Northern
21 Park?  Is it Northern --
22     Q    Northern Parkway?

11

1      A    I believe, yeah.
2      Q    Okay.  That involved a woman?
3      A    Yes.
4      Q    Was she a pregnant woman?
5      A    I don't remember if she was pregnant.
6      Q    What were -- I'm not saying that you
7  agreed with this --
8      A    Uh-huh.
9      Q    -- but what were -- what were the
10 allegations that she made in the case?
11     A    It was either excessive force and, like,
12 something around her -- her arrest, but I wasn't
13 the arresting officer.
14     Q    You were one of a number of officers
15 present?
16     A    Correct.  There was a Signal 13, which
17 is police code for assist an officer, so multiple
18 units responded to assist.
19     Q    Did you have to physically interact with
20 her in some ways?
21     A    Yes.
22     Q    Did -- what -- what was the extent of

12

1  your physical interaction with her?
2      A    After she struck another officer with
3  her vehicle, I went to aid in her arrest and
4  apprehension, and she resisted arrest and was
5  still in control of the vehicle.  And we attempted
6  to take her into custody, which she continued to
7  be active -- actively resisting, and I deployed my
8  taser.
9      Q    Was that the full extent of your
10 physical contact?  Did you have any other -- or
11 did you have any other contact?
12     A    That was it.  Because I was in the
13 passenger seat, trying to get her out, so once I
14 deployed the taser, she was able to be extracted
15 from the vehicle and taken into custody by the
16 other officers.
17     Q    Do you know what the disposition of that
18 case was?
19     A    No, sir.
20     Q    Did it ever go to trial?
21     A    Not sure, to be honest.  It was all
22 handled -- like, never came to this part, like, as

13

1  far as what the --
2     Q    Depositions?
3     A    Correct.
4     Q    And I'm sorry; I may have asked you.
5  But with the dog case, do you know what the
6  disposition of that case was?
7     A    No, to be honest.
8     Q    Now, other than those two cases and this
9  one, of course, do you have any recollection of
10 ever being a plaintiff or a defendant in any other
11 case?
12    A    No.
13    Q    Had you ever filed for worker's
14 compensation?
15    A    Yes.
16    Q    On how many occasions?
17    A    Once.  Yeah.
18    Q    And what was the nature of that
19 occurrence?
20    A    I was struggling with a suspect to take
21 him into custody, myself and two other officers,
22 and we were unable to take him into custody.  He

14

1  was -- he shattered the window and he was grabbing
2  the shards of glass trying to cut us.  And Officer
3  Macklin attempted to tase him.  She missed.  One
4  of the prongs went into him, and one of the prongs
5  went into my left foot and causing injuries.
6     Q    To your foot?
7     A    Yeah.  It went straight through my boot
8  and it hit, like, I guess, the tendon area on top,
9  and I was -- I had to be hospitalized for them to
10 cut it out from the top of my foot.
11    Q    Did you injure any other part of your
12 body in that occurrence?
13    A    No.
14    Q    Did you have to go for a hearing on
15 that?
16    A    No hearing, no.
17    Q    Did you -- were you ever given a
18 disability rating that you know of?
19    A    A percentage, but I'm not sure.
20    Q    And would that have been just solely to
21 your foot?
22    A    Yes.

15

1     Q    Did you receive a sum of money for that?
2     A    Yes.
3     Q    Do you recall how much?
4     A    It was less than $2,000.
5     Q    Okay.  Now, at the present time, could
6  you tell me what your -- your rank and your
7  assignments are?
8     A    A sergeant, and I am assigned to the
9  Central District administrative section.
10    Q    Is there a reason why you're assigned to
11 the administrative section?
12    A    Yes.  I am under -- I am currently
13 suspended, and I assist with the administrative
14 tasks given my capabilities.
15    Q    And what is the reason you are currently
16 suspended?
17    A    In reference to this incident.
18    Q    Are you suspended as a result of a trial
19 board or from some other administrative directive?
20    A    It was due to the indictment of charges.
21    Q    So that suspension started when?
22    A    2019, February.

16

1     Q    So you have been on administrative duty
2  since February of 2019?
3     A    Yes.
4     Q    Uninterruptedly?
5     A    Yes.
6     Q    Now, other than that occasion in
7  February 2019, have your police powers ever been
8  suspended or revoked for any other reason?
9     A    No.
10    Q    Other than this particular case, do you
11 know of any complaints that have been filed
12 against you?
13    A    Complaints as in -- could you, like, be
14 a little bit more specific?
15    Q    Well, it could come from any -- it could
16 come from a citizen.  I believe in this particular
17 case, the trial judge, Judge Mays instituted some
18 complaints against officers who were involved in
19 this situation.  But it would be a formal
20 complaint to a police department, which I imagine
21 we'll hear more in the next deposition --
22 deposition because we go to Internal Affairs,

17

1 something of that nature.

2     A   Okay. So the process when Internal
3 Affairs gets a complaint, sometimes they don't
4 always notify us; it depends on the nature. They
5 conduct their investigation, and if it is
6 something of violation of policy, usually you get
7 called down there to sign -- or to give a
8 statement or to sign for punishment if need be.
9 So as of today, I have never been notified by
10 Internal Affairs, so I don't know if there's any
11 open numbers. They don't usually just tell you
12 what they're investigating, so I don't know if
13 there's any complaints.

14     Q   I -- I understand your answer. I --
15 obviously, I don't want you to tell me anything
16 you don't know.

17     A   Uh-huh.

18     Q   But I'm only asking, since you've been a
19 member of the police department for any reason,
20 have you become aware of any complaints that have
21 been filed?

22     A   There was an incident where a female

18

1 refused to stop after I activated my lights and
2 sirens in order to get her to clear the
3 intersection. She moved her vehicle, then she
4 pulled over. Then as I exited my vehicle, she
5 exited hers very aggressive. But this was all
6 captured on body-worn camera. And I believe she
7 was suspended and I didn't allow her to drive the
8 vehicle away, and she couldn't -- it wasn't the --
9 it was -- I don't remember the -- in details. I
10 would have to review the case folder for that.
11 But it was -- she claimed something -- I was -- I
12 acted, like, unjustly, I believe, like, I
13 shouldn't have gave her the citation, like, she
14 didn't -- but everything was within policy.
15 Because of the fact that she was suspended, she
16 couldn't drive the vehicle, and the vehicle was
17 towed.

18     Q   When you say suspended, are you
19 referring to her license being suspended?

20     A   Correct. She was not able to drive the
21 -- the vehicle.

22     Q   Okay. And that complaint, do you know

19

1 what the final disposition of that complaint was?

2     A   The -- the actual investigation in my --
3 I was within policy as far as the -- what's the
4 word -- the enforcement back side of things, as
5 far as -- I don't remember if she went to jail or
6 she was given the citation. But during my
7 encounter with her, she stated something to -- to
8 me, and as I was walking away -- I didn't say it
9 directly to her, but as you could see from the
10 body-worn camera, I was walking away and I said, I
11 don't give a shit. And at that point, they got me
12 for language, I believe.

13     Q   When you said they got you for language,
14 what was --

15     A   It was a sustained complaint for
16 language.

17     Q   Sustained for language?

18     A   Yes.

19     Q   And were you given any suspension?

20     A   I don't remember the discipline, whether
21 it be a letter or -- a letter of reprimand or
22 verbal cap. I don't remember the disposition.

20

1     Q   You don't remember the woman's name?

2     A   No, sir.

3     Q   Any other complaints that you are aware
4 of?

5     A   No, not that I can't recall.

6     Q   Before becoming a police officer -- by
7 the way, what -- what was the date that you became
8 --

9     A   November 21st, 2011, I was hired.

10     Q   Where were you employed prior to that
11 time?

12     A   I was working for a private ambulance
13 company as an EMT in New York called Senior Care
14 Ambulance.

15     Q   And what were the dates of that
16 employment roughly?

17     A   Yeah. 2010 to 2011. I don't remember
18 the dates for the year. I -- well, I know the end
19 date because I -- when I resigned there, I got
20 hired here. So somewhere in 2010 to that November
21 of 2011.

22     Q   Did you -- excuse me. Did you resign

21

1 from that company before you were hired by the
2 Baltimore Police Department?
3     A   Yes.  So I had to show the Baltimore
4 Police Department a letter to confirm that I
5 resigned from my current employment.
6     Q   Were you in good standing when you
7 resigned?
8     A   Yes.
9     Q   What was the name of that company?
10     A   Senior Care Ambulance.
11     Q   Now, before that time, where were you
12 employed?
13     A   I was with another ambulance company
14 called Citywide Mobile Response, and that was 2009
15 to 2010.
16     Q   What was that in New York?
17     A   Bronx.  Both of them are in The Bronx,
18 New York.
19     Q   And what was the reason that you
20 resigned or were --
21     A   Better pay and -- and opportunities at
22 Senior Care.

22

1     Q   Now, prior to that time, did you have
2 any employment that lasted for a period of two or
3 more years?
4     A   No, because I -- I graduated high school
5 in 2006, and I was going to school and I started
6 working at Rite Aid, I believe in 2008.  Well, I
7 worked at Rite Aid, then I worked at a bank.  I
8 was a teller at a bank for, I believe, a year, at
9 Ridgewood Savings Bank.
10     Q   What brought you to Baltimore?
11     A   The job opportunity.  The police
12 department.
13     Q   How did you become aware of the job
14 opportunity?
15     A   I started Explorers Program, which is,
16 like, a Boy Scout program -- so almost like ROTC
17 for the NYPD -- the NYPD Explorers Program in high
18 school in 2004.  So I joined them.  Then I did the
19 auxiliary police program, which is volunteer
20 police officer from 2008 to 2011.  So during those
21 -- that program, I met a lot of young people, and
22 one of the gentleman there, a federal jury

23

1 officer, he said let's -- you know, what about
2 Baltimore, because I always wanted to be a police
3 officer.
4     And during 2008 or 2009, that recession --
5 NYPD, they do it differently where it's like a
6 civil service exam.  You go, you take the test,
7 and you're put on a list.  So because of the
8 backlog, they had to go backwards.  So they were
9 backed up about two years.  Because during that, I
10 guess, recession time, they didn't hire; they
11 didn't have academy classes.  So when I was
12 eligible, after I got my citizenship in 2011, when
13 I applied to NYPD, it would have taken
14 approximately two years before I was even
15 considered to be hired.  So at that point, one of
16 the auxiliary officers -- he also wanted to be a
17 police officer -- he said, hey, let's go to
18 Baltimore and apply there.  So, hence, why I came
19 down here to take the exam.
20     Q   Did he also become a police officer?
21     A   No.  Unfortunately no.  He didn't pass
22 the PT test.  So I continued the process.  And to

24

1 this day, I wish he had pushed himself.
2     Q   Was high school the highest grade level
3 you attained?
4     A   Yes.  I have some college.  I went to
5 John Jay for a couple, and then I did some online
6 schooling.  But as far as a degree, high school
7 diploma.
8     Q   Now, I'm going to direct your attention
9 to August 26, 2018.  Do you recall that evening --
10     A   Yes.
11     Q   -- or early morning?
12     A   Early morning, correct.
13     Q   What -- do you recall what shift you
14 were on?
15     A   Midnight shift, or as the police
16 department will say, Adam shift.
17     Q   And when you came on shift, did -- tell
18 me what your recollection is, what you were doing
19 when you initially came on shift.
20     A   I was the sole supervisor for that
21 evening shift due to staffing shortages, and I was
22 the -- it was -- we consider SIC, or sergeant in

25

1 charge, which you take the -- the rank and the
2 responsibilities of a lieutenant.
3     Q    And was -- did there come a time when
4 you went out on the street?
5     A    Yes.  So after roll call, I assigned
6 officers their patrol vehicles and posts, and I
7 then went -- because of the shortage, went on the
8 street to help as a backup unit.
9     Q    Do you recall where you initially went?
10 Did you have any site or place that you went to?
11     A    So because the -- Central District is an
12 entertainment district, so to speak, as far as
13 nightlife, and we are responsible as commanders to
14 notify our majors of any major events.  So as the
15 shift commander, I began by going around.  I
16 passed through the block (indiscernible) 400 East
17 Baltimore to check up on officers, to see the --
18 to get a gauge of the crowd.  Then I went to
19 Marketplace Power Plant to -- because that's also
20 a latenight club -- to see what's going on, their
21 count, as far as headcount, how many people are
22 they expecting, like, a special guest or so on and

26

1 so forth.  Then I was also there to speak with
2 security because of complaints from officers that
3 they're using, like, excessive force during their
4 encounters with patrons.  So I was there talking
5 to security to get the headcount, and also to
6 advise them of the complaint.
7     Q    And did there come a time that you were
8 notified in some manner that your presence would
9 be required down around the 400 block of East
10 Baltimore Street or --
11     A    Yes.
12     Q    -- Custom House?
13     A    So during my conversation, a frantic
14 radio call came over the air, and I was aware that
15 an officer on the block -- which the only officer
16 I assigned there was Officer Pujols, so I knew
17 that he was there alone, and from the voice, it
18 appears to be him calling for assistance.  So I
19 left that location, Power Plant, that Marketplace,
20 and responded because I was a few blocks away from
21 -- from his location.
22     Q    Got there within minutes?

27

1     A    Yes.  It's -- I could have went up the
2 wrong way due to the nature of the called
3 emergency, but I went around, so that -- that took
4 a -- maybe a minute or two?
5     Q    Lights and sirens on?
6     A    Yes.
7     Q    And when you arrived, what did you
8 observe?
9     A    I observed a large crowd in the middle
10 of the street.  It started towards -- like, on
11 Baltimore Street -- I had to make my way through
12 that -- and then also on Custom House.
13     Q    Now, when you got to Custom House and
14 East Baltimore Street, did you turn your vehicle
15 into Custom House?
16     A    I did.
17     Q    Okay.  When you got out of your vehicle,
18 was your body camera activated?
19     A    No.
20     Q    During the entire incident, was your
21 body camera activated at any time?
22     A    Yes.

28

1     Q    Okay.  When -- when was it?
2     A    After I placed Ms. Middleton under
3 arrest.
4     Q    So you activated your body camera for
5 the first time after the incident?
6     A    After -- yes -- the use of force, yes.
7     Q    Okay.  Pardon me.  And this actually was
8 a violation; wasn't it?
9     A    Yes.
10     Q    When you exited your vehicle, what did
11 you then do?
12     A    I was scanning the crowd for my officer,
13 the officer that was calling for help.
14     Q    Did you find him?
15     A    I did.
16     Q    And what did you observe at that time?
17     A    I observed him attempting to what
18 appeared to hold a female back, like he was trying
19 to de-escalate a very hostile environment.
20     Q    And then what, if anything, did you do?
21     A    I went to assist him.
22     Q    What'd you do then?

29

1     A    I -- as far as -- I went to go assist --

2     Q    What action did you take?

3     A    I walked up to him.  And at that point,

4 trying to decipher what's happening here between

5 what -- what statements he's making to this

6 female, like, our commands given, trying to get a

7 gauge as to what he had and why is he dealing with

8 her.

9     Q    Did you receive a response?

10     A    No.  By -- at that time, while trying to

11 figure out what's going on between him and this

12 female -- which I believe was later identified as

13 Ms. Stancil -- the suspect approached from my

14 right, and she attempted to strike that female.

15 At that point I

16     Q    Can you just -- you've used a pronoun.

17 You said that -- would you repeat what you just

18 said?  I hate to interrupt you, but I want to make

19 sure we're identifying the people properly.  Ms.

20 Stancil, you started to say?

21     A    Yes.  So I'll start over.  So as I

22 approached Officer Pujols, Pujols was dealing with

30

1 a female.  She was later identified as Ms.

2 Stancil.  While trying to gauge as to why he's

3 interacting with her, another female came up from

4 my right.  So Ms. Stancil is to my left, and the

5 other female came up from my right.  And the

6 suspect, later identified as Ms. Middleton,

7 attempted to strike Ms. Stancil.  At that point, I

8 gave verbal commands to back up to -- verbal

9 commands to Middleton, Ms. Middleton, to back up.

10 She failed to comply.  I then raised my right

11 forearm in attempts to stop her to -- from

12 assaulting Ms. Stancil.  She failed to comply.

13     She then shoves me, causing me to go

14 backwards off of the sidewalk.  At that point, I

15 attempted to arrest her for the assault on police.

16 She then got into an aggressive stance, fists

17 balled, hand pulled backwards, then -- in the

18 motion trying to strike me.  At that point, I

19 defended myself.  I struck her once un the left

20 side of her face.  Then once I struck her, I

21 attempted to place her under arrest again.  She

22 then attempted to flee the location.  I gave

31

1 chase.  I was able to grab her, perform what we

2 called a leg sweep, take her to the ground.

3     Once on the ground, she continued to resist

4 arrest.  I attempted to pry her arms behind her

5 back.  She continued to resist.  At one point, she

6 was able to gain her balance.  She got up.  I was

7 able to then use the patrol vehicle as leverage,

8 and I was able to handcuff her successfully and

9 take her into custody.

10     Q    Now, as -- if I understand your prior

11 testimony, at no time while all this was going on

12 was your body camera operating?

13     A    Correct.

14     Q    Now, would it be fair to state that you

15 have seen videos of this particular incident?

16     A    Yes.  This incident was captured on our

17 CitiWatch camera.

18     Q    CCTV?

19     A    Yes.

20     Q    Okay.  Any other videos that you've seen

21 of this incident?

22     A    The incident made the local news, and

32

1 there was a video there.

2     Q    Have you seen videos from any other

3 officers whose body cameras were operable during

4 this event?

5     A    Yes.  During my trial, we did review a

6 few angles or officers' response, whether it be

7 during the use of force or after the use of force.

8     Q    Yesterday, during the deposition of

9 Henrietta Middleton -- I don't know if you had an

10 opportunity to see any exhibits that were

11 introduced, but one of the exhibits, which I

12 believe was Exhibit 9, which I've marked as

13 Exhibit 1 for the purposes of this deposition, I'd

14 like you to take a look at this, please.

15     (Exhibit 1 was marked.)

16     A    Very blurry.

17     Q    It is blurry.  Aaron didn't take the

18 photo, so -- can you identify any of the -- first

19 of all, I ask you, could you identify your vehicle

20 in this photograph?

21     A    Yes.  It's the one with the emergency

22 lights activated.

33

1    Q    Could you, with this writing implement
2  that I'm giving you, make an X, please, on that
3  vehicle?
4    A    Okay.  I'll put it on the right bar
5  (indiscernible).
6    Q    Any place.  Can you identify yourself in
7  this photo?
8    A    It's kind of hard to tell.  Here.  It's
9  very pixelated.
10   Q    Well, let me ask you this.  Can you
11 identify Ms. Stancil?
12   A    Yes.  I believe that was the -- there's
13 -- I don't know what you call that, but it's --
14 it's almost like a see-through throw-over material
15 that she's wearing.  And it's white and yellow, it
16 looks like, and -- from this photo.
17   Q    Yes.  Okay.  Yeah, I -- I see what
18 you're talking about.  Could you put an S
19 someplace on --
20   A    S on --
21   Q    -- the white material?
22   A    Uh-huh.

34

1    Q    Now, to her right is -- appears to be a
2  police officer; correct?
3    A    Yes.  I believe that's Pujols.
4    Q    Do you believe that's Pujols?
5    A    Yes, from my recollection of the -- of
6  the video.
7    Q    Okay.  Can you put a P for Pujols?
8    A    Okay.
9    Q    Do you see -- can you -- after
10 eliminating those individuals, do you see yourself
11 in this photo?
12   A    I believe that's me in front of the
13 patrol car.  That's -- all I see is a little
14 yellow and a foot, and I'm assuming the yellow is
15 my taser.
16   Q    Well, by the foot, if that looks like a
17 place, could you put a K?
18   A    Okay.
19   Q    Now, where you are situated in this
20 Defendant's exhibit -- excuse me -- Exhibit -- it
21 was Defense Exhibit 9 but in Plaintiff's
22 deposition, Exhibit 1.

35

1    A    Okay.
2    Q    When you exited your vehicle, did you
3  walk directly to where you appear in this photo?
4    A    When I exited my vehicle, if I walked
5  directly to where I am?
6    Q    In other words, did you make a direct
7  pay up there, or did you go someplace else first?
8  Did you divert where you working -- walking?
9    A    It'll be -- well, I have to exit.  I'll
10 come down here where -- in between the car and my
11 patrol car, and then make a right.
12   Q    Where -- would you draw a line from your
13 door to where you were in the photo?
14   A    Okay.
15   Q    And then after that point, where you
16 are, did you continue directly in the direction of
17 Officer Pujols?
18   A    Yes.
19   Q    Okay.  From the time that you left your
20 vehicle to the time you actually punched Henrietta
21 Middleton, how much time elapsed?
22   A    I don't recall.

36

1    Q    From the videos that you viewed, do you
2  recall seeing a strip at the bottom which would
3  give the time?  I'm talking now about the CCTV or
4  Citywide, as you --
5    A    I believe they're timestamped, yes.
6    Q    Okay.  Have you looked at the time
7  stamp?
8    A    I didn't pay attention to the timestamp,
9  but there is a timestamp.
10   Q    If I told you that it was between 10 and
11 15 seconds, would you disagree with that?
12   A    No.
13   Q    While you were in physical contact with
14 -- I'll call her -- she was Sergeant at the time,
15 -- Sergeant Middleton, did anyone restrain you?
16   A    Restrain me?  No.  I -- Officer -- I
17 think you are referring to Officer Pujols grabbing
18 me from behind.  I wouldn't necessarily call it
19 restrain, because as soon as he grabbed me, I told
20 him that she's under arrest, and that is when he
21 disengaged and allowed me to continue to effect a
22 lawful arrest.

37

1    Q    While he was holding you, I guess -- is
2  that your word, holding --
3    **A    Yes, sir.**
4    Q    -- instead of restrain?  While he was
5  holding you, were you also attempting to continue
6  to punch Sergeant Middleton?
7    **A    No, the use of force was right where**
8  **that vehicle was.  When I was attempting to**
9  **restrain our suspect, Sergeant Middleton or Ms.**
10 **Middleton, she was just resisting arrest.  She --**
11 **I didn't continue to use strikes; it was all**
12 **pulling.  I was pulling her arms behind -- prying**
13 **her arms behind her back.**
14   Q    Do you deny pulling her hair?
15   **A    I do deny that.**
16   Q    Okay.  Do you know who Ms. Blake is?
17   **A    Yes.  She's a -- well, I don't know**
18 **whether she is now, but she was a security officer**
19 **there.**
20   Q    Was she also holding you while you were
21 in physical contact with Sergeant Middleton?
22   **A    I don't recall her grabbing me, no.**

38

1    Q    You indicated that you arrested Sergeant
2  Middleton.  Did you place her in handcuffs?
3    **A    Yes.**
4    Q    And after you placed her in handcuffs,
5  what did you do?
6    **A    After she was placed in handcuffs --**
7  **this is all happening very quickly.  More officers**
8  **arrived, and Sergeant Davis arrived, and at that**
9  **point, Ms. Middleton started to identify herself**
10 **as law enforcement.  Officer -- I'm sorry, not**
11 **officer.  Sergeant Davis also mentioned that she's**
12 **police, and then he took her into his custody and**
13 **walked her to the Central District.**
14   Q    Do you know why Sergeant Davis took her
15 into his custody?
16   **A    To get her away from the location due to**
17 **the hostile crowd.**
18   Q    Why was it that you did not take her
19 into custody?
20   **A    Because I still had to deal with the**
21 **large crowd and the shift commander.  And the --**
22 **the scene was very chaotic, so I had to stay to**

39

1  direct officers to help control that crowd.
2    Q    How long did you remain on the scene?
3    **A    I don't recall how long, but I am sure**
4  **that officers were taking up position in order to**
5  **disperse the crowd.  I -- I remember calling for**
6  **mounted units to help disperse the crowd.**
7    Q    At some time you did leave that scene,
8  though?
9    **A    Correct.**
10   Q    And where did you proceed?
11   **A    To the Central District to check on my**
12 **prisoner.**
13   Q    Do you have any idea what time that you
14 got to Central District?
15   **A    It was within a few minutes.  I'm not**
16 **sure the time.**
17   Q    Within a few minutes of the incident?
18   **A    Correct, of the use of force.**
19   Q    And what is that, about a block away
20 from Central District?
21   **A    If you were to walk, yes, but because of**
22 **where my vehicle I had to take a couple of blocks.**

40

1  **Because they're all one-way streets, so I have to**
2  **pretty much go all the way around.**
3    Q    And when you got to Central District,
4  what was the first thing that you did?
5    **A    I went to the prisoner holding area and**
6  **to check on the prisoner, Ms. Middleton --**
7    Q    To --
8    **A    -- and to ensure that -- huh?**
9    Q    No; I'm sorry.
10   **A    Oh.**
11   Q    I didn't mean to -- I thought you were
12 finished.  I'm sorry I interrupted you.
13   **A    Oh, no -- to ensure that she was being**
14 **treated by medics and to -- to go down -- our**
15 **protocol to ensure that the prisoner is -- after a**
16 **use of force, that they are given medical**
17 **attention.**
18   Q    And where is the prisoner -- strike
19 that.
20   On the -- the date this occurred --
21   **A    Uh-huh.**
22   Q    -- where was the -- the prisoner holding

41

1  area in Central District?

2  A   It was in our lobby, to -- if you enter

3  the door, to the left; and you had the front desk

4  to the right, and there's a little bench to the

5  left.  Also, we do DUIs in one other room there;

6  they do breathalyzer tests there.

7  Q   So, did you -- you said you found

8  Sergeant Middleton in that lobby area?

9  A   Yes.  She was handcuffed to the bench.

10  Q   Now, that's where you said all the

11  prisoners would be kept except, you said, DUI

12  maybe?

13  A   Out-of-district units usually bring DUI

14  suspects there.  That district, at one point they

15  did have all cells up on the third floor.  I --

16  originally from the northeast, we had, like,

17  specific rooms that were meant for our prisoners

18  so, that way, they can't escape, so on and so

19  forth.  But the Central District itself didn't

20  have a specific room, so prisoners will be

21  handcuffed there temporarily for the wagon to come

22  pick them up and transport to central booking.

42

1  Q   So then, Sergeant Middleton, being

2  detained, handcuffed to a bench in that lobby

3  area, was not being given any special treatment;

4  was she?

5  A   The way she was treated, yes, she -- I

6  would say she was given special treatment.

7  Q   In what -- in what way was she given

8  special treatment?

9  A   So while I was there, her friends, who I

10  didn't know at the time, started to fill the

11  lobby.  Sergeant David appears to know most of

12  these individuals from his past, I guess,

13  encounters or work experience; I'm not sure.  But

14  he appeared to have known Sergeant Middleton and

15  her acquaintances.  So he -- he was there and

16  these women started to fill the -- the lobby and,

17  for example, sitting next to her -- sitting next

18  to Sergeant Middleton, things that we will not

19  allow for -- for officer safety, tactical reasons.

20  You would never allow a family member or friend to

21  come into the district and to sit with a prisoner

22  for fear of them taking evidence or handing

43

1  weapons, so on and so forth.

2  So -- and as a former medic and so on,

3  sometimes giving people something as simple as a

4  glass of water can cause more damage.  You don't

5  know what's the -- the reason behind it.  If they

6  choke on it, they can say, oh, well you gave them

7  water; You shouldn't have did that.  So -- but the

8  idea that she's being handcuffed, like,

9  one-handed, not both hands, behind the back, then

10  given where people are able to come sit with her,

11  console her, so on and so forth, that's what I

12  mean by special treatment.

13  Q   These friends, many of them were police

14  officers; weren't they?

15  A   I didn't know that at the time.  They

16  never identified themselves, nor were they in

17  uniform, so I assumed that they were just her

18  friends.

19  Q   Well, you said -- what do you know now?

20  A   Now, hindsight, yes.  But in that

21  moment, no.

22  Q   And so, Sergeant Davis obviously --

44

1  A   Yeah.

2  Q   -- was aware that they were police

3  officers?

4  A   Correct.

5  Q   And during this time, Sergeant Middleton

6  was handcuffed to the bench --

7  A   One-handed; correct.

8  Q   -- one-handed?

9  A   Uh-huh.

10  Q   Now, you would say, normally, these

11  prisoners would have both hands behind their back

12  and handcuffed?

13  A   Yes, and the reason, in my experience as

14  a law enforcement officer and the way we're

15  trained, once the handcuffs go on, you don't

16  usually want to take it off at any point because

17  of fear of officer safety.  So during that

18  encounter, if you free her hand, it now can become

19  a weapon used against you.  So, when prisoners are

20  sat on that bench, they're handcuffed behind their

21  -- their -- and both -- they're physically

22  restrained with both arms, so they cannot become a

45

1 physical threat to the officer.
2    Q   I thought you said they were handcuffed
3 to the bench?
4    A   Yes, with both hands behind their back.
5 And you then -- so the -- the handcuffs has, like,
6 three little chains in between the two restraints
7 on each wrist.  On that bench itself, there is a
8 chain approximately three feet long -- two to
9 three feet long.  Attached to that chain is a
10 handcuff.  So what we usually do is use that other
11 handcuff to put it in between the two chains.  So
12 the prisoner is cuffed to the back.  That handcuff
13 then -- the other one goes over the middle of the
14 handcuff; that way, the prisoner is still
15 handcuffed behind their back.
16    And the reason for that is that they just
17 can't get up and run out of the district, which
18 has happened before.  So that's the reason for --
19 for that.  But in her case, she was uncuffed,
20 single-handed -- I mean, she was cuffed
21 single-handed and then cuffed to the other
22 handcuff there, freeing -- essentially freeing one

46

1 hand.
2    Q   What did you do once you observed her?
3 Did you do anything else?
4    A   I ensured that Sergeant Davis had
5 rendered or requested medical attention.  And
6 again, I'm the sole supervisor and I have to run a
7 district, and the calls for service are still
8 coming in.  And at this night, a walk-in shooting
9 comes over the radio, and at that point, we're
10 required, as supervisors, to respond to ensure the
11 integrity of the scene and -- the crime scene and
12 the victim, so on and so forth.
13    At that point, I asked -- I knew that I had
14 to deal with an arrest, and I also have to run a
15 shift.  I asked Sergeant Davis -- because he was
16 the shift in front of me -- Charlie, our evening
17 shift, if he would respond to that call for
18 service, and he stated, no, and I knew that I'm
19 the only one; I'm it.  So I had to leave, and then
20 I went to Shock Trauma to investigate this walk-in
21 shooting.
22    Q   When did you get back involved with

47

1 Sergeant Middleton's case?
2    A   So after the call for service at
3 University Hospital, I then went to CitiWatch to
4 observe the video evidence.  Then I came back to
5 the district.  Upon my arrival back to the
6 district, she was no longer in the front; she was
7 moved to the roll call room.
8    Q   Okay.  Now, did you ever have any
9 evidence that Henrietta Middleton had a weapon on
10 her?
11    A   No.  She -- the type of clothing that
12 she was wearing, I did not observe any weapons.
13    Q   Did she have on her any evidence?
14    A   I personally did not search her.  I know
15 a female officer probably searched her.
16    Q   Did you see any documents, or did anyone
17 tell you that she had any evidence that related to
18 this incident?
19    MR. THEMELIS: Objection to form.
20    Q   You may answer.
21    A   No.
22    Q   When you went to CCTV, why did you go?

48

1    A   I went there to observe what was
2 happening.  Because I was advised later that there
3 was altercation that happened prior to my arrival,
4 and I wanted to -- also, I knew that the use of
5 force was captured on CCTV, so at that point, I
6 wanted to ensure that the video was preserved for
7 the use of force.
8    Q   Was that standard procedure for you to
9 do that?
10    A   I frequently go down to CitiWatch.  That
11 is part of the use of force investigation, to
12 ensure that there -- if there's any -- if there's
13 any CCTV supervisors when we investigate uses of
14 force, we're supposed to canvass the area for
15 cameras, witnesses, so on, and so forth.  So I
16 knew that there was CCTV there, so that is why I
17 went to review the CCTV for the use of force.
18    Q   You said when you got back, Sergeant
19 Middleton was in the roll -- roll call room?
20    A   Correct.
21    Q   Do you know why she had been moved
22 there?

49

1     A     Again, that goes to her special
2 treatment.  From the inception, Sergeant Middleton
3 was always -- once we learned that she's police,
4 she was given the professional courtesy.  So she
5 was moved to a more, I guess -- for what the --
6 how the district was laid out, a more private area
7 away from the front lobby of the police station.
8     Q     Was she restrained in any way?
9     A     I don't recall seeing restraints.
10    Q     Do you know how long she remained in
11 custody before she was let go?
12    A     To be -- no. I do not have -- my memory
13 of that evening -- because I'm midnight shift, I
14 go based on daylight.  And I remember she was let
15 go during daylight hours.  I don't remember what
16 time.
17    Q     And this incident happened, if I'm not
18 mistaken, a little after --
19    A     After midnight.
20    Q     -- after midnight?
21    A     Yes.
22    Q     But you have no approximation of how

50

1 long she was kept in custody?
2     A     No.
3     Q     Was it -- well, you were intending to
4 issue a citation for her; correct?
5     A     Yes.  Once I learned that she was
6 police, I knew that I wanted to give her a
7 professional courtesy, so I gave her -- I issued
8 criminal citations.
9     Q     Before you issued those criminal
10 citations -- were there two of them that you
11 issued at that --
12    A     Yes.
13    Q     -- instance?  And they were for what?
14    A     Disorderly conduct and failure to obey.
15    Q     Do you recall at what time you issued
16 those citations?
17    A     So after I came back to the district,
18 there was a sergeant -- well, before I left,
19 Sergeant Davis had stated he notified internal
20 affairs.  Internal affairs, I believe it was
21 Sergeant Lloyd -- well, before that, her -- I
22 later learned -- I didn't know this at the time --

51

1 that her supervisor, Sergeant Jackson, arrived.  I
2 don't know how he was notified.  He arrived and he
3 attempted to persuade me to give her a citizen
4 contact receipt.  And a citizen contact receipt is
5 simply a document stating who I am, who the
6 suspect is, and what's the reason for the -- our
7 interaction and what your actions were.  It's
8 essentially, as we call it, a stop receipt.  It's
9 -- it's not -- it's a non-punitive form.
10    And the reason -- so he started to interview
11 me, and I thought that he was Internal Affairs.
12 Again, I've never dealt with this situation before
13 with an off-duty officer.  So once he told me
14 that, that's when a red flag raised, because that
15 was not protocol.  I -- I knew that just giving
16 her a contact receipt was not sufficient, that she
17 was an arrestee; she needed -- she needed to be
18 charged.  So that's when I found out that Sergeant
19 Lloyd, who came not too long after, he was the
20 Internal -- the on-duty Internal Affairs officer.
21 So they essentially took control of the -- what I
22 felt like, took control of the scene.

52

1     Then later Lieutenant Blue and there was
2 another -- I don't know, he -- I know it was a
3 white officer -- or no; it's a white shirt.  I
4 don't know his rank, but I knew it was Lieutenant
5 Blue.  I think she was wearing another white
6 shirt, and in Baltimore Police Department, ranks
7 of lieutenant and above wear white shirts.  They
8 were interviewing -- or I thought was interviewing
9 Sergeant Middleton.  And it was the supervisor's
10 area of the Central District.  I believe,
11 yesterday, that's where she mentioned that she was
12 moved to a different location.  From the roll call
13 room, she was taken to the supervisor's cubicle,
14 where she was talking to Lieutenant Blue.  And I
15 don't remember the -- who was with Lieutenant
16 Blue, but they were in full uniform, white --
17 white police uniforms.
18    And at that point, Lieutenant Blue asked me,
19 what are we doing?  And I was like, what do you
20 mean what are we doing?  And she wanted to know as
21 far as what my actions were going to be.  So as I
22 stated, I wanted to give Sergeant Middleton

53

1  professional courtesy, so I advised Lieutenant
2  Blue that I'm going to issue criminal citations.
3  Lieutenant Blue and the male lieutenant -- I don't
4  know his rank -- were there to witness me issue
5  the citation.  So it was Sergeant Middleton,
6  Lieutenant Blue, and the male lieutenant -- I
7  guess, two lieutenants -- and I issued the
8  citations to Sergeant Middleton and she was
9  released.
10    Q    And you don't have any indication of
11 what time that was that she was released?
12    A    No.  Again, I just -- because I worked
13 midnight shift, I knew it was light out.
14    Q    Now, what -- do you know Sergeant
15 Jackson's first name?
16    A    Is it Jeron Jackson (phonetic)?
17    Q    If you don't know -- because --
18    A    No.  There's a couple Jacksons.
19    Q    Yes.
20    A    He's a lieutenant now.
21    Q    He's now a lieutenant.
22    A    Yes.

54

1    Q    And he was assigned --
2    A    To the same unit as Sergeant Middleton,
3  SIRT.
4    Q    SIRT?
5    A    As Special Investigation and Response
6  Team, S-I-R-T.
7    Q    Okay.  Now, you said that you were
8  giving professional courtesy to Sergeant
9  Middleton.  I just -- my question is if you had
10 not learned that she was a police sergeant, how
11 would you have handled this case differently?
12    A    She would've been transported to central
13 booking, and a statement of probable cause
14 would've been written, and the State's Attorney
15 would've recommended charges.
16    Q    Before -- first of all, I guess you were
17 surprised when you found out initially that you
18 were dealing with a police officer,
19 coincidentally?
20    A    Yes, I was very surprised, because of
21 the fact that -- the way she was physically
22 responding to my commands and the way she was

55

1  acting that night towards a civilian.  I was
2  shocked that a police officer will act in that
3  manner.
4    Q    Did she ever tell you that she was a
5  police officer?
6    A    Me?  No, she never said, hey, I'm
7  police.  She said it to -- I believe when I was
8  reviewing the camera, you can hear her talk to
9  Sergeant Davis at the time, who at the point --
10 who at that point said that she's police.  So she
11 never, like, face to face, said, hey Serge, I'm a
12 police officer; I'm off duty.
13    Q    Was it Sergeant Davis that you first
14 heard from that indicated she was a police
15 officer?
16    A    Yes, because as I'm putting her in
17 handcuffs, he arrived short after.  And, like, as
18 the use of force ended, then I took her into
19 custody.  She gets up, and then Sergeant Davis
20 arrives as I'm picking her up, putting her in
21 handcuffs.  That is when he says something along
22 the lines of she's police, and then I say that,

56

1  well, she's under arrest.
2    Q    Prior to that statement by Sergeant
3  Davis, did you hear from any of her, you referred
4  to them as, friends that she was a police officer?
5    A    No.
6    Q    Before you actually wrote the citations,
7  did you consult with anybody, any superior
8  officer?
9    A    So that night, I called -- and that's on
10 my body-worn camera -- I called my -- was it
11 captain or major -- I believe it was, major at the
12 time to notify him.  Any -- any notable incidents,
13 whether it be a shooting, anything that happened,
14 because of the Central District and the nature of
15 the Central District, we are to notify our
16 captains and majors.  They don't want to be
17 surprised as to anything that happens Downtown,
18 because Downtown Baltimore, anything can make the
19 news and the commanders want to be aware of
20 everything that goes on in that district.
21    So it is normal for you to call your captain
22 or major for notable incidents, and I believe this

57

1 was a notable incident, an off-duty officer
2 getting arrested in the block. So, right away, I
3 called him to advise him of, hey Major, this is
4 what's going on; we have an incident of noteworthy
5 -- a noteworthy incident, meaning that, you know,
6 he's going to find out about this in some way,
7 shape, or form, and he wants to be on top of that,
8 not surprised. So that's why I called him. But
9 it wasn't to guide me, it was more of a
10 notification of what's happening. Same with the
11 shooting that came out, I had to notify him, hey,
12 Major, there's a walk-in shooting, because they
13 want to keep abreast with everything.
14    Q    Can you identify by name who that was?
15    A    Gaines, Major Gaines, I believe.
16    Q    G-A-I-N-E-S?
17    A    Yes.
18    Q    And you said that was captured when your
19 body camera --
20    A    Yes. So after I realized my body-worn
21 camera was not activated, I activated immediately,
22 and I kept it on for the purpose of, you know, the

58

1 integrity of the situation. And that's why I
2 advised him, hey, I'm -- I'm on camera and this is
3 what's going on, and I'm on my way to the district
4 now.
5    Q    And is that the segment that was played
6 at your criminal trial?
7    A    Yes, correct.
8    Q    And that was accurate?
9    A    Correct. From the minute I looked down,
10 and I didn't see it recording, I activated it with
11 the hopes that it went back 30 seconds to capture
12 the use of force, because if it didn't, I don't
13 think we would be here today.
14    Q    Would it be accurate to state that
15 during the -- that segment of the video with Major
16 Gaines, you were upset?
17    A    I was in a state of shock that an
18 officer was acting that way and I had to use
19 force. I was still, you know -- I was being -- I
20 was attacked, then I had to use force, and to find
21 out that it's one of your own --
22    Q    Were you upset about your actions?

59

1    A    My actions? No.
2    Q    Now, did there come a time when you
3 issued a second set of citations?
4    A    Yes. So as a sergeant -- and also,
5 criminal citations, I didn't issue those a lot.
6 So in the back of that, it has -- it's a -- it's
7 pre-printed on the back and it says, Narrative.
8 So I filled out the front of the citation, and in
9 the back of it where it says, Narrative, I wrote a
10 brief narrative. Because it's only a small piece
11 of paper. I summarized what happened to basically
12 the -- to ensure that the language of the -- it
13 met the criteria of the charges of the law. So
14 because I wrote on the back, it, I guess, bled
15 through to the front of the carbon copy and our
16 RMS, records management system, they kicked it
17 back, or they rejected it, and they say that the
18 State's Attorney's office is not going to accept
19 this because of the way it bled through to the
20 front, and they advised to rewrite or reissue the
21 citations because of -- of that bleed-through.
22    Q    How soon after you had written the

60

1 initial set were you advised to rewrite it?
2    A    I would have to refer to -- it was all
3 -- all the dates, so I -- every time I did
4 something, I did what was called a follow-up
5 report to the incident, or a supplement report,
6 and that's all in the statement of probable cause
7 that came later. The dates and times -- I don't
8 remember exactly the date, but it seemed -- it
9 seemed like a week or a few -- or -- I don't
10 remember. I have -- the dates are all in the
11 statement of probable cause, but I was notified
12 that I needed to reissue it.
13    Q    When you reissued, did you reissue the
14 same two citations?
15    A    Yes, I did.
16    Q    And what were the charges in those two?
17    A    The same. I believe it was that
18 disorderly conduct, failure to obey.
19    Q    And what happened with those?
20    A    So there's a signature section of that
21 citation and it needed to be signed. I didn't
22 know where Sergeant Middleton was assigned at that

61

1 point, so I was trying to get in contact with her.
2 I found out that she was a part of SIRT, so I
3 called SIRT and it just happened that Sergeant
4 Jackson answers the phone. I said, hey, Serge,
5 I'm -- of course, I don't remember the exact
6 words, but it was -- I do remember his words --
7 but it was somewhere along the lines of, hey, she
8 needed to sign these new citations. And when I
9 said -- and I quote him. He says, I don't believe
10 she has to make herself available to sign those.
11 So now, here I am trying to reissue
12 citations. I'm trying to contact her unit to see
13 where she is to go meet with her to re-sign these
14 new citations, and I was given the -- the
15 runaround. So at that point, I put unable to
16 sign, I believe, on the -- I handwrote unable to
17 sign, and I sent them back to RMS. RMS says,
18 that's not going to work; you need to have a
19 physical signature.
20 I believe at this point, Lieutenant Yerg was
21 handling the investigation. I advised him of
22 that, then there was a communication that he was

62

1 going to attempt the third set of citations to
2 hand deliver it to the -- to her attorneys. I
3 don't know what happened to those, whether she
4 refused or not, the third set of citations. And I
5 believe at the direction of State's Attorney, I
6 was advised to obtain charges, and that is why I
7 went to the court commissioner and filed an
8 application of charges.
9 Q Now, how did you know Lieutenant Yerg
10 was handling the investigation? You're talking
11 about the Internal Affairs investigation?
12 A Correct.
13 Q How did you know he was handling that?
14 A I was contacted, I believe, by him and
15 asked what is the status of the citations.
16 Q Had -- did you know Lieutenant Yerg
17 before this incident?
18 A No.
19 Q Did you know Sergeant Middleton before
20 this incident?
21 A No.
22 Q I think she testified yesterday on her

63

1 deposition that you may have been involved in an
2 incident indirectly when she was investigating a
3 shooting incident?
4 A Yes. I believe she was referring to the
5 shooting of Officer Martinez. He was involved in
6 an officer-involved shooting. I responded as a
7 backup unit. I heard, I believe -- there was,
8 like, shots fired, and I responded to assist him.
9 Q Was there an accident with your vehicle
10 during that incident --
11 A Yes.
12 Q -- after it?
13 A So when I arrived on scene, I observed
14 two of the suspects coming from an alley. I
15 thought I put my vehicle in park, and given the
16 adrenaline and the nature of the call and shots
17 fired, I exited my vehicle promptly and my vehicle
18 was not put in park, and it started to go
19 backwards. I attempted to gain control of the
20 vehicle by getting inside of it, and I was able to
21 get inside of the vehicle and it -- it tapped the
22 the security gate of a closed business. No

64

1 damages to the patrol car or the gate was
2 sustained.
3 Q Now, did you have any interaction with
4 Sergeant Middleton as a result of that?
5 A No.
6 Q Now, you indicated that you were advised
7 by the State's Attorney's Office to obtain
8 charges?
9 A Yes.
10 Q That -- by way of a criminal summons?
11 A Well, obtain charges. So when you go to
12 the court commissioner, they're the ones that make
13 the decision as to what charges or whether it be
14 -- we -- we frequently go there for domestic
15 incidents mostly, where you will go down to the
16 court commissioner, you'll give them your
17 statement of probable cause, and they determine,
18 based on the -- the language of the -- of the
19 statement, if it met the elements of the crime,
20 they will charge the -- they will charge the
21 defendant accordingly. And I don't know what
22 criteria they make, whether they issue a warrant

65

1 or a criminal summons.

2    Q    Now, do you -- I'm not sure if the name
3 is State's -- Assistant State's Attorney, is it
4 Deros, or a name that sounds like that?  Do you
5 know who the contact person was in the State's
6 attorney's office?

7    **A    No, I don't.  I was following an e-mail**
8 **by Lieutenant Yerg to obtain charges, and in the**
9 **body was that State's Attorney.  I'm not sure who**
10 **that person is.**

11    Q    But isn't it true what the State's
12 Attorney indicated was the procedure you could
13 use, but was not specifically instructed that you
14 should seek those charges?

15    **A    From my understanding, it was to obtain**
16 **charges.  That was my -- that was my understanding**
17 **of the e-mail, was to -- the State's Attorney was**
18 **advising to seek charges.**

19    Q    Now, what e-mail are you referring to?

20    **A    An e-mail from Lieutenant Yerg.**

21    Q    You and he were communicating by e-mail
22 during this period of time?

66

1    **A    Yes.**

2    Q    Do you know when -- what date you
3 actually sought those charges?

4    **A    So I believe it was -- it went into --**
5 **because I worked midnight shift -- it went into**
6 **December, so December 1st, but I started on the**
7 **30th of November.**

8    Q    Okay.  Why did it take so long to seek
9 those charges?

10    **A    The midnight shift part?**

11    Q    No.  This incident happened in August,
12 and you're talking now about obtaining the charges
13 in November into late November 30th, December 1st.
14 I'm only asking you why it took that long.

15    **A    Because we -- again, I was trying to do**
16 **the professional courtesy route of issuing**
17 **citations.  The first citation was issued.  It**
18 **was, I guess, a clerical mistake on my end which**
19 **caused it to be rejected.  Then the second time,**
20 **the defendant failed to sign.  The second time,**
21 **failed to sign.  So at that point, you're kind of**
22 **-- the -- the courtesy is, you know, hey, why are**

67

1 you not signing these citations?  So at that
2 point, it was to obtain charges.

3    Q    But this was September, October,
4 November?

5    **A    Yes.  Because as said, I don't remember**
6 **the dates from when these citations were being**
7 **kicked back and -- but because of the time in**
8 **transit, by the time the RMS section gets them, it**
9 **-- it takes a while for them to process it.  Now,**
10 **everything is electronic.  Back then, it was paper**
11 **where you submit it to your -- like, in my case,**
12 **in the Central District, to our RMS person, the**
13 **district RMS personnel.  They have to review it,**
14 **then they put it in a packet, they send it**
15 **downtown to headquarters, then headquarters have**
16 **to sort it.  I don't know -- I've never dealt with**
17 **that unit, so I don't know their procedures of**
18 **intaking and processing criminal citations.  So**
19 **that's the time lag, is because of the snail mail,**
20 **I guess, so to speak, giving citations.**

21    Q    No, I'm not sure what procedure you
22 used, but you said you presented this to a

68

1 commissioner in order to get a criminal summons?

2    **A    Yes, so after my shift started, again,**
3 **I'm a sergeant, so I have to ensure personnel are**
4 **deployed properly, and after that is done, that's**
5 **when I went to the court commissioner's office.**
6 **But because we start so early, at 10:00, that's**
7 **why it's probably early morning during -- while**
8 **everything is more calm, officers and the -- the**
9 **block is closed, all the -- the major events**
10 **that's happening in the Central District is over,**
11 **that's when I went and took care of the**
12 **administrative side of things.**

13    Q    Do you remember who the commissioner
14 was?

15    **A    I remember it was a female.  I don't**
16 **remember the name; I remember it was a female**
17 **commissioner.**

18    Q    Did you indicate to the commissioner
19 what you wanted as charges on the criminal
20 summons?

21    **A    I believe that was in my narrative, yes.**

22    Q    Okay.  So in your narrative -- as -- as

**69**

1 a result of that narrative, were the criminal
2 charges different from the charges that were in
3 the prior three citations?
4    A   Yes.
5    Q   In what respect?
6    A   There were, I believe -- I don't
7 remember exactly how many charges were issued, but
8 it was assault, resist arrest, the failure to
9 obey, disorderly conduct. That's the four I can
10 think of.
11    Q   So assault and resist --
12    A   Yes.
13    Q   -- they were added to what you had
14 previously charged her with; is that correct?
15    A   My citation, yes.
16    Q   Yes. Any reason why you added those
17 two?
18    A   Well, my narrative for that statement of
19 probable cause was identical to my incident report
20 from the night. So the intent -- I wrote my
21 incident report that night with all the facts and
22 circumstances to show that an assault occurred, a

**70**

1 resisting of arrests occurred, a failure to obey,
2 and disorderly conduct occurred. However, our
3 charge by citation, not only for the professional
4 courtesy, but I didn't believe that those other
5 charges were capable of a citation. I believe
6 that's something that the State's Attorney would
7 have later added during trial, if they wanted to.
8    So when I went to the court commissioner,
9 just like if you were to -- for example, if I have
10 a business that's calling for somebody that's
11 trespassing and you try to do the least intrusive
12 and you give them a warning, and then you give
13 them a citation, if the officer feels as though
14 that person is not going to abide by that, you are
15 able to then effect an arrest. So if I'm trying
16 to attempt to give you professional courtesy of
17 different -- three different times to give you
18 citations and you're still not abiding by it, at
19 that point, I essentially went to the court
20 commissioner with the facts of that night and the
21 -- the circumstances and let them decide what they
22 wanted to do.

**71**

1    Q   At that point, had you become angry
2 about the situation?
3    A   I didn't become angry; I was very
4 disappointed.
5    Q   So that there was no anger involved in
6 your adding the additional charges?
7    A   No. It was a disappointment for the
8 fact that you're trying to give a fellow officer
9 the courtesy of going to court on these charges.
10 I wrote my report, the initial report, as an
11 assault on police resisting, because it always had
12 the facts in there, and the elements of the crimes
13 were always in my narrative. I literally copied
14 and paste that incident report into the probable
15 cause statement, only adding my follow-ups in
16 addition to show this -- to show the commissioner
17 that I tried to give these citations as a courtesy
18 and now the suspect at this point is failing to
19 comply.
20    Q   Well, I understand what you're saying,
21 but I'm still trying -- I hear your words, but I
22 don't understand your motivation for adding the

**72**

1 two additional charges.
2    A   My motivation was to seek criminal
3 charges and let the court commissioner decide. I
4 can apply for anything. It's the fact that I'm
5 not the one making the decision; the court
6 commissioner is.
7    Q   At the time that you applied for these
8 criminal charges, you had been advised that the
9 focus of the State's Attorney's investigation had
10 shifted from Middleton to you; isn't that correct?
11    A   No.
12    Q   When did you first learn that the
13 State's Attorney's investigation had shifted its
14 concentration from Middleton to you?
15    A   I believe that they -- I tried -- it's
16 very hard for me to process it, but February 2nd
17 of 2019, that's the day I was suspended and I -- I
18 was called in after work to -- by Lieutenant -- I
19 don't remember his name. And I remember the day
20 because I was telling my now husband; I have to go
21 in, they're calling me in. And that was probably
22 one of the lowest moments of my life where I had

73

1 to turn my badge in, something I worked so hard to
2 acquire, and I literally put it in a -- in a
3 cardboard box. So that's the day I learned that
4 the State's Attorneys were charging me with this
5 incident, was the day of my indictment.
6     Q     And what date was that?
7     A     I believe it was February 2nd, 2019.
8     Q     So until you received your indictment,
9 your testimony is that you were not aware that the
10 State's Attorney's office was investigating you?
11     A     No.
12         MR. THEMELIS:  Objection.
13 Mischaracterizes testimony.
14     Q     Did Lieutenant Yerg ever tell you that
15 the investigation was being shifted from Middleton
16 to you?
17     A     No.
18     Q     When you went before the commissioner --
19 I'm just going back for a moment.  Was it just
20 your narrative that you presented to the
21 commissioner or did you present any other
22 evidence?

74

1     A     Narrative.
2     Q     Now, subsequently, after your
3 indictment, you did go to trial; correct?
4     A     Yes.
5     Q     And I have the date as October 2nd,
6 2019.  You were found guilty by Judge Mays,
7 sitting without a jury; it was a judge trial with
8 regard to the offense of assault in the second
9 degree; there was a guilty finding; in regard to
10 misconduct in office, there was a guilty finding;
11 is that correct?
12     A     Yes.
13     Q     Then, subsequently, there was a
14 sentencing on November 7th, 2019, and the Court
15 sentenced you, on the second-degree assault, to
16 six years in the Department of Corrections, and
17 the Court suspended all the time served, placed
18 you in a period of three years probation.  The
19 first year will be supervised and you will perform
20 100 hours of community service to be completed on
21 or before January 1st, 2021.
22         With regard to Count Two, misconduct in

75

1 office, the sentence of the Court is ten years to
2 the Department of Corrections that will be
3 consecutive to the six, the Court suspending all
4 the time served in that matter, and that you would
5 be placed on a probation period of three years,
6 the first year supervised; is that correct?
7     A     Yes.
8     Q     Subsequently, you filed a motion for a
9 sentence modification; correct?
10     A     Yes.
11     Q     And that was heard on October 10th,
12 2022, and as a result, the Court struck the guilty
13 findings on Count One, assault, and entered
14 probation before judgment, and on Count Two,
15 struck the guilty finding of misconduct in office
16 and entered a probation before judgment; is that
17 correct?
18     A     Yes.
19     Q     Okay.  And during the course of that
20 hearing, you testified; didn't you?
21     A     I don't know if it's considered
22 testimony, but I made a statement.  I don't know

76

1 if that's considered testimony or it was, like --
2     Q     Okay.  Well, I'm -- I'll adopt your
3 words.
4     A     No, I didn't know what -- I know -- I
5 know I made a statement.
6     Q     You spoke?
7     A     Yes, I did.
8     Q     Okay.  You spoke.  And during that time,
9 you indicated -- you said -- and you were
10 addressing Judge Mays, and you said, Next Tuesday,
11 Your Honor, I will be terminated from the BPD?
12     A     Yes.
13     Q     Do you recall making that statement?
14     A     Yes.  I had a trial board scheduled.
15     Q     You had a trial board scheduled, but
16 that trial board actually didn't occur until
17 sometime later; is that correct?  Very recently?
18     A     Yes.
19         MR. THEMELIS:  Objection to form.
20     Q     So the trial board did not proceed the
21 following Tuesday; correct?
22     A     Yes.  We were notified that the

---

**77**

1 Department was not moving forward with the trial
2 board.
3    Q    Do you know why?
4    A    No.
5    Q    But you didn't know ahead of time what
6 the trial board result would be; did you?
7    A    No, but they were seeking my
8 termination.
9    Q    But you had no evidence of --
10    A    No.
11    Q    What -- what evidence did you have that
12 they would be successful in terminating you?
13        MR. THEMELIS:  Objection, form.
14    A    Evidence?  The charges that I signed at
15 Internal Affairs.  I had to sign paperwork.  No.
16 No.  I believe it's -- I -- I don't know the term,
17 but it was, like, a notification of charges
18 saying, hey, these are your charges from Internal
19 Affairs and what the recommendation, and the
20 recommendation there was termination.
21    Q    Well, you know, trial boards don't
22 always go along with the recommendations; do they?

---

**78**

1        MR. THEMELIS:  Objection, argumentative.
2 BY MR. RABINEAU:
3    Q    Do you know?
4    A    I personally -- that was -- that
5 would've been my first trial board as an officer.
6    Q    Did you -- when you heard you were going
7 before the Trial Board, did you speak to other
8 officers?  Did you ask around about the procedure
9 and perhaps outcome to be expected?
10    A    I mean, you hear, but, like, asking
11 specific, you know, of, like, the Trial Board,
12 that's part of our law enforcement Bill of Rights
13 and our policy, to -- to have a trial of your
14 peers.
15    Q    So what you're saying is you don't know?
16    A    I don't know.  I -- it was speculation.
17    Q    And you've also testified or spoke --
18 I'll use your -- what we've agreed on.  At that
19 time that you sought psychological counseling?
20    A    Yes.
21    Q    And where did you seek that
22 psychological counseling?

---

**79**

1    A    It was -- I don't remember the -- it was
2 in Carroll County.  I went for a couple of
3 sessions.
4    Q    And why did you go?
5    A    I went because my life was not how I've
6 always -- I've always walked the straight and
7 narrow and for me to go out there, do my job, and
8 to be prosecuted for doing my job -- and as I said
9 it earlier, that day that my equipment was
10 stripped away and thrown in a cardboard box was
11 very difficult for me to deal with.  To know that
12 I was doing my job and here I am about to lose my
13 livelihood.  I -- how am I going to pay my
14 mortgage, my finances?  Just there was a lot for
15 me to -- to -- to digest and to process, that fear
16 of how am I going to make this work and my family,
17 the -- the shame that I will bring to them.
18        So I talked to my husband.  I -- I always try
19 to speak and try to deal with it on my own, but he
20 noticed that it was tough and that maybe I should
21 seek professionalism.  And I reached out to our
22 behavioral health section with the BPD who

---

**80**

1 referred me to -- to seek counseling.  So I -- I
2 think it was BHS, Behavioral Health and Wellness
3 Section.
4    Q    Of the police department?
5    A    Of the police department.
6    Q    Do -- do you think you got a raw deal?
7    A    Yes.
8    Q    You still do?
9    A    Yes.
10    Q    Now, in the past week was it that you
11 did appear before the Trial Board?
12    A    Yes.
13    Q    Okay.  And --
14    A    It was a week or two.  It's recent.
15    Q    Yeah, very recent.  Okay.  And can you
16 tell us, do you know who were the people who
17 appeared on your trial board?
18    A    Yes, after I -- there -- I -- I -- it
19 was Major -- Major, I believe, Webb, Major Webb,
20 Lieutenant Rice, and a sergeant that I don't know
21 how to say his last name, and two civilians that I
22 don't know the name of.

81

1  Q  You didn't get the name of the
2  civilians?
3  A  No. Well, I know they said that — I
4  don't know — I don't know them. I know it was
5  two females, a black female, and a white female.
6  Q  What were your charges?
7  A  Departmental charges of not following
8  the law and conduct unbecoming of an officer.
9  Q  And what were the findings?
10  A  Guilty as to some. I — I know my
11  attorney will know better; not — not counsel to
12  my left, but my trial board attorney would know.
13  But I recall —
14  Q  Is that the same as your criminal
15  attorney?
16  A  No. His — his name Clarke Ahlers.
17  Q  Okay.
18  A  I — I remember the first charge. They
19  said, not guilty, and then — which I felt a
20  weight lifted. Then it was thrown right back on
21  by a guilty. So I don't know which ones they —
22  there were some charges they found not guilty and

82

1  some guilty.
2  Q  Well, if I can understand it, not
3  following the law, conduct unbecoming, but under
4  each of those were there multiple sub-charges?
5  A  I believe that; hence, why some were not
6  guilty and some were guilty. But the first thing
7  they read out when he came back, he said, on the
8  count something, and then all — all — all I
9  heard was not guilty, and I was, like, wow,
10  justice finally. And then seconds later, he says,
11  Guilty. On which one, I don't — so after that,
12  everything was emotional. So I would have to seek
13  his — he would know which ones were guilty.
14  Q  And what about the disposition? Did
15  they hand down the disposition at that time?
16  A  Initially, it was going to be 20 days
17  loss of leave, one letter of severe reprimand. As
18  we were exiting the parking lot, we were called
19  back into the location, because the attorney's
20  supervisor was on Zoom and stated to her that they
21  can't do that; they have to specify exactly which
22  charge gets what.

83

1  They deliberated again. They decided to
2  divide the 20 days into four, and — so five days
3  each. And then instead of one letter, they put
4  two letters, so one on each of the charges. So
5  now I have — recommendation is 20 days loss of
6  leave and two severe letter of reprimand.
7  Q  And you mentioned it's a recommendation.
8  Does this have to go to the commissioner?
9  A  Yes.
10  Q  And what is your understanding? What
11  can he do?
12  A  I don't — I don't know if — I believe,
13  under the LOBR, that he has to follow the
14  recommendation of the — of the Trial Board.
15  Q  Do you know -- and you may not know.
16  You may not have discussed this, but do you know
17  what the appeal procedure is if you intend to
18  appeal?
19  A  No. We — so Mr. Ahlers understands
20  that this was very emotional for me and I'm still
21  processing that, to be honest.
22  MR. THEMELIS: I just want to caution

84

1  you. I mean, you're -- you're really asking
2  questions that are going to infringe on his
3  attorney-client --
4  MR. RABINEAU: Well, you could -- it's
5  up to you to instruct him.
6  MR. THEMELIS: Got it.
7  MR. RABINEAU: I mean, I'm -- I'm not
8  asking him; he's volunteered 90 percent of what he
9  said in this deposition. I haven't even asked
10  him. So he's volunteered quite a bit. But I -- I
11  have not asked him what his attorney -- I've only
12  asked him what his understanding was. Knowing
13  that he's a member of the FOP, they discuss these
14  things.
15 BY MR. RABINEAU:
16  Q  I don't want to know anything about it
17  and I don't intend for you to tell me anything
18  your -- you did mention your attorney's name, so
19 --
20  MR. THEMELIS: So just -- just be -- if
21  you want to be --
22  Q  If you don't know --

---

85

1       MR. THEMELIS: -- mindful of -- of your

2   privilege with your attorney --

3       THE WITNESS: Okay.

4       MR. THEMELIS: -- and the fact that

5   whether or not you're going to appeal it or not --

6       MR. RABINEAU: It was my last question.

7   I don't want to make a mountain out of a molehill.

8       MR. THEMELIS: My recommendation is he

9   appeals it. I'll tell you that right now.

10      MR. RABINEAU: Well, you have a

11  recommendation. I -- wait for his bill.

12      THE WITNESS: Yeah. So I -- I haven't

13  discussed that.

14  BY MR. RABINEAU:

15      Q   Okay. If you will give us a couple of

16  minutes. This lasted a lot longer than I thought,

17  and I think we're finished --

18      **A   Okay.**

19      Q   -- but if you'll let me just go over it

20  for a moment.

21      **A   Uh-huh.**

22      **A   I'll be back. If you want to get up,**

---

86

1   stretch your legs.

2       (Off the record.)

3       THE REPORTER: We're back on.

4   BY MR. RABINEAU:

5       Q   I -- I just have a -- a question. Do

6   you know the names of the witnesses at the Trial

7   Board?

8       **A   Not the -- not the state. I keep saying**

9   **the state. I'm not sure if they're considered the**

10  **state. As far as myself, I don't remember. I had**

11  **character witnesses and --**

12      Q   I -- I would just need the names, and if

13  you don't know the --

14      **A   Of the character witnesses or --**

15      Q   Just anyone who testified, and tell me

16  --

17      **A   Let's start with the character because**

18  **that's a shorter list. The character witnesses**

19  **were Lieutenant Brooks, Lieutenant Warren, Officer**

20  **Mccray, and my friend Louis Celeste. We had**

21  **summoned but they didn't testify. Oh, yeah,**

22  **that's right.**

---

87

1       Q   Just the people that were witnesses.

2       **A   So Lieutenant -- I'm sorry. He's**

3   **Captain. Captain Swinson, Detective Gertz,**

4   **Sergeant Anselme — I don't know how you spell it.**

5   **Ansley or Ansley — and those were our three**

6   **witnesses that we called.**

7       Q   Okay. So -- but those three, were your

8   witnesses, you said, but didn't you say the others

9   were character --

10      **A   Character witnesses. And then the other**

11  **one, I don't know the --**

12      Q   Use of force witnesses?

13      **A   Yes, use of force. I guess that's all**

14  **technically witnesses. I'm not sure of the legal**

15  **term.**

16      MR. RABINEAU: Thank you. I have no

17  further questions.

18      MR. THEMELIS: Okay. We will read and

19  sign. I don't have any questions. We're done.

20  All right. You guys can switch seats.

21      (Off the record at 2:39 p.m.)

22

---

88

1       CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2       I, Shawn Cavaliere, the officer before

3   whom the foregoing proceedings were taken, do

4   hereby certify that any witness(es) in the

5   foregoing proceedings were fully sworn; that the

6   proceedings were recorded by me and thereafter

7   reduced to typewriting by a qualified

8   transcriptionist; that said digital audio recording

9   of said proceedings are a true and accurate record

10  to the best of my knowledge, skills, and ability;

11  and that I am neither counsel for, related to, nor

12  employed by any of the parties to this case and

13  have no interest, financial or otherwise, in its

14  outcome.

15

16

17  _____

18  SHAWN CAVALIERE, NOTARY PUBLIC

19  FOR THE STATE OF MARYLAND

20  October 19, 2023

21

22

89

```
1        CERTIFICATE OF TRANSCRIBER
2        I, Karen M. Galvez, do hereby certify
3    that this transcript was prepared from the digital
4    audio recording of the foregoing proceeding; that
5    said proceedings were reduced to typewriting under
6    my supervision; that said transcript is a true and
7    accurate record of the proceedings to the best of
8    my knowledge, skills, and ability; and that I am
9    neither counsel for, related to, nor employed by
10   any of the parties to the case and have no
11   interest, financial or otherwise, in its outcome.
12
13   Karen M. Galvez
14   _____
15   Karen M. Galvez
16   PLANET DEPOS, LLC
17   October 19, 2023
18
19
20
21
22
```

## A

aaron
32:17
aarron
3:5
abide
70:14
abiding
70:18
ability
88:10, 89:8
able
12:14, 18:20,
31:1, 31:6,
31:7, 31:8,
43:10, 63:20,
70:15
about
9:21, 23:1,
23:9, 33:18,
36:3, 39:19,
57:6, 58:22,
62:11, 66:12,
71:2, 78:8,
79:12, 82:14,
84:16
above
52:7
abreast
57:13
academy
7:14, 7:15,
23:11
accept
59:18
accident
63:9
accordingly
64:21
accurate
58:8, 58:14,
88:9, 89:7
acquaintances
42:15
acquire
73:2
act
55:2

acted
18:12
acting
55:1, 58:18
action
29:2
actions
51:7, 52:21,
58:22, 59:1
activated
18:1, 27:18,
27:21, 28:4,
32:22, 57:21,
58:10
active
12:7
actively
12:7
actual
19:2
actually
10:15, 28:7,
35:20, 56:6,
66:3, 76:16
adam
24:16
added
69:13, 69:16,
70:7
adding
71:6, 71:15,
71:22
addition
9:20, 71:16
additional
71:6, 72:1
addressing
76:10
administrative
15:9, 15:11,
15:13, 15:19,
16:1, 68:12
adopt
76:2
adrenaline
63:16
advise
26:6, 57:3

advised
48:2, 53:1,
58:2, 59:20,
60:1, 61:21,
62:6, 64:6, 72:8
advising
65:18
affairs
16:22, 17:3,
17:10, 50:20,
51:11, 51:20,
62:11, 77:15,
77:19
affirmed
5:4
after
12:2, 18:1,
23:12, 25:5,
28:2, 28:5,
28:6, 32:7,
34:9, 35:15,
38:4, 38:6,
40:15, 47:2,
49:18, 49:19,
49:20, 50:17,
51:19, 55:17,
57:20, 59:22,
63:12, 68:2,
68:4, 72:18,
74:2, 80:18,
82:11
again
30:21, 46:6,
49:1, 51:12,
53:12, 66:15,
68:2, 83:1
against
10:5, 16:12,
16:18, 44:19
age
7:4
aggressive
18:5, 30:16
ago
9:17
agreed
11:7, 78:18
agreement
2:13

ahead
77:5
ahlers
81:16, 83:19
aid
12:3, 22:6,
22:7
air
26:14
al
1:9
all
8:20, 12:21,
18:5, 31:11,
32:19, 34:13,
37:11, 38:7,
40:1, 40:2,
41:10, 41:15,
54:16, 60:2,
60:3, 60:6,
60:10, 68:9,
69:21, 74:17,
75:3, 82:8,
87:13, 87:20
allan
3:4
allegations
11:10
alley
63:14
allow
18:7, 42:19,
42:20
allowed
36:21
almost
22:16, 33:14
alone
26:17
along
55:21, 61:7,
77:22
also
3:21, 23:16,
23:20, 25:19,
26:1, 26:5,
27:12, 37:5,
37:20, 38:11,

41:5, 46:14,
48:4, 59:4,
78:17

**altercation**
48:3

**always**
17:4, 23:2,
49:3, 71:11,
71:13, 77:22,
79:6, 79:18

**ambulance**
20:12, 20:14,
21:10, 21:13

**america**
7:3

**anger**
71:5

**angles**
32:6

**angry**
71:1, 71:3

**another**
9:21, 12:2,
21:13, 30:3,
52:2, 52:5

**anselme**
87:4

**ansley**
87:5

**answer**
6:6, 17:14,
47:20

**answers**
61:4

**any**
6:13, 6:19,
8:5, 12:10,
12:11, 13:9,
13:10, 14:11,
16:8, 16:11,
16:15, 17:10,
17:13, 17:19,
17:20, 19:19,
20:3, 22:2,
25:10, 25:14,
27:21, 31:20,
32:2, 32:10,
32:18, 33:6,

39:13, 42:3,
44:16, 47:8,
47:12, 47:13,
47:16, 47:17,
48:12, 48:13,
49:8, 53:10,
56:3, 56:7,
56:12, 64:3,
69:16, 73:21,
87:19, 88:4,
88:12, 89:10

**anybody**
56:7

**anyone**
36:15, 47:16,
86:15

**anything**
6:6, 7:18,
17:15, 28:20,
46:3, 56:13,
56:17, 56:18,
72:4, 84:16,
84:17

**appeal**
83:17, 83:18,
85:5

**appeals**
85:9

**appear**
35:3, 80:11

**appeared**
28:18, 42:14,
80:17

**appears**
26:18, 34:1,
42:11

**application**
62:8

**applied**
23:13, 72:7

**apply**
23:18, 72:4

**apprehension**
12:4

**approached**
29:13, 29:22

**approximately**
23:14, 45:8

**approximation**
49:22

**area**
14:8, 40:5,
41:1, 41:8,
42:3, 48:14,
49:6, 52:10

**argumentative**
78:1

**arms**
31:4, 37:12,
37:13, 44:22

**around**
10:19, 11:12,
25:15, 26:9,
27:3, 40:2, 78:8

**arrest**
11:12, 12:3,
12:4, 28:3,
30:15, 30:21,
31:4, 36:20,
36:22, 37:10,
46:14, 56:1,
69:8, 70:15

**arrested**
38:1, 57:2

**arrestee**
51:17

**arresting**
11:13

**arrests**
70:1

**arrival**
47:5, 48:3

**arrived**
27:7, 38:8,
51:1, 51:2,
55:17, 63:13

**arrives**
55:20

**asked**
13:4, 46:13,
46:15, 52:18,
62:15, 84:9,
84:11, 84:12

**asking**
17:18, 66:14,
78:10, 84:1,

84:8

**assault**
30:15, 69:8,
69:11, 69:22,
71:11, 74:8,
74:15, 75:13

**assaulting**
30:12

**assigned**
15:8, 15:10,
25:5, 26:16,
54:1, 60:22

**assignments**
15:7

**assist**
11:17, 11:18,
15:13, 28:21,
29:1, 63:8

**assistance**
26:18

**assistant**
65:3

**assumed**
43:17

**assuming**
34:14

**attached**
45:9

**attacked**
58:20

**attained**
24:3

**attempt**
62:1, 70:16

**attempted**
12:5, 14:3,
29:14, 30:7,
30:15, 30:21,
30:22, 31:4,
51:3, 63:19

**attempting**
28:17, 37:5,
37:8

**attempts**
30:11

**attention**
24:8, 36:8,
40:17, 46:5

attorney
54:14, 62:5,
65:3, 65:9,
65:12, 65:17,
70:6, 81:11,
81:12, 81:15,
84:11, 85:2
attorney's
59:18, 64:7,
65:6, 72:9,
72:13, 73:10,
82:19, 84:18
attorney-client
84:3
attorneys
62:2, 73:4
audio
88:8, 89:4
august
24:9, 66:11
auxiliary
22:19, 23:16
available
61:10
aware
17:20, 20:3,
22:13, 26:14,
44:2, 56:19,
73:9
away
18:8, 19:8,
19:10, 26:20,
38:16, 39:19,
49:7, 57:2,
79:10

**B**

back
19:4, 28:18,
30:8, 30:9,
31:5, 37:13,
43:9, 44:11,
45:4, 45:12,
45:15, 46:22,
47:4, 47:5,
48:18, 50:17,
58:11, 59:6,
59:7, 59:9,

59:14, 59:17,
61:17, 67:7,
67:10, 73:19,
81:20, 82:7,
82:19, 85:22,
86:3
backed
23:9
backlog
23:8
backup
25:8, 63:7
backwards
23:8, 30:14,
30:17, 63:19
badge
73:1
baker
3:15
balance
31:6
balled
30:17
ballenger
2:5, 3:6
baltimore
1:8, 1:15, 2:8,
3:8, 3:18, 21:2,
21:3, 22:10,
23:2, 23:18,
25:17, 26:10,
27:11, 27:14,
52:6, 56:18
bank
22:7, 22:8,
22:9
bar
33:4
based
49:14, 64:18
basically
6:1, 6:4, 59:11
basis
7:21
became
20:7
because
6:14, 12:12,

16:22, 18:15,
20:19, 22:4,
23:2, 23:7,
23:9, 25:7,
25:11, 25:19,
26:2, 26:20,
36:19, 38:20,
39:21, 40:1,
44:16, 46:15,
48:2, 49:13,
51:14, 53:12,
53:17, 54:20,
55:16, 56:14,
56:18, 57:12,
58:12, 59:10,
59:14, 59:19,
59:21, 66:5,
66:15, 67:5,
67:7, 67:19,
68:6, 71:11,
72:20, 79:5,
82:19, 86:17
become
17:20, 22:13,
23:20, 44:18,
44:22, 71:1,
71:3
becoming
20:6
been
7:6, 8:13,
8:16, 9:19,
14:20, 16:1,
16:7, 16:11,
17:9, 17:18,
17:21, 48:21,
54:12, 54:14,
63:1, 72:8, 78:5
before
2:13, 8:14,
20:6, 21:1,
21:11, 23:14,
45:18, 49:11,
50:9, 50:18,
50:21, 51:12,
54:16, 56:6,
62:17, 62:19,
73:18, 74:21,

75:14, 75:16,
78:7, 80:11,
88:2
began
25:15
behalf
3:3, 3:12
behavioral
79:22, 80:2
behind
31:4, 36:18,
37:12, 37:13,
43:5, 43:9,
44:11, 44:20,
45:4, 45:15
being
5:4, 13:10,
18:19, 40:13,
42:1, 42:3,
43:8, 58:19,
67:6, 73:15
believe
8:20, 11:1,
16:16, 18:6,
18:12, 19:12,
22:6, 22:8,
29:12, 32:12,
33:12, 34:3,
34:4, 34:12,
36:5, 50:20,
52:10, 55:7,
56:11, 56:22,
57:15, 60:17,
61:9, 61:16,
61:20, 62:5,
62:14, 63:4,
63:7, 66:4,
68:21, 69:6,
70:4, 70:5,
72:15, 73:7,
77:16, 80:19,
82:5, 83:12
bench
41:4, 41:9,
42:2, 44:6,
44:20, 45:3,
45:7
best
88:10, 89:7

better
21:21, 81:11
between
29:4, 29:11,
35:10, 36:10,
45:6, 45:11
bhs
80:2
bill
78:12, 85:11
birth
6:22, 7:2
bit
16:14, 84:10
black
81:5
blake
37:16
bled
59:14, 59:19
bleed-through
59:21
block
25:16, 26:9,
26:15, 39:19,
57:2, 68:9
blocks
26:20, 39:22
blue
52:1, 52:5,
52:14, 52:16,
52:18, 53:2,
53:3, 53:6
blurry
32:16, 32:17
board
15:19, 76:14,
76:15, 76:16,
76:20, 77:2,
77:6, 78:5,
78:7, 78:11,
80:11, 80:17,
81:12, 83:14,
86:7
boards
77:21
body
14:12, 27:18,

27:21, 28:4,
31:12, 32:3,
57:19, 65:9
body-worn
18:6, 19:10,
56:10, 57:20
booking
41:22, 54:13
boot
14:7
both
21:17, 43:9,
44:11, 44:21,
44:22, 45:4
bottom
36:2
box
73:3, 79:10
boxing
7:13, 7:18
boy
22:16
bpd
76:11, 79:22
break
6:16, 6:17
breathalyzer
41:6
brief
59:10
bring
41:13, 79:17
bronx
21:17
brooks
86:19
brought
22:10
building
3:16
bull
10:5
business
63:22, 70:10

**C**

call
25:5, 26:14,

33:13, 36:14,
36:18, 46:17,
47:2, 47:7,
48:19, 51:8,
52:12, 56:21,
63:16
called
17:7, 20:13,
21:14, 27:2,
31:2, 56:9,
56:10, 57:3,
57:8, 60:4,
61:3, 72:18,
82:18, 87:6
calling
26:18, 28:13,
39:5, 70:10,
72:21
calls
46:7
calm
68:8
came
7:4, 12:22,
23:18, 24:17,
24:19, 26:14,
30:3, 30:5,
47:4, 50:17,
51:19, 57:11,
60:7, 82:7
camera
18:6, 19:10,
27:18, 27:21,
28:4, 31:12,
31:17, 55:8,
56:10, 57:19,
57:21, 58:2
cameras
32:3, 48:15
can't
20:5, 41:18,
45:17, 82:21
cannot
44:22
canvass
48:14
cap
19:22

capabilities
15:14
capable
70:5
captain
56:11, 56:21,
87:3
captains
56:16
capture
58:11
captured
18:6, 31:16,
48:5, 57:18
car
34:13, 35:10,
35:11, 64:1
carbon
59:15
cardboard
73:3, 79:10
care
20:13, 21:10,
21:22, 68:11
carroll
8:3, 79:2
case
1:6, 8:17,
9:22, 11:10,
12:18, 13:5,
13:6, 13:11,
16:10, 16:17,
18:10, 45:19,
47:1, 54:11,
67:11, 88:12,
89:10
cases
13:8
cause
43:4, 54:13,
60:6, 60:11,
64:17, 69:19,
71:15
caused
66:19
causing
14:5, 30:13
caution
83:22

cavaliere
1:22, 2:13,
88:2, 88:18
cctv
31:18, 36:3,
47:22, 48:5,
48:13, 48:16,
48:17
celeste
86:20
cells
41:15
central
15:9, 25:11,
38:13, 39:11,
39:14, 39:20,
40:3, 41:1,
41:19, 41:22,
52:10, 54:12,
56:14, 56:15,
67:12, 68:10
certificate
88:1, 89:1
certify
88:4, 89:2
chain
45:8, 45:9
chains
45:6, 45:11
chaotic
38:22
character
86:11, 86:14,
86:17, 86:18,
87:9, 87:10
charge
25:1, 64:20,
70:3, 81:18,
82:22
charged
51:18, 69:14
charges
15:20, 54:15,
59:13, 60:16,
62:6, 62:8,
64:8, 64:11,
64:13, 65:8,
65:14, 65:16,

65:18, 66:3,
66:9, 66:12,
67:2, 68:19,
69:2, 69:7,
70:5, 71:6,
71:9, 72:1,
72:3, 72:8,
77:14, 77:17,
77:18, 81:6,
81:7, 81:22,
83:4
charging
73:4
charlie
46:16
chase
31:1
check
25:17, 39:11,
40:6
choke
43:6
circumstances
69:22, 70:21
citation
18:13, 19:6,
50:4, 53:5,
59:8, 60:21,
66:17, 69:15,
70:3, 70:5,
70:13
citations
50:8, 50:10,
50:16, 53:2,
53:8, 56:6,
59:3, 59:5,
59:21, 60:14,
61:8, 61:12,
61:14, 62:1,
62:4, 62:15,
66:17, 67:1,
67:6, 67:18,
67:20, 69:3,
70:18, 71:17
citiwatch
31:17, 47:3,
48:10
citizen
7:9, 16:16,

51:3, 51:4
citizenship
23:12
city
1:8
citywide
21:14, 36:4
civil
8:17, 23:6
civilian
55:1
civilians
80:21, 81:2
claimed
18:11
clarke
81:16
classes
23:11
clear
18:2
clerical
66:18
closed
63:22, 68:9
clothing
47:11
club
25:20
code
11:17
coincidentally
54:19
college
24:4
come
16:15, 16:16,
25:3, 26:7,
35:10, 41:21,
42:21, 43:10,
59:2
comes
46:9
coming
8:4, 46:8,
63:14
commander
25:15, 38:21

commanders
25:13, 56:19
commands
29:6, 30:8,
30:9, 54:22
commissioner
62:7, 64:12,
64:16, 68:1,
68:13, 68:17,
68:18, 70:8,
70:20, 71:16,
72:3, 72:6,
73:18, 73:21,
83:8
commissioner's
68:5
communicating
65:21
communication
61:22
community
74:20
company
20:13, 21:1,
21:9, 21:13
compensation
13:14
complaint
16:20, 17:3,
18:22, 19:1,
19:15, 26:6
complaints
16:11, 16:13,
16:18, 17:13,
17:20, 20:3,
26:2
completed
74:20
comply
30:10, 30:12,
71:19
concentration
72:14
conduct
17:5, 50:14,
60:18, 69:9,
70:2, 81:8, 82:3
confirm
21:4

consecutive
75:3
consider
24:22
considered
23:15, 75:21,
76:1, 86:9
console
43:11
constantine
3:13
consult
56:7
contact
12:10, 12:11,
36:13, 37:21,
51:4, 51:16,
61:1, 61:12,
65:5
contacted
62:14
continue
35:16, 36:21,
37:5, 37:11
continued
12:6, 23:22,
31:3, 31:5
continuously
7:6
control
12:5, 39:1,
51:21, 51:22,
63:19
conversation
26:13
copied
71:13
copy
59:15
correct
5:13, 11:16,
13:3, 18:20,
24:12, 31:13,
34:2, 39:9,
39:18, 44:4,
44:7, 48:20,
50:4, 58:7,
58:9, 62:12,

69:14, 72:10,
74:3, 74:11,
75:6, 75:9,
75:17, 76:17,
76:21
corrections
74:16, 75:2
could
5:22, 15:5,
16:13, 16:15,
19:9, 27:1,
32:19, 33:1,
33:18, 34:17,
65:12, 84:4
couldn't
18:8, 18:16
counsel
5:7, 81:11,
88:11, 89:9
counseling
78:19, 78:22,
80:1
count
25:21, 74:22,
75:13, 75:14,
82:8
county
8:1, 8:3, 79:2
couple
9:7, 24:5,
39:22, 53:18,
79:2, 85:15
course
13:9, 61:5,
75:19
court
1:1, 62:7,
64:12, 64:16,
68:5, 70:8,
70:19, 71:9,
72:3, 72:5,
74:14, 74:17,
75:1, 75:3,
75:12, 88:1
courtesy
49:4, 50:7,
53:1, 54:8,
66:16, 66:22,

70:4, 70:16,
71:9, 71:17
crime
46:11, 64:19
crimes
71:12
criminal
50:8, 50:9,
53:2, 58:6,
59:5, 64:10,
65:1, 67:18,
68:1, 68:19,
69:1, 72:2,
72:8, 81:14
criteria
59:13, 64:22
crowd
25:18, 27:9,
28:12, 38:17,
38:21, 39:1,
39:5, 39:6
cubicle
52:13
cuffed
45:12, 45:20,
45:21
current
21:5
currently
15:12, 15:15
custody
12:6, 12:15,
13:21, 13:22,
31:9, 38:12,
38:15, 38:19,
49:11, 50:1,
55:19
custom
26:12, 27:12,
27:13, 27:15
cut
14:2, 14:10

**D**

damage
43:4
damages
64:1

date
6:22, 20:7,
20:19, 40:20,
60:8, 66:2,
73:6, 74:5
dates
20:15, 20:18,
60:3, 60:7,
60:10, 67:6
david
42:11
davis
38:8, 38:11,
38:14, 43:22,
46:4, 46:15,
50:19, 55:9,
55:13, 55:19,
56:3
day
24:1, 72:17,
72:19, 73:3,
73:5, 79:9
daylight
49:14, 49:15
days
82:16, 83:2,
83:5
de-escalate
28:19
deal
38:20, 46:14,
79:11, 79:19,
80:6
dealing
29:7, 29:22,
54:18
dealt
51:12, 67:16
december
66:6, 66:13
decide
70:21, 72:3
decided
83:1
decipher
29:4
decision
64:13, 72:5

defendant
8:17, 13:10,
64:21, 66:20
defendant's
34:20
defendants
1:10, 3:12
defended
30:19
defense
34:21
degree
24:6, 74:9
deliberated
83:1
deliver
62:2
deny
37:14, 37:15
department
1:9, 10:2,
16:20, 17:19,
21:2, 21:4,
22:12, 24:16,
52:6, 74:16,
75:2, 77:1,
80:4, 80:5
departmental
81:7
depends
17:4
deployed
12:7, 12:14,
68:4
depos
89:16
deposition
1:14, 2:1, 4:8,
5:13, 5:16,
5:21, 8:13,
10:14, 16:21,
16:22, 32:8,
32:13, 34:22,
63:1, 84:9
depositions
13:2
deros
65:4

described
10:18
desk
41:3
details
18:9
detained
42:2
detective
87:3
determine
64:17
different
52:12, 69:2,
70:17
differently
23:5, 54:11
difficult
79:11
digest
79:15
digital
88:8, 89:3
diploma
24:7
direct
24:8, 35:6,
39:1
direction
35:16, 62:5
directive
15:19
directly
19:9, 35:3,
35:5, 35:16
disability
14:18
disagree
36:11
disappointed
71:4
disappointment
71:7
discipline
19:20
discuss
84:13
discussed
83:16, 85:13

disengaged
36:21
disorderly
50:14, 60:18,
69:9, 70:2
disperse
39:5, 39:6
disposition
12:17, 13:6,
19:1, 19:22,
82:14, 82:15
district
1:1, 1:2, 15:9,
25:11, 25:12,
38:13, 39:11,
39:14, 39:20,
40:3, 41:1,
41:14, 41:19,
42:21, 45:17,
46:7, 47:5,
47:6, 49:6,
50:17, 52:10,
56:14, 56:15,
56:20, 58:3,
67:12, 67:13,
68:10
divert
35:8
divide
83:2
division
1:3
document
51:5
documents
8:5, 47:16
dog
10:3, 10:6,
13:5
doing
24:18, 52:19,
52:20, 79:8,
79:12
domestic
64:14
done
68:4, 87:19
donelson
3:15

door
35:13, 41:3
down
17:7, 23:19,
26:9, 35:10,
40:14, 48:10,
58:9, 64:15,
82:15
downtown
56:17, 56:18,
67:15
draw
35:12
drive
18:7, 18:16,
18:20
due
15:20, 24:21,
27:2, 38:16
dui
41:11, 41:13
duis
41:5
duly
5:4
during
5:12, 5:15,
19:6, 22:20,
23:4, 23:9,
26:3, 26:13,
27:20, 32:3,
32:5, 32:7,
32:8, 44:5,
44:17, 49:15,
58:15, 63:10,
65:22, 68:7,
70:7, 75:19,
76:8
duty
16:1, 55:12

**E**

e-mail
65:7, 65:17,
65:19, 65:20,
65:21
each
45:7, 82:4,

83:3, 83:4
**earlier**
79:9
**early**
24:11, 24:12,
68:6, 68:7
**east**
25:16, 26:9,
27:14
**effect**
36:21, 70:15
**either**
11:11
**elapsed**
35:21
**electronic**
67:10
**elements**
64:19, 71:12
**eligible**
23:12
**eliminating**
34:10
**else**
35:7, 46:3
**emergency**
27:3, 32:21
**emotional**
82:12, 83:20
**employed**
20:10, 21:12,
88:12, 89:9
**employment**
20:16, 21:5,
22:2
**emt**
20:13
**encounter**
19:7, 44:18
**encounters**
26:4, 42:13
**end**
20:18, 66:18
**ended**
55:18
**enforcement**
19:4, 38:10,
44:14, 78:12

**engaged**
7:13
**ensure**
40:8, 40:13,
40:15, 46:10,
48:6, 48:12,
59:12, 68:3
**ensured**
46:4
**enter**
41:2
**entered**
75:13, 75:16
**entertainment**
25:12
**entire**
27:20
**environment**
28:19
**equipment**
79:9
**escape**
41:18
**esquire**
3:4, 3:5, 3:13,
3:14
**essentially**
45:22, 51:8,
51:21, 70:19
**et**
1:9
**even**
23:14, 84:9
**evening**
24:9, 24:21,
46:16, 49:13
**event**
32:4
**events**
25:14, 68:9
**ever**
7:6, 7:13,
7:20, 8:13,
8:16, 12:20,
13:10, 13:13,
14:17, 16:7,
47:8, 55:4,
73:14

**every**
60:3
**everything**
18:14, 56:20,
57:13, 67:10,
68:8, 82:12
**evidence**
42:22, 47:4,
47:9, 47:13,
47:17, 73:22,
77:9, 77:11,
77:14
**exact**
61:5
**exactly**
60:8, 69:7,
82:21
**exam**
23:6, 23:19
**examination**
4:2, 5:7
**examined**
5:6
**example**
42:17, 70:9
**except**
41:11
**excessive**
11:11, 26:3
**excuse**
20:22, 34:20
**exhibit**
4:8, 4:9,
32:12, 32:13,
32:15, 34:20,
34:21, 34:22
**exhibits**
32:10, 32:11
**exit**
35:9
**exited**
18:4, 18:5,
28:10, 35:2,
35:4, 63:17
**exiting**
82:18
**expected**
78:9

**expecting**
25:22
**experience**
42:13, 44:13
**explorers**
22:15, 22:17
**extensive**
6:2
**extent**
11:22, 12:9
**extracted**
12:14

**F**

**face**
30:20, 55:11
**fact**
5:15, 6:1,
18:15, 54:21,
71:8, 72:4, 85:4
**facts**
69:21, 70:20,
71:12
**failed**
30:10, 30:12,
66:20, 66:21
**failing**
71:18
**failure**
50:14, 60:18,
69:8, 70:1
**fair**
31:14
**family**
42:20, 79:16
**far**
10:13, 13:1,
19:3, 19:5,
24:6, 25:12,
25:21, 29:1,
52:21, 86:10
**fear**
42:22, 44:17,
79:15
**february**
15:22, 16:2,
16:7, 72:16,
73:7

federal
22:22
feels
70:13
feet
7:12, 45:8,
45:9
fellow
71:8
felt
51:22, 81:19
female
9:5, 17:22,
28:18, 29:6,
29:12, 29:14,
30:1, 30:3,
30:5, 47:15,
68:15, 68:16,
81:5
female's
9:12
females
81:5
few
26:20, 32:6,
39:15, 39:17,
60:9
figure
29:11
filed
10:9, 10:11,
13:13, 16:11,
17:21, 62:7,
75:8
fill
42:10, 42:16
filled
59:8
final
19:1
finally
82:10
finances
79:14
financial
88:13, 89:11
find
28:14, 57:6,

58:20
finding
74:9, 74:10,
75:15
findings
75:13, 81:9
finished
40:12, 85:17
fired
63:8, 63:17
first
5:4, 8:15,
10:17, 28:5,
32:18, 35:7,
40:4, 53:15,
54:16, 55:13,
66:17, 72:12,
74:19, 75:6,
78:5, 81:18,
82:6
fists
30:16
five
83:2
flag
51:14
flee
30:22
floor
3:17, 41:15
focus
72:9
folder
18:10
follow
83:13
follow-up
8:12, 60:4
follow-ups
71:15
following
65:7, 76:21,
81:7, 82:3
follows
5:6
foot
14:5, 14:6,
14:10, 14:21,

34:14, 34:16
fop
84:13
force
10:4, 11:11,
26:3, 28:6,
32:7, 37:7,
39:18, 40:16,
48:5, 48:7,
48:11, 48:14,
48:17, 55:18,
58:12, 58:19,
58:20, 87:12,
87:13
forearm
30:11
foregoing
88:3, 88:5,
89:4
form
47:19, 51:9,
57:7, 76:19,
77:13
formal
16:19
former
43:2
forth
10:14, 26:1,
41:19, 43:1,
43:11, 46:12,
48:15
forward
77:1
found
41:7, 51:18,
54:17, 61:2,
74:6, 81:22
four
69:9, 83:2
frantic
26:13
free
44:18
freeing
45:22
frequently
48:10, 64:14

friend
42:20, 86:20
friends
42:9, 43:13,
43:18, 56:4
front
34:12, 41:3,
46:16, 47:6,
49:7, 59:8,
59:15, 59:20
full
5:10, 12:9,
52:16
fully
88:5
further
87:17

G

g-a-i-n-e-s
57:16
gain
31:6, 63:19
gaines
57:15, 58:16
galvez
89:2, 89:15
garble
6:14
gate
63:22, 64:1
gauge
25:18, 29:7,
30:2
gave
18:13, 30:8,
30:22, 43:6,
50:7
gentleman
22:22
gertz
87:3
getting
57:2, 63:20
give
17:7, 19:11,
36:3, 50:6,
51:3, 52:22,

64:16, 70:12,
70:16, 70:17,
71:8, 71:17,
85:15

**given**
5:19, 14:17,
15:14, 19:6,
19:19, 29:6,
40:16, 42:3,
42:6, 42:7,
43:10, 49:4,
61:14, 63:15

**giving**
33:2, 43:3,
51:15, 54:8,
67:20

**glass**
14:2, 43:4

**go**
12:20, 14:14,
16:22, 23:6,
23:8, 23:17,
29:1, 30:13,
35:7, 40:2,
40:14, 44:15,
47:22, 48:10,
49:11, 49:14,
49:15, 61:13,
63:18, 64:11,
64:14, 64:15,
72:20, 74:3,
77:22, 79:4,
79:7, 83:8,
85:19

**goes**
45:13, 49:1,
56:20

**going**
6:2, 6:5,
10:12, 22:5,
24:8, 25:15,
25:20, 29:11,
31:11, 52:21,
53:2, 57:4,
57:6, 58:3,
59:18, 61:18,
62:1, 70:14,
71:9, 73:19,

78:6, 79:13,
79:16, 82:16,
84:2, 85:5

**good**
21:6

**grab**
31:1

**grabbed**
36:19

**grabbing**
14:1, 36:17,
37:22

**grade**
24:2

**graduated**
22:4

**ground**
31:2, 31:3

**growing**
7:18

**guess**
6:7, 14:8,
23:10, 37:1,
42:12, 49:5,
53:7, 54:16,
59:14, 66:18,
67:20, 87:13

**guest**
25:22

**guide**
57:9

**guilty**
74:6, 74:9,
74:10, 75:12,
75:15, 81:10,
81:19, 81:21,
81:22, 82:1,
82:6, 82:9,
82:11, 82:13

**gus**
3:13

**guyana**
7:3

**guys**
87:20

**gym**
7:20

---

**H**

**hair**
37:14

**hand**
6:7, 30:17,
44:18, 46:1,
62:2, 82:15

**handcuff**
31:8, 45:10,
45:11, 45:12,
45:14, 45:22

**handcuffed**
41:9, 41:21,
42:2, 43:8,
44:6, 44:12,
44:20, 45:2,
45:15

**handcuffs**
38:2, 38:4,
38:6, 44:15,
45:5, 55:17,
55:21

**handing**
42:22

**handled**
12:22, 54:11

**handling**
61:21, 62:10,
62:13

**hands**
43:9, 44:11,
45:4

**handwrote**
61:16

**happened**
9:12, 10:19,
45:18, 48:3,
49:17, 56:13,
59:11, 60:19,
61:3, 62:3,
66:11

**happening**
29:4, 38:7,
48:2, 57:10,
68:10

**happens**
56:17

**happy**
6:16

**hard**
33:8, 72:16,

73:1

**harford**
10:19, 10:20

**hate**
29:18

**headcount**
25:21, 26:5

**headquarters**
67:15

**health**
79:22, 80:2

**hear**
16:21, 55:8,
56:3, 71:21,
78:10

**heard**
5:19, 55:14,
63:7, 75:11,
78:6, 82:9

**hearing**
14:14, 14:16,
75:20

**height**
7:11

**held**
2:1

**help**
9:14, 25:8,
28:13, 39:1,
39:6

**helps**
9:13

**hence**
23:18, 82:5

**henrietta**
1:5, 5:13,
32:9, 35:20,
47:9

**here**
7:6, 8:4,
20:20, 23:19,
29:4, 33:8,
35:10, 58:13,
61:11, 79:12

**hereby**
88:4, 89:2

**herself**
38:9, 61:10

| | | | |
|---|---|---|---|
| **hey** 23:17, 55:6, 55:11, 57:3, 57:11, 58:2, 61:4, 61:7, 66:22, 77:18 | **house** 26:12, 27:12, 27:13, 27:15 | 64:15 **indicate** 68:18 | **intent** 69:20 |
| **high** 22:4, 22:17, 24:2, 24:6 | **however** 70:2 | **indicated** 38:1, 55:14, 64:6, 65:12, 76:9 | **interact** 11:19 |
| **highest** 24:2 | **huh** 40:8 | **indication** 53:10 | **interacting** 30:3 |
| **himself** 24:1 | **husband** 72:20, 79:18 | **indictment** 15:20, 73:5, 73:8, 74:3 | **interaction** 12:1, 51:7, 64:3 |
| **hindsight** 43:20 | **I** | **indirectly** 63:2 | **interest** 88:13, 89:11 |
| **hire** 23:10 | **idea** 39:13, 43:8 | **individuals** 34:10, 42:12 | **internal** 16:22, 17:2, 17:10, 50:19, 50:20, 51:11, 51:20, 62:11, 77:15, 77:18 |
| **hired** 20:9, 20:20, 21:1, 23:15 | **identical** 69:19 | **infringe** 84:2 | **interrupt** 9:16, 29:18 |
| **hit** 14:8 | **identified** 29:12, 30:1, 30:6, 43:16 | **initial** 60:1, 71:10 | **interrupted** 40:12 |
| **hobby** 7:16 | **identify** 32:18, 32:19, 33:6, 33:11, 38:9, 57:14 | **initially** 24:19, 25:9, 54:17, 82:16 | **intersection** 18:3 |
| **hold** 28:18 | **identifying** 29:19 | **injure** 14:11 | **interview** 51:10 |
| **holding** 37:1, 37:2, 37:5, 37:20, 40:5, 40:22 | **imagine** 16:20 | **injuries** 14:5 | **interviewing** 52:8 |
| **honest** 5:22, 9:3, 12:21, 13:7, 83:21 | **immediately** 57:21 | **inside** 63:20, 63:21 | **introduced** 32:11 |
| **honestly** 9:18 | **implement** 33:1 | **instance** 50:13 | **intrusive** 70:11 |
| **honor** 76:11 | **inception** 49:2 | **instead** 37:4, 83:3 | **investigate** 46:20, 48:13 |
| **hopes** 58:11 | **incident** 4:9, 15:17, 17:22, 27:20, 28:5, 31:15, 31:16, 31:21, 31:22, 39:17, 47:18, 49:17, 57:1, 57:4, 57:5, 60:5, 62:17, 62:20, 63:2, 63:3, 63:10, 66:11, 69:19, 69:21, 71:14, 73:5 | **instituted** 16:17 | **investigating** 17:12, 63:2, 73:10 |
| **hospital** 47:3 | | **instruct** 84:5 | **investigation** 17:5, 19:2, 48:11, 54:5, 61:21, 62:10, 62:11, 72:9, 72:13, 73:15 |
| **hospitalized** 14:9 | | **instructed** 65:13 | **involved** 10:3, 11:2, 16:18, 46:22, 63:1, 63:5, 71:5 |
| **hostile** 28:19, 38:17 | | **instructions** 5:19 | **issue** 50:4, 53:2, |
| **hours** 49:15, 74:20 | **incidents** 56:12, 56:22, | **intaking** 67:18 | |
| | | **integrity** 46:11, 58:1 | |
| | | **intend** 83:17, 84:17 | |
| | | **intending** 50:3 | |

53:4, 59:5,
64:22
**issued**
50:7, 50:9,
50:11, 50:15,
53:7, 59:3,
66:17, 69:7
**issuing**
66:16
**it'll**
35:9
**itself**
41:19, 45:7

**J**

**jackson**
51:1, 53:16,
61:4
**jackson's**
53:15
**jacksons**
53:18
**jail**
19:5
**january**
74:21
**jason**
3:22
**jay**
24:5
**jeron**
53:16
**job**
1:20, 22:11,
22:13, 79:7,
79:8, 79:12
**job-related**
8:20
**john**
24:5
**johnson**
3:5
**joined**
22:18
**judge**
16:17, 74:6,
74:7, 76:10
**judgment**
75:14, 75:16

**july**
7:1
**jury**
22:22, 74:7
**justice**
82:10

**K**

**karen**
89:2, 89:15
**keep**
57:13, 86:8
**kept**
41:11, 50:1,
57:22
**kicked**
59:16, 67:7
**kind**
33:8, 66:21
**knew**
26:16, 46:13,
46:18, 48:4,
48:16, 50:6,
51:15, 52:4,
53:13
**know**
6:6, 10:1,
10:10, 12:17,
13:5, 14:18,
16:11, 17:10,
17:12, 17:16,
18:22, 20:18,
23:1, 32:9,
33:13, 37:16,
37:17, 38:14,
42:10, 42:11,
43:5, 43:15,
43:19, 47:14,
48:21, 49:10,
50:22, 51:2,
52:2, 52:4,
52:20, 53:4,
53:14, 53:17,
57:5, 57:22,
58:19, 60:22,
62:3, 62:9,
62:13, 62:16,
62:19, 64:21,

65:5, 66:2,
66:22, 67:16,
67:17, 75:21,
75:22, 76:4,
76:5, 77:3,
77:5, 77:16,
77:21, 78:3,
78:11, 78:15,
78:16, 79:11,
80:16, 80:20,
80:22, 81:3,
81:4, 81:10,
81:11, 81:12,
81:21, 82:13,
83:12, 83:15,
83:16, 84:16,
84:22, 86:6,
86:13, 87:4,
87:11
**knowing**
84:12
**knowledge**
88:10, 89:8
**known**
42:14
**koushall**
1:14, 2:1, 4:2,
4:8, 5:3, 5:11

**L**

**lag**
67:19
**laid**
49:6
**language**
19:12, 19:13,
19:16, 19:17,
59:12, 64:18
**large**
27:9, 38:21
**last**
80:21, 85:6
**lasted**
22:2, 85:16
**late**
66:13
**latenight**
25:20

**later**
29:12, 30:1,
30:6, 48:2,
50:22, 52:1,
60:7, 70:7,
76:17, 82:10
**law**
38:10, 44:14,
59:13, 78:12,
81:8, 82:3
**lawful**
36:22
**learn**
72:12
**learned**
49:3, 50:5,
50:22, 54:10,
73:3
**least**
70:11
**leave**
39:7, 46:19,
82:17, 83:6
**left**
14:5, 26:19,
30:4, 30:19,
35:19, 41:3,
41:5, 50:18,
81:12
**leg**
31:2
**legal**
87:14
**legg**
3:16
**legs**
86:1
**less**
15:4
**let's**
23:1, 23:17,
86:17
**letter**
19:21, 21:4,
82:17, 83:3,
83:6
**letters**
83:4

| | | | |
|---|---|---|---|
| **level**<br>24:2<br>**leverage**<br>31:7<br>**license**<br>18:19<br>**lieutenant**<br>25:2, 52:1,<br>52:4, 52:7,<br>52:14, 52:15,<br>52:18, 53:1,<br>53:3, 53:6,<br>53:20, 53:21,<br>61:20, 62:9,<br>62:16, 65:8,<br>65:20, 72:18,<br>73:14, 80:20,<br>86:19, 87:2<br>**lieutenants**<br>53:7<br>**life**<br>72:22, 79:5<br>**lifted**<br>81:20<br>**light**<br>3:17, 53:13<br>**lights**<br>18:1, 27:5,<br>32:22<br>**line**<br>35:12<br>**lines**<br>55:22, 61:7<br>**list**<br>23:7, 86:18<br>**literally**<br>71:13, 73:2<br>**little**<br>16:14, 34:13,<br>41:4, 45:6,<br>49:18<br>**livelihood**<br>79:13<br>**living**<br>7:6<br>**llc**<br>2:5, 3:6, 89:16<br>**lloyd**<br>50:21, 51:19 | **lobby**<br>41:2, 41:8,<br>42:2, 42:11,<br>42:16, 49:7<br>**lobr**<br>83:13<br>**local**<br>31:22<br>**location**<br>26:19, 26:21,<br>30:22, 38:16,<br>52:12, 82:19<br>**long**<br>39:2, 39:3,<br>45:8, 45:9,<br>49:10, 50:1,<br>51:19, 66:8,<br>66:14<br>**longer**<br>47:6, 85:16<br>**look**<br>32:14<br>**looked**<br>36:6, 58:9<br>**looks**<br>33:16, 34:16<br>**looped**<br>9:7<br>**lose**<br>79:12<br>**loss**<br>82:17, 83:5<br>**lot**<br>22:21, 59:5,<br>79:14, 82:18,<br>85:16<br>**louis**<br>86:20<br>**lowest**<br>72:22<br><br>**M**<br><br>**macklin**<br>14:3<br>**made**<br>10:10, 11:10,<br>31:22, 75:22,<br>76:5 | **mail**<br>67:19<br>**major**<br>25:14, 56:11,<br>56:22, 57:3,<br>57:12, 57:15,<br>58:15, 68:9,<br>80:19<br>**majors**<br>25:14, 56:16<br>**make**<br>27:11, 29:18,<br>33:2, 35:6,<br>35:11, 56:18,<br>61:10, 64:12,<br>64:22, 79:16,<br>85:7<br>**making**<br>29:5, 72:5,<br>76:13<br>**male**<br>53:3, 53:6<br>**management**<br>59:16<br>**manner**<br>26:8, 55:3<br>**many**<br>8:19, 13:16,<br>25:21, 43:13,<br>69:7<br>**marked**<br>32:12, 32:15<br>**marketplace**<br>25:19, 26:19<br>**marlon**<br>1:14, 2:1, 4:2,<br>5:3, 5:11<br>**marquez**<br>3:14<br>**martinez**<br>63:5<br>**maryland**<br>1:2, 1:15, 2:8,<br>2:14, 3:8, 3:18,<br>88:19<br>**mason**<br>3:16<br>**material**<br>33:14, 33:21 | **matter**<br>75:4<br>**maybe**<br>27:4, 41:12,<br>79:20<br>**mays**<br>16:17, 74:6,<br>76:10<br>**mccray**<br>86:20<br>**mean**<br>9:16, 40:11,<br>43:12, 45:20,<br>52:20, 78:10,<br>84:1, 84:7<br>**meaning**<br>57:5<br>**meant**<br>6:8, 41:17<br>**medic**<br>43:2<br>**medical**<br>40:16, 46:5<br>**medics**<br>40:14<br>**meet**<br>61:13<br>**member**<br>17:19, 42:20,<br>84:13<br>**memory**<br>49:12<br>**mention**<br>84:18<br>**mentioned**<br>38:11, 52:11,<br>83:7<br>**met**<br>22:21, 59:13,<br>64:19<br>**middle**<br>27:9, 45:13<br>**middleton**<br>1:5, 28:2,<br>30:6, 30:9,<br>32:9, 35:21,<br>36:15, 37:6,<br>37:9, 37:10, |

37:21, 38:2,
38:9, 40:6,
41:8, 42:1,
42:14, 42:18,
44:5, 47:9,
48:19, 49:2,
52:9, 52:22,
53:5, 53:8,
54:2, 54:9,
60:22, 62:19,
64:4, 72:10,
72:14, 73:15
middleton's
5:13, 47:1
midnight
24:15, 49:13,
49:19, 49:20,
53:13, 66:5,
66:10
mindful
85:1
mine
6:14
minute
27:4, 58:9
minutes
26:22, 39:15,
39:17, 85:16
mischaracterizes
73:13
misconduct
74:10, 74:22,
75:15
missed
14:3
mistake
66:18
mistaken
49:18
mobile
21:14
modification
75:9
molehill
85:7
moment
43:21, 73:19,
85:20

moments
72:22
money
15:1
more
8:11, 16:14,
16:21, 22:3,
38:7, 43:4,
49:5, 49:6,
57:9, 68:8
morning
24:11, 24:12,
68:7
mortgage
79:14
most
8:21, 9:1,
42:11
mostly
64:15
motion
30:18, 75:8
motivation
71:22, 72:2
mountain
85:7
mounted
39:6
moved
18:3, 47:7,
48:21, 49:5,
52:12
moving
77:1
much
15:3, 35:21,
40:2
multiple
11:17, 82:4
myself
10:2, 10:3,
10:4, 13:21,
30:19, 86:10

N

name
5:10, 9:5,
9:12, 20:1,

21:9, 53:15,
57:14, 65:2,
65:4, 68:16,
72:19, 80:21,
80:22, 81:1,
81:16, 84:18
names
86:6, 86:12
narrative
59:7, 59:9,
59:10, 68:21,
68:22, 69:1,
69:18, 71:13,
73:20, 74:1
narrow
79:7
nature
13:18, 17:1,
17:4, 27:2,
56:14, 63:16
necessarily
36:18
need
6:16, 17:8,
61:18, 86:12
needed
51:17, 60:12,
60:21, 61:8
neither
88:11, 89:9
never
12:22, 17:9,
42:20, 43:16,
51:12, 55:6,
55:11, 67:16
new
20:13, 21:16,
21:18, 61:8,
61:14
news
10:10, 31:22,
56:19
next
16:21, 42:17,
76:10
night
8:7, 46:8,
55:1, 56:9,

69:20, 69:21,
70:20
nightlife
25:13
non-punitive
51:9
normal
56:21
normally
44:10
northeast
41:16
northern
1:3, 9:12,
10:20, 10:21,
10:22
notable
56:12, 56:22,
57:1
notary
2:14, 88:1,
88:18
notes
5:15
noteworthy
57:4, 57:5
nothing
5:5
noticed
79:20
notification
57:10, 77:17
notified
17:9, 26:8,
50:19, 51:2,
60:11, 76:22
notify
17:4, 25:14,
56:12, 56:15,
57:11
november
20:9, 20:20,
66:7, 66:13,
67:4, 74:14
number
11:14
numbers
17:11

nypd
22:17, 23:5, 23:13

O

o'connor
9:11
obey
50:14, 60:18, 69:9, 70:1
objection
47:19, 73:12, 76:19, 77:13, 78:1
observe
27:8, 28:16, 47:4, 47:12, 48:1
observed
27:9, 28:17, 46:2, 63:13
obtain
62:6, 64:7, 64:11, 65:8, 65:15, 67:2
obtaining
66:12
obviously
17:15, 43:22
occasion
16:6
occasions
8:19, 13:16
occur
76:16
occurred
40:20, 69:22, 70:1, 70:2
occurrence
13:19, 14:12
october
1:16, 67:3, 74:5, 75:11, 88:20, 89:17
off-duty
51:13, 57:1
offense
74:8

office
59:18, 64:7, 65:6, 68:5, 73:10, 74:10, 75:1, 75:15
officer
9:10, 10:3, 11:13, 11:17, 12:2, 14:2, 20:6, 22:20, 23:1, 23:3, 23:17, 23:20, 26:15, 26:16, 28:12, 28:13, 29:22, 34:2, 35:17, 36:16, 36:17, 37:18, 38:10, 38:11, 42:19, 44:14, 44:17, 45:1, 47:15, 51:13, 51:20, 52:3, 54:18, 55:2, 55:5, 55:12, 55:15, 56:4, 56:8, 57:1, 58:18, 63:5, 70:13, 71:8, 78:5, 81:8, 86:19, 88:2
officer-involved
63:6
officers
9:10, 11:14, 12:16, 13:21, 16:18, 23:16, 25:6, 25:17, 26:2, 32:3, 32:6, 38:7, 39:1, 39:4, 43:14, 44:3, 68:8, 78:8
offices
2:2
oh
6:8, 9:3, 40:10, 40:13, 43:6, 86:21

okay
5:9, 6:3, 6:10, 6:11, 6:21, 8:4, 10:17, 11:2, 15:5, 17:2, 18:22, 27:17, 28:1, 28:7, 31:20, 33:4, 33:17, 34:7, 34:8, 34:18, 35:1, 35:14, 35:19, 36:6, 37:16, 47:8, 54:7, 66:8, 68:22, 75:19, 76:2, 76:8, 80:13, 80:15, 81:17, 85:3, 85:15, 85:18, 87:7, 87:18
on-duty
51:20
once
12:13, 13:17, 30:19, 30:20, 31:3, 44:15, 46:2, 49:3, 50:5, 51:13
one
8:17, 9:21, 10:17, 11:14, 13:9, 14:3, 14:4, 22:22, 23:15, 31:5, 32:11, 32:21, 41:5, 41:14, 45:13, 45:22, 46:19, 58:21, 72:5, 72:22, 75:13, 82:11, 82:17, 83:3, 83:4, 87:11
one-handed
43:9, 44:7, 44:8
one-way
40:1
ones
64:12, 81:21,

82:13
online
24:5
only
17:18, 26:15, 46:19, 59:10, 66:14, 70:3, 71:15, 84:11
open
17:11
operable
32:3
operating
31:12
opportunities
21:21
opportunity
22:11, 22:14, 32:10
order
18:2, 39:4, 68:1
originally
41:16
other
6:7, 8:17, 8:19, 9:2, 9:3, 12:10, 12:11, 12:16, 13:8, 13:10, 13:21, 14:11, 15:19, 16:6, 16:8, 16:10, 20:3, 30:5, 31:20, 32:2, 35:6, 41:5, 45:10, 45:13, 45:21, 70:4, 73:21, 78:7, 87:10
others
87:8
otherwise
88:13, 89:11
out
7:20, 12:13, 14:10, 25:4, 27:17, 29:11, 45:17, 49:6,

51:18, 53:13,
54:17, 57:6,
57:11, 58:21,
59:8, 61:2,
79:7, 79:21,
82:7, 85:7
**out-of-district**
41:13
**outcome**
78:9, 88:14,
89:11
**outside**
7:15
**over**
18:4, 26:14,
29:21, 45:13,
46:9, 68:10,
85:19
**own**
58:21, 79:19

**P**

**packet**
67:14
**page**
4:2, 4:8
**pages**
1:21
**paper**
59:11, 67:10
**paperwork**
77:15
**pardon**
28:7
**park**
10:21, 63:15,
63:18
**parking**
82:18
**parkway**
9:13, 10:22
**part**
9:6, 12:22,
14:11, 48:11,
61:2, 66:10,
78:12
**particular**
16:10, 16:16,

31:15
**parties**
88:12, 89:10
**pass**
23:21
**passed**
25:16
**passenger**
12:13
**past**
42:12, 80:10
**paste**
71:14
**patrol**
25:6, 31:7,
34:13, 35:11,
64:1
**patrons**
26:4
**pay**
21:21, 35:7,
36:8, 79:13
**peers**
78:14
**people**
9:7, 9:9,
22:21, 25:21,
29:19, 43:3,
43:10, 80:16,
87:1
**percent**
84:8
**percentage**
14:19
**perfectly**
5:18
**perform**
31:1, 74:19
**perhaps**
78:9
**period**
22:2, 65:22,
74:18, 75:5
**person**
65:5, 65:10,
67:12, 70:14
**personally**
9:6, 47:14,

78:4
**personnel**
67:13, 68:3
**persuade**
51:3
**phone**
61:4
**phonetic**
53:16
**photo**
4:9, 32:18,
33:7, 33:16,
34:11, 35:3,
35:13
**photograph**
32:20
**physical**
12:1, 12:10,
36:13, 37:21,
45:1, 61:19
**physically**
11:19, 44:21,
54:21
**pick**
41:22
**picking**
55:20
**piece**
59:10
**pit**
10:5
**pixelated**
33:9
**place**
7:2, 25:10,
30:21, 33:6,
34:17, 38:2
**placed**
28:2, 38:4,
38:6, 74:17,
75:5
**plaintiff**
1:6, 3:3, 5:7,
8:16, 13:10
**plaintiff's**
34:21
**planet**
89:16

**plant**
25:19, 26:19
**played**
58:5
**please**
5:9, 6:21,
32:14, 33:2
**plural**
8:11
**point**
19:11, 23:15,
29:3, 29:15,
30:7, 30:14,
30:18, 31:5,
35:15, 38:9,
41:14, 44:16,
46:9, 46:13,
48:5, 52:18,
55:9, 55:10,
61:1, 61:15,
61:20, 66:21,
67:2, 70:19,
71:1, 71:18
**police**
1:8, 10:1,
11:17, 16:7,
16:20, 17:19,
20:6, 21:2,
21:4, 22:11,
22:19, 22:20,
23:2, 23:17,
23:20, 24:15,
30:15, 34:2,
38:12, 43:13,
44:2, 49:3,
49:7, 50:6,
52:6, 52:17,
54:10, 54:18,
55:2, 55:5,
55:7, 55:10,
55:12, 55:14,
55:22, 56:4,
71:11, 80:4,
80:5
**policy**
17:6, 18:14,
19:3, 78:13
**position**
39:4

posts
25:6
pounds
7:12
power
25:19, 26:19
powers
16:7
pratt
2:6, 3:7
pre-printed
59:7
prefer
6:6
pregnant
11:4, 11:5
prepared
89:3
presence
26:8
present
3:10, 3:21,
5:12, 9:22,
11:15, 15:5,
73:21
presented
67:22, 73:20
presently
8:2
preserved
48:6
pretty
40:2
previously
69:14
prior
8:4, 9:19,
20:10, 22:1,
31:10, 48:3,
56:2, 69:3
prisoner
39:12, 40:5,
40:6, 40:15,
40:18, 40:22,
42:21, 45:12,
45:14
prisoners
41:11, 41:17,

41:20, 44:11,
44:19
private
20:12, 49:6
privilege
85:2
probable
54:13, 60:6,
60:11, 64:17,
69:19, 71:14
probably
47:15, 68:7,
72:21
probation
74:18, 75:5,
75:14, 75:16
procedure
5:21, 48:8,
65:12, 67:21,
78:8, 83:17
procedures
67:17
proceed
39:10, 76:20
proceeding
89:4
proceedings
88:3, 88:5,
88:6, 88:9,
89:5, 89:7
process
17:2, 23:22,
67:9, 72:16,
79:15
processing
67:18, 83:21
professional
49:4, 50:7,
53:1, 54:8,
66:16, 70:3,
70:16
professionalism
79:21
program
22:15, 22:16,
22:17, 22:19,
22:21
promptly
63:17

prongs
14:4
pronoun
29:16
proper
5:18
properly
29:19, 68:4
prosecuted
79:8
protect
10:4
protocol
40:15, 51:15
pry
31:4
prying
37:12
psychological
78:19, 78:22
pt
23:22
public
2:14, 88:1,
88:18
pujols
26:16, 29:22,
34:3, 34:4,
34:7, 35:17,
36:17
pulled
18:4, 30:17
pulling
37:12, 37:14
punch
37:6
punched
35:20
punishment
17:8
purpose
57:22
purposes
32:13
pursuant
2:13
pushed
24:1

put
23:7, 33:4,
33:18, 34:7,
34:17, 45:11,
61:15, 63:15,
63:18, 67:14,
73:2, 83:3
putting
55:16, 55:20

**Q**

qualified
88:7
question
6:13, 6:15,
54:9, 85:6, 86:5
questions
6:5, 6:19,
84:2, 87:17,
87:19
quickly
38:7
quite
84:10
quote
61:9

**R**

rabineau
3:4, 4:3, 5:8,
78:2, 84:4,
84:7, 84:15,
85:6, 85:10,
85:14, 86:4,
87:16
radio
26:14, 46:9
raised
30:10, 51:14
rank
15:6, 25:1,
52:4, 53:4
ranks
52:6
rating
14:18
raw
80:6

| | | | |
|---|---|---|---|
| **re-sign**<br>61:13 | 85:11 | **released**<br>53:9, 53:11 | 21:7, 21:20 |
| **reached**<br>79:21 | **recommendations**<br>77:22 | **remain**<br>39:2 | **resist**<br>31:3, 31:5,<br>69:8, 69:11 |
| **read**<br>82:7, 87:18 | **recommended**<br>54:15 | **remained**<br>49:10 | **resisted**<br>12:4 |
| **realized**<br>57:20 | **record**<br>5:9, 86:2,<br>87:21, 88:9,<br>89:7 | **remember**<br>9:4, 9:5, 9:10,<br>9:11, 9:18, | **resisting**<br>12:7, 37:10,<br>70:1, 71:11 |
| **really**<br>84:1 | **recorded**<br>1:22, 88:6 | 10:12, 11:5,<br>18:9, 19:5,<br>19:20, 19:22, | **respect**<br>69:5 |
| **reason**<br>15:10, 15:15,<br>16:8, 17:19,<br>21:19, 43:5,<br>44:13, 45:16,<br>45:18, 51:6,<br>51:10, 69:16 | **recording**<br>58:10, 88:8,<br>89:4 | 20:1, 20:17,<br>39:5, 49:14,<br>49:15, 52:15,<br>60:8, 60:10,<br>61:5, 61:6,<br>67:5, 68:13,<br>68:15, 68:16, | **respond**<br>46:10, 46:17 |
| | **records**<br>59:16 | | **responded**<br>11:18, 26:20,<br>63:6, 63:8 |
| | **red**<br>51:14 | | **responding**<br>54:22 |
| **reasons**<br>42:19 | **reduced**<br>88:7, 89:5 | 69:7, 72:19,<br>79:1, 81:18,<br>86:10 | **response**<br>21:14, 29:9,<br>32:6, 54:5 |
| **recall**<br>10:8, 15:3,<br>20:5, 24:9,<br>24:13, 25:9,<br>35:22, 36:2,<br>37:22, 39:3,<br>49:9, 50:15,<br>76:13, 81:13 | **refer**<br>60:2 | **rendered**<br>46:5 | **responsibilities**<br>25:2 |
| | **reference**<br>10:2, 15:17 | **repeat**<br>5:22, 29:17 | **responsible**<br>25:13 |
| | **referred**<br>56:3, 80:1 | **rephrase**<br>6:16 | **restrain**<br>36:15, 36:16,<br>36:19, 37:4,<br>37:9 |
| | **referring**<br>18:19, 36:17,<br>63:4, 65:19 | **report**<br>60:5, 69:19,<br>69:21, 71:10,<br>71:14 | |
| **receipt**<br>51:4, 51:8,<br>51:16 | **refused**<br>18:1, 62:4 | **reporter**<br>86:3, 88:1 | **restrained**<br>44:22, 49:8 |
| **receive**<br>15:1, 29:9 | **regard**<br>74:8, 74:9,<br>74:22 | **reports**<br>8:6, 8:10, 8:12 | **restraints**<br>45:6, 49:9 |
| **received**<br>73:8 | **regarding**<br>5:20 | **reprimand**<br>19:21, 82:17,<br>83:6 | **result**<br>15:18, 64:4,<br>69:1, 75:12,<br>77:6 |
| **recent**<br>8:21, 9:1,<br>80:14, 80:15 | **regular**<br>7:20 | **requested**<br>46:5 | **review**<br>18:10, 32:5,<br>48:17, 67:13 |
| **recently**<br>76:17 | **reissue**<br>59:20, 60:12,<br>60:13, 61:11 | **required**<br>26:9, 46:10 | **reviewed**<br>8:5 |
| **recession**<br>23:4, 23:10 | **reissued**<br>60:13 | **reside**<br>8:1 | **reviewing**<br>55:8 |
| **recollection**<br>13:9, 24:18,<br>34:5 | **rejected**<br>59:17, 66:19 | **resign**<br>20:22 | **revoked**<br>16:8 |
| **recommendation**<br>77:19, 77:20,<br>83:5, 83:7,<br>83:14, 85:8, | **related**<br>47:17, 88:11,<br>89:9 | **resigned**<br>20:19, 21:5, | **rewrite**<br>59:20, 60:1 |

| | | | |
|---|---|---|---|
| **rice** | **sabrina** | **scanning** | **seeing** |
| 80:20 | 3:14 | 28:12 | 36:2, 49:9 |
| **ridgewood** | **safety** | **scene** | **seek** |
| 22:9 | 42:19, 44:17 | 38:22, 39:2, | 65:14, 65:18, |
| **right** | **said** | 39:7, 46:11, | 66:8, 72:2, |
| 6:9, 29:14, | 9:20, 10:18, | 51:22, 63:13 | 78:21, 79:21, |
| 30:4, 30:5, | 19:10, 19:13, | **scheduled** | 80:1, 82:12 |
| 30:10, 33:4, | 23:1, 23:17, | 76:14, 76:15 | **seeking** |
| 34:1, 35:11, | 29:17, 29:18, | **school** | 77:7 |
| 37:7, 41:4, | 41:7, 41:10, | 22:4, 22:5, | **seemed** |
| 57:2, 81:20, | 41:11, 43:19, | 22:18, 24:2, | 60:8, 60:9 |
| 85:9, 86:22, | 45:2, 48:18, | 24:6 | **seen** |
| 87:20 | 54:7, 55:6, | **schooling** | 31:15, 31:20, |
| **rights** | 55:7, 55:10, | 24:6 | 32:2 |
| 78:12 | 55:11, 57:18, | **scout** | **segment** |
| **rite** | 61:4, 61:9, | 22:16 | 58:5, 58:15 |
| 22:6, 22:7 | 67:5, 67:22, | **search** | **send** |
| **rms** | 76:9, 76:10, | 47:14 | 67:14 |
| 59:16, 61:17, | 79:8, 81:3, | **searched** | **senior** |
| 67:8, 67:12, | 81:19, 82:7, | 47:15 | 20:13, 21:10, |
| 67:13 | 84:9, 87:8, | **seat** | 21:22 |
| **road** | 88:8, 88:9, | 12:13 | **sent** |
| 9:15, 10:19 | 89:5, 89:6 | **seats** | 61:17 |
| **roche** | **same** | 87:20 | **sentence** |
| 2:5, 3:6 | 9:9, 54:2, | **second** | 75:1, 75:9 |
| **roll** | 57:10, 60:14, | 59:3, 66:19, | **sentenced** |
| 25:5, 47:7, | 60:17, 81:14 | 66:20, 74:8 | 74:15 |
| 48:19, 52:12 | **sampson** | **second-degree** | **sentencing** |
| **room** | 5:11 | 74:15 | 74:14 |
| 41:5, 41:20, | **sat** | **seconds** | **september** |
| 47:7, 48:19, | 44:20 | 36:11, 58:11, | 67:3 |
| 52:13 | **savings** | 82:10 | **serge** |
| **rooms** | 22:9 | **section** | 55:11, 61:4 |
| 41:17 | **say** | 15:9, 15:11, | **sergeant** |
| **rotc** | 8:10, 18:18, | 60:20, 67:8, | 15:8, 24:22, |
| 22:16 | 19:8, 24:16, | 79:22, 80:3 | 36:14, 36:15, |
| **roughly** | 29:20, 42:6, | **security** | 37:6, 37:9, |
| 20:16 | 43:6, 44:10, | 26:2, 26:5, | 37:21, 38:1, |
| **route** | 55:22, 59:17, | 37:18, 63:22 | 38:8, 38:11, |
| 66:16 | 80:21, 87:8 | **see** | 38:14, 41:8, |
| **run** | **saying** | 19:9, 25:17, | 42:1, 42:11, |
| 45:17, 46:6, | 11:6, 71:20, | 25:20, 32:10, | 42:14, 42:18, |
| 46:14 | 77:18, 78:15, | 33:17, 34:9, | 43:22, 44:5, |
| **runaround** | 86:8 | 34:10, 34:13, | 46:4, 46:15, |
| 61:15 | **says** | 47:16, 58:10, | 47:1, 48:18, |
| **S** | 55:21, 59:7, | 61:12 | 49:2, 50:18, |
| **s-i-r-t** | 59:9, 61:9, | **see-through** | 50:19, 50:21, |
| 54:6 | 61:17, 82:10 | 33:14 | 51:1, 51:18, |

52:9, 52:22,
53:5, 53:8,
53:14, 54:2,
54:8, 54:10,
55:9, 55:13,
55:19, 56:2,
59:4, 60:22,
61:3, 62:19,
64:4, 68:3,
80:20, 87:4
**serious**
6:5
**served**
74:17, 75:4
**service**
23:6, 46:7,
46:18, 47:2,
74:20
**sessions**
79:3
**set**
59:3, 60:1,
62:1, 62:4
**severe**
82:17, 83:6
**sgt**
1:14, 2:1, 4:2,
5:3
**shame**
79:17
**shape**
57:7
**shards**
14:2
**shattered**
14:1
**shawn**
1:22, 2:13,
88:2, 88:18
**shift**
24:13, 24:15,
24:16, 24:17,
24:19, 24:21,
25:15, 38:21,
46:15, 46:16,
46:17, 49:13,
53:13, 66:5,
66:10, 68:2

**shifted**
72:10, 72:13,
73:15
**shirt**
52:3, 52:6
**shirts**
52:7
**shit**
19:11
**shock**
46:20, 58:17
**shocked**
55:2
**shooter**
10:15
**shooting**
46:8, 46:21,
56:13, 57:11,
57:12, 63:3,
63:5, 63:6
**short**
55:17
**shortage**
25:7
**shortages**
24:21
**shorter**
86:18
**shot**
10:6
**shots**
63:8, 63:16
**should**
65:14, 79:20
**shouldn't**
18:13, 43:7
**shoves**
30:13
**show**
21:3, 69:22,
71:16
**sic**
24:22
**side**
19:4, 30:20,
68:12
**sidewalk**
30:14

**sign**
17:7, 17:8,
61:8, 61:10,
61:16, 61:17,
66:20, 66:21,
77:15, 87:19
**signal**
11:16
**signature**
60:20, 61:19
**signature-mig2k**
89:13
**signature-p1kal**
88:16
**signed**
60:21, 77:14
**signing**
67:1
**simple**
43:3
**simply**
51:5
**since**
7:7, 16:2,
17:18
**single-handed**
45:20, 45:21
**sir**
12:19, 20:2,
37:3
**sirens**
18:2, 27:5
**sirt**
54:3, 54:4,
61:2, 61:3
**sit**
42:21, 43:10
**site**
25:10
**sitting**
42:17, 74:7
**situated**
34:19
**situation**
16:19, 51:12,
58:1, 71:2
**six**
7:12, 74:16,

**skills**
88:10, 89:8
**small**
59:10
**snail**
67:19
**sole**
24:20, 46:6
**solely**
14:20
**some**
11:20, 15:19,
16:17, 24:4,
24:5, 26:8,
39:7, 57:6,
81:10, 81:22,
82:1, 82:5, 82:6
**somebody**
70:10
**someplace**
33:19, 35:7
**something**
10:13, 11:12,
17:1, 17:6,
18:11, 19:7,
43:3, 55:21,
60:4, 70:6,
73:1, 82:8
**sometime**
76:17
**sometimes**
6:14, 17:3,
43:3
**somewhere**
20:20, 61:7
**soon**
36:19, 59:22
**sorry**
9:16, 13:4,
38:10, 40:9,
40:12, 87:2
**sort**
67:16
**sought**
66:3, 78:19
**sounds**
65:4

75:3

south
7:3
speak
25:12, 26:1,
67:20, 78:7,
79:19
special
25:22, 42:3,
42:6, 42:8,
43:12, 49:1,
54:5
specific
8:11, 16:14,
41:17, 41:20,
78:11
specifically
65:13
specify
82:21
speculation
78:16
spell
87:4
spoke
76:6, 76:8,
78:17
st
20:9
staffing
24:21
stamp
36:7
stance
30:16
stancil
29:13, 29:20,
30:2, 30:4,
30:7, 30:12,
33:11
standard
48:8
standing
21:6
start
29:21, 68:6,
86:17
started
15:21, 22:5,

22:15, 27:10,
29:20, 38:9,
42:10, 42:16,
51:10, 63:18,
66:6, 68:2
state
2:14, 5:10,
31:14, 58:14,
58:17, 86:8,
86:9, 86:10,
88:19
state's
54:14, 59:18,
62:5, 64:7,
65:3, 65:5,
65:9, 65:11,
65:17, 70:6,
72:9, 72:13,
73:4, 73:10
stated
19:7, 46:18,
50:19, 52:22,
82:20
statement
17:8, 54:13,
56:2, 60:6,
60:11, 64:17,
64:19, 69:18,
71:15, 75:22,
76:5, 76:13
statements
29:5
states
1:1
stating
51:5
station
49:7
status
62:15
stay
38:22
still
12:5, 38:20,
45:14, 46:7,
58:19, 70:18,
71:21, 80:8,
83:20

stop
18:1, 30:11,
51:8
straight
14:7, 79:6
street
2:6, 3:7, 3:17,
25:4, 25:8,
26:10, 27:10,
27:11, 27:14
streets
40:1
stretch
86:1
strike
29:14, 30:7,
30:18, 40:18
strikes
37:11
strip
36:2
stripped
79:10
struck
12:2, 30:19,
30:20, 75:12,
75:15
struggling
13:20
sub-charges
82:4
submit
67:11
subsequently
74:2, 74:13,
75:8
successful
77:12
successfully
31:8
sued
10:1
sufficient
51:16
suit
10:8, 10:11
suite
2:7, 3:7

sum
15:1
summarized
59:11
summoned
86:21
summons
64:10, 65:1,
68:1, 68:20
superior
56:7
supervised
74:19, 75:6
supervision
89:6
supervisor
24:20, 46:6,
51:1, 82:20
supervisor's
52:9, 52:13
supervisors
46:10, 48:13
supplement
60:5
supposed
48:14
sure
9:4, 10:11,
12:21, 14:19,
29:19, 39:3,
39:16, 42:13,
65:2, 65:9,
67:21, 86:9,
87:14
surprised
54:17, 54:20,
56:17, 57:8
suspect
10:4, 13:20,
29:13, 30:6,
37:9, 51:6,
71:18
suspects
41:14, 63:14
suspended
15:13, 15:16,
15:18, 16:8,
18:7, 18:15,

18:18, 18:19,
72:17, 74:17
**suspending**
75:3
**suspension**
15:21, 19:19
**sustained**
19:15, 19:17,
64:2
**sweep**
31:2
**swinson**
87:3
**switch**
87:20
**sworn**
5:4, 88:5
**system**
59:16

**T**

**tactical**
42:19
**take**
6:17, 12:6,
13:20, 13:22,
23:6, 23:19,
25:1, 29:2,
31:2, 31:9,
32:14, 32:17,
38:18, 39:22,
44:16, 66:8
**taken**
8:13, 12:15,
23:13, 52:13,
88:3
**takes**
67:9
**taking**
39:4, 42:22
**talk**
55:8
**talked**
79:18
**talking**
8:11, 9:21,
26:4, 33:18,
36:3, 52:14,

62:10, 66:12
**tapped**
63:21
**tase**
14:3
**taser**
12:8, 12:14,
34:15
**tasks**
15:14
**team**
54:6
**technically**
87:14
**tell**
6:15, 6:17,
6:21, 15:6,
17:11, 17:15,
24:17, 33:8,
47:17, 55:4,
73:14, 80:16,
84:17, 85:9,
86:15
**teller**
22:8
**telling**
72:20
**temporarily**
41:21
**ten**
75:1
**tendon**
14:8
**term**
77:16, 87:15
**terminated**
76:11
**terminating**
77:12
**termination**
77:8, 77:20
**test**
23:6, 23:22
**testified**
5:6, 62:22,
75:20, 78:17,
86:15
**testify**
5:4, 86:21

**testimony**
31:11, 73:9,
73:13, 75:22,
76:1
**tests**
41:6
**th**
3:17, 7:1,
66:7, 66:13,
75:11
**thank**
87:16
**themelis**
3:13, 5:20,
47:19, 73:12,
76:19, 77:13,
78:1, 83:22,
84:6, 84:20,
85:1, 85:4,
85:8, 87:18
**themselves**
43:16
**thereafter**
88:6
**thing**
40:4, 82:6
**things**
19:4, 42:18,
68:12, 84:14
**think**
5:15, 10:12,
36:17, 52:5,
58:13, 62:22,
69:10, 80:2,
80:6, 85:17
**third**
41:15, 62:1,
62:4
**thought**
10:18, 40:11,
45:2, 51:11,
52:8, 63:15,
85:16
**threat**
45:1
**three**
45:6, 45:8,
45:9, 69:3,

70:17, 74:18,
75:5, 87:5, 87:7
**through**
14:7, 25:16,
27:11, 59:15,
59:19
**throw-over**
33:14
**thrown**
79:10, 81:20
**thursday**
1:16
**time**
5:20, 8:15,
8:22, 15:5,
20:11, 21:11,
22:1, 23:10,
25:3, 26:7,
27:21, 28:5,
28:16, 29:10,
31:11, 35:19,
35:20, 35:21,
36:3, 36:6,
36:14, 39:7,
39:13, 39:16,
42:10, 43:15,
44:5, 49:16,
50:15, 50:22,
53:11, 55:9,
56:12, 59:2,
60:3, 65:22,
66:19, 66:20,
67:7, 67:8,
67:19, 72:7,
74:17, 75:4,
76:8, 77:5,
78:19, 82:15
**times**
60:7, 70:17
**timestamp**
36:8, 36:9
**timestamped**
36:5
**today**
8:4, 17:9,
58:13
**told**
36:10, 36:19,

51:13
**took**
5:15, 8:6,
27:3, 38:12,
38:14, 51:21,
51:22, 55:18,
66:14, 68:11
**top**
14:8, 14:10,
57:7
**tough**
79:20
**towards**
27:10, 55:1
**towed**
18:17
**trained**
44:15
**transcriber**
89:1
**transcript**
89:3, 89:6
**transcriptionist**
88:8
**transit**
67:8
**transport**
41:22
**transported**
54:12
**trauma**
46:20
**treated**
40:14, 42:5
**treatment**
42:3, 42:6,
42:8, 43:12,
49:2
**trespassing**
70:11
**trial**
12:20, 15:18,
16:17, 32:5,
58:6, 70:7,
74:3, 74:7,
76:14, 76:15,
76:16, 76:20,
77:1, 77:6,

77:21, 78:5,
78:7, 78:11,
78:13, 80:11,
80:17, 81:12,
83:14, 86:6
**tried**
71:17, 72:15
**true**
65:11, 88:9,
89:6
**truth**
5:5, 5:6
**try**
70:11, 79:18,
79:19
**trying**
12:13, 14:2,
28:18, 29:4,
29:6, 29:10,
30:2, 30:18,
61:1, 61:11,
61:12, 66:15,
70:15, 71:8,
71:21
**tuesday**
76:10, 76:21
**turn**
27:14, 73:1
**twice**
8:20, 8:21
**two**
13:8, 13:21,
22:2, 23:9,
23:14, 27:4,
45:6, 45:8,
45:11, 50:10,
53:7, 60:14,
60:16, 63:14,
69:17, 72:1,
74:22, 75:14,
80:14, 80:21,
81:5, 83:4, 83:6
**type**
47:11
**typewriting**
88:7, 89:5

**U**

**uh-huh**
11:8, 17:17,

33:22, 40:21,
44:9, 85:21
**un**
30:19
**unable**
13:22, 61:15,
61:16
**unbecoming**
81:8, 82:3
**uncuffed**
45:19
**under**
15:12, 28:2,
30:21, 36:20,
56:1, 82:3,
83:13, 89:5
**understand**
6:13, 6:15,
17:14, 31:10,
71:20, 71:22,
82:2
**understanding**
65:15, 65:16,
83:10, 84:12
**understands**
83:19
**unfortunately**
23:21
**uniform**
43:17, 52:16
**uniforms**
52:17
**uninterruptedly**
16:4
**unit**
25:8, 54:2,
61:12, 63:7,
67:17
**united**
1:1
**units**
11:18, 39:6,
41:13
**university**
47:3
**unjustly**
18:12
**until**
73:8, 76:16

**upset**
58:16, 58:22
**uruschima**
9:11
**use**
10:4, 28:6,
31:7, 32:7,
37:7, 37:11,
39:18, 40:16,
45:10, 48:4,
48:7, 48:11,
48:17, 55:18,
58:12, 58:18,
58:20, 65:13,
78:18, 87:12,
87:13
**uses**
48:13
**using**
26:3
**usually**
17:6, 17:11,
41:13, 44:16,
45:10

**V**

**vehicle**
12:3, 12:5,
12:15, 18:3,
18:4, 18:8,
18:16, 18:21,
27:14, 27:17,
28:10, 31:7,
32:19, 33:3,
35:2, 35:4,
35:20, 37:8,
39:22, 63:9,
63:15, 63:17,
63:20, 63:21
**vehicles**
25:6
**verbal**
19:22, 30:8
**via**
3:10
**victim**
46:12
**video**
32:1, 34:6,

47:4, 48:6,
58:15
**videoconference**
3:10
**videos**
31:15, 31:20,
32:2, 36:1
**viewed**
36:1
**violation**
17:6, 28:8
**voice**
26:17
**volunteer**
22:19
**volunteered**
84:8, 84:10
**vs**
1:7

**W**

**wagon**
41:21
**wait**
85:11
**walk**
35:3, 39:21
**walk-in**
46:8, 46:20,
57:12
**walked**
29:3, 35:4,
38:13, 79:6
**walking**
19:8, 19:10,
35:8
**want**
17:15, 29:18,
44:16, 56:16,
56:19, 57:13,
83:22, 84:16,
84:21, 85:7,
85:22
**wanted**
23:2, 23:16,
48:4, 48:6,
50:6, 52:20,
52:22, 68:19,

70:7, 70:22
**wants**
57:7
**warning**
70:12
**warrant**
64:22
**warren**
86:19
**water**
43:4, 43:7
**way**
20:7, 27:2,
27:11, 40:2,
41:18, 42:5,
42:7, 44:14,
45:14, 49:8,
54:21, 54:22,
57:6, 58:3,
58:18, 59:19,
64:10
**ways**
11:20
**we'll**
16:21
**we're**
29:19, 44:14,
46:9, 48:14,
85:17, 86:3,
87:19
**we've**
78:18
**weapon**
44:19, 47:9
**weapons**
43:1, 47:12
**wear**
52:7
**wearing**
33:15, 47:12,
52:5
**webb**
80:19
**week**
60:9, 80:10,
80:14
**weight**
7:11, 81:20

**wellness**
80:2
**went**
12:3, 14:4,
14:5, 14:7,
19:5, 24:4,
25:4, 25:7,
25:9, 25:10,
25:18, 27:1,
27:3, 28:21,
29:1, 40:5,
46:20, 47:3,
47:22, 48:1,
48:17, 58:11,
62:7, 66:4,
66:5, 68:5,
68:11, 70:8,
70:19, 73:18,
79:2, 79:5
**weren't**
43:14
**what'd**
28:22
**whereupon**
5:2
**whether**
10:8, 19:20,
32:6, 37:18,
56:13, 62:3,
64:13, 64:22,
85:5
**white**
33:15, 33:21,
52:3, 52:5,
52:7, 52:16,
52:17, 81:5
**whole**
5:5
**window**
14:1
**wish**
24:1
**within**
18:14, 19:3,
26:22, 39:15,
39:17
**without**
74:7

**witness**
53:4, 85:3,
85:12
**witness(es**
88:4
**witnesses**
48:15, 86:6,
86:11, 86:14,
86:18, 87:1,
87:6, 87:8,
87:10, 87:12,
87:14
**woman**
11:2, 11:4
**woman's**
20:1
**women**
42:16
**word**
19:4, 37:2
**words**
35:6, 61:6,
71:21, 76:3
**work**
7:20, 42:13,
61:18, 72:18,
79:16
**worked**
22:7, 53:12,
66:5, 73:1
**worker's**
13:13
**working**
20:12, 22:6,
35:8
**would've**
54:12, 54:14,
54:15, 78:5
**wouldn't**
36:18
**wow**
82:9
**wrist**
45:7
**writing**
33:1
**written**
54:14, 59:22

**wrong**
27:2
**wrote**
56:6, 59:9,
59:14, 69:20,
71:10

## Y

**yeah**
6:9, 11:1,
13:17, 14:7,
20:17, 33:17,
44:1, 80:15,
85:12, 86:21
**year**
9:4, 9:18,
20:18, 22:8,
74:19, 75:6
**years**
9:17, 22:3,
23:9, 23:14,
74:16, 74:18,
75:1, 75:5
**yellow**
33:15, 34:14
**yerg**
3:22, 61:20,
62:9, 62:16,
65:8, 65:20,
73:14
**yesterday**
5:12, 32:8,
52:11, 62:22
**york**
20:13, 21:16,
21:18
**young**
22:21
**yourself**
33:6, 34:10

## Z

**zoom**
82:20

## $

**$2,000**
15:4

## .

**.1120**
3:19
**.9150**
3:9

## 0

**00**
68:6
**03536**
1:7

## 1

**10**
36:10, 68:6,
75:11
**100**
3:17, 74:20
**12**
1:17
**13**
7:1, 11:16
**14**
7:5
**15**
36:11
**19**
3:17, 88:20,
89:17
**1988**
7:1
**1:-cv--elh**
1:7
**1st**
66:6, 66:13,
74:21

## 2

**2**
87:21
**20**
1:7, 82:16,
83:2, 83:5
**2004**
22:18
**2006**
22:5

**2008**
22:6, 22:20,
23:4
**2009**
21:14, 23:4
**2010**
20:17, 20:20,
21:15
**2011**
20:9, 20:17,
20:21, 22:20,
23:12
**2015**
9:19
**2016**
9:19
**2018**
24:9
**2019**
15:22, 16:2,
16:7, 72:17,
73:7, 74:6,
74:14
**2021**
74:21
**2022**
75:12
**2023**
1:16, 88:20,
89:17
**21**
20:9
**210**
7:12
**21202**
2:8, 3:8, 3:18
**2341**
2:7, 3:7
**26**
24:9
**2nd**
72:16, 73:7,
74:5

## 3

**30**
58:11, 66:7,
66:13

**32**
4:9
**39**
87:21

## 4

**400**
25:16, 26:9
**401**
2:6, 3:7
**410.685**
3:19
**410.837**
3:9

## 5

**510428**
1:20
**57**
1:17
**5th**
1:16

## 7

**7th**
74:14

## 8

**89**
1:21

## 9

**90**
84:8