IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HENRIETTA MIDDLETON,

*Plaintiff*,

*v.*                                                              Civil Action No. ELH-20-3536

MARLON KOUSHALL, *et al.*

*Defendants*.

**MEMORANDUM OPINION**

In the early morning of August 26, 2018, defendant Marlon Koushall, a sergeant in the Baltimore City Police Department ("BPD"), arrested plaintiff Henrietta Middleton, an off-duty sergeant in the BPD who was attending a party at a strip club in Baltimore. Middleton was charged with second-degree assault and other offenses, but the charges were later dismissed. Thereafter, Middleton filed suit against Koushall and former BPD lieutenant Jason Yerg, who was involved in the BPD's internal investigation of the incident. In a Second Amended Complaint (ECF 43, "SAC"), Middleton alleges, *inter alia*, that Koushall used excessive force in effectuating her arrest, in violation of the Fourth Amendment, and that Koushall and Yerg unlawfully conspired to charge her without probable cause.

Middleton's suit has been amended twice and subject to three rounds of motions to dismiss. In the counts that remain, Middleton alleges, with respect to Koushall, battery (Count I); false imprisonment (Count II); false arrest (Count VI); and violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV). ECF 50 at 7. With respect to both Koushall and Yerg, Middleton alleges malicious prosecution and abuse of process (Count III); violations of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Count VII); conspiracy under

Maryland law (Count IX); and conspiracy to deny equal protection of the laws, in violation of 42 U.S.C. § 1985(3) (Count X).  *Id.*

Defendants have filed a post-discovery motion for summary judgment (ECF 83), supported by a memorandum of law (ECF 83-1) (collectively, the "Motion").  The Motion is supported by seventeen exhibits.  ECF 83-2 to ECF 83-19.  Plaintiff opposes the Motion (ECF 89), supported by a memorandum (ECF 89-1) (collectively, "Opposition").  She has also submitted nine exhibits. ECF 89-2 to ECF 89-11.  Defendants have replied.  ECF 98 ("Reply").  The Reply is supported by one exhibit.  ECF 98-1.

No hearing is necessary to decide the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny the Motion in part.

## I.    Procedural Background

Plaintiff filed suit on December 7, 2020.  ECF 1.  The Complaint named multiple defendants:  the BPD; the Mayor and City Council of Baltimore City (the "City"); Koushall, individually and in his official capacity; Yerg, individually and in his official capacity; and Gary Tuggle, the former Commissioner of the BPD, individually and in his official capacity.  *See id.* The City, BPD, and Tuggle (the "City Defendants") moved to dismiss the Complaint.  ECF 19. Koushall and Yerg also moved to dismiss the Complaint, in part.  ECF 26.  Before the Court ruled on the motions, plaintiff filed a First Amended Complaint.  ECF 28 ("FAC").

The FAC contained ten counts.  In particular, the FAC asserted claims of battery (Count I); false imprisonment (Count II); malicious prosecution and abuse of process (Count III); violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV); intentional infliction of emotional distress (Count V); false arrest (Count VI); a claim of violation of plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution, pursuant to 42 U.S.C. §

2

1983 (Count VII); false light invasion of privacy (Count VIII); conspiracy (Count IX); and a conspiracy claim under 42 U.S.C. § 1985(3) (Count X).

The City Defendants moved to dismiss the FAC. ECF 29. And, Koushall and Yerg moved to dismiss the FAC, in part. ECF 31. By Memorandum Opinion and Order of January 28, 2022 (ECF 41; ECF 42), I granted the City Defendants' motion and dismissed the suit as to the City, BPD, and Tuggle. ECF 41 at 69. And, I granted the motion of Koushall and Yerg in part and denied it in part. *Id.* Specifically, I dismissed Count V (intentional infliction of emotional distress) and Count VIII (invasion of privacy) as to both Koushall and Yerg, and I dismissed Counts I (battery), II (false imprisonment), IV (Articles 24 and 26 of the Maryland Declaration of Rights), and VI (false arrest) as to Yerg. *Id.* I also dismissed Count VII (Fourth and Fourteenth Amendments) as to both defendants in their official capacities, and as to Yerg in his individual capacity insofar the count asserted a denial of medical care. *Id.* I otherwise denied that motion. *Id.*

Thereafter, plaintiff filed the SAC, which is the operative pleading. ECF 43. The SAC again names Koushall, Yerg, and Tuggle as defendants. *Id.* And, with the exception of Count VIII (false light invasion of privacy), the SAC reasserts the counts contained in the FAC, including those that were dismissed. *See id.*; ECF 50 at 3.

Tuggle moved to dismiss the SAC. ECF 44. Koushall and Yerg moved to dismiss the claims that the Court had previously dismissed, but which plaintiff reasserted in the SAC. ECF 45.

By Memorandum and Order of August 18, 2022 (ECF 50; ECF 51), I granted the motions. In particular, I dismissed Tuggle from the suit, with prejudice. ECF 51. As to Yerg, I dismissed Counts I, II, IV, and VI, with prejudice. With respect to Yerg in his individual capacity, I dismissed

Count VII insofar as it asserted a claim for denial of medical care.  As to Koushall and Yerg, I dismissed Count V, with prejudice.  And, as to Koushall and Yerg in their official capacities, I dismissed Count VII.

Discovery ensued.  As noted, several counts remain.  As to Koushall, they are battery (Count I); false imprisonment (Count II); false arrest (Count VI); and violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV).  With respect to both Koushall and Yerg, the remaining claims are malicious prosecution and abuse of process (Count III); violations of the Fourth and Fourteenth Amendments (Count VIII); conspiracy under Maryland law (Count IX); and conspiracy under 42 U.S.C. § 1985(3) (Count X).

## II.     Factual Background[1]

At the time of Middleton's arrest on August 26, 2018, she was a sergeant in the BPD, assigned to the office of the BPD Inspector General.  ECF 83-3 (Middleton deposition), at 16, 69.[2] Middleton was promoted to captain in March 2023.  *Id.* at 15.  Koushall was also a sergeant in the BPD at the time of the incident.  ECF 83-4 (Koushall deposition), at 24–25.  He has been on administrative duty since February 2019.  *Id.* at 16.

On the morning of Middleton's arrest, she was attending a bachelorette party at Norma Jean's, a strip club (the "Club") on "The Block," an area in Baltimore known for adult entertainment.  ECF 83-3 at 13, 15, 24.  The party was for Wanda Johnson, who was also an officer in the BPD.  *Id.* at 28, 30–31.

---

[1] As discussed, *infra*, the facts are construed in the light most favorable to plaintiff as the nonmoving party.

[2] Electronic page numbers do not appear in the deposition transcripts appended to the Motion.  *See* ECF 83-3; ECF 83-4; ECF 83-11.  Therefore, I cite to the page numbers printed on the transcripts by the reporting service.

The party began with a brunch the previous day, attended by about fifteen to twenty people. *Id.* at 24–25. Middleton had "one or two" alcoholic drinks at the brunch. *Id.* at 25–26. After the brunch, the group went to a restaurant called "Little Italy" and then to the Baltimore Marriott Waterfront Hotel. *Id.* at 34–36. Middleton did not have any alcoholic beverages at the restaurant or the hotel. *Id.* at 34, 36–37.

At about 10:00 p.m. on August 25, 2018, Middleton and others in her group arrived at Norma Jean's, located at 10 Custom Avenue in Baltimore. *Id.* at 15, 24, 37. At some point while at the Club, Johnson became involved in a "physical altercation" with a woman named Jada Stancil. *Id.* at 32. Middleton did not see the fight begin because her back was turned. *Id.* However, another member of the party told Middleton of the altercation while it was ongoing. *Id.* at 32–33. Middleton then "went over, grabbed [Johnson] by her waist, and attempted to pull her back into" the area of the Club where Middleton's group was gathered. *Id.* at 33. While Middleton was doing so, "[t]here was a female to [her] left, . . . laying on her back, kicking [Middleton] in [the] side." *Id.* Once Middleton "realized what was going on," she "swiped" the woman's "foot off of" her. *Id.*

The dispute between Stancil and members of Middleton's group continued outside the Club. *See* ECF 89-5 (CCTV footage) at :00–:35.[3] As Stancil stood on the sidewalk, shouting and gesturing at several women, *id.* at :00–:07, another woman approached her from behind and struck her in the back of the head. *Id.* at :07. Stancil wheeled around and attempted to strike the woman. *Id.* at :07–:10.

At the time, BPD officer Anthony Pujols was assigned to patrol The Block. ECF 83-4 at 26. The CCTV footage shows that Pujols separated Stancil and the woman who struck her. ECF

---

[3] "CCTV" refers to Baltimore's closed-circuit television or video surveillance cameras.

89-5 at :10–14.  As Pujols restrained Stancil, Middleton restrained the other woman by grabbing hold of her by her waist.  *Id.* at :12–:22.  Middleton and the other woman then began walking away from the Club.  *Id.* at :14–:28.  As they were walking away, Koushall arrived in his police car, with his lights activated.  *Id.* at :17–:26.

Koushall had been working the midnight shift in the BPD's Central District as the "sergeant in charge."  ECF 83-4 at 24–25.  The "sergeant in charge" assumes the "rank and responsibilities of a lieutenant."  *Id.* at 25.  Koushall "was the sole supervisor for the [midnight] shift due to staffing shortages."  *Id.* at 24.  Staffing shortages also required Koushall to go "on the street as a backup unit" after he "assigned officers their patrol vehicles and posts."  *Id.* at 25.  While on patrol, Koushall heard "a frantic radio call c[o]me over the air."  *Id.* at 26.  He understood that the call was made by "an officer on [T]he [B]lock."  *Id.*  And, he knew that "the only officer [he] assigned there was Officer Pujols."  *Id.*  Therefore, Koushall knew that Pujols "was there alone," and he understood Pujols to be "calling for assistance."  *Id.*

Koushall arrived at The Block about one to two minutes after hearing Pujols's call for assistance.  *Id.* at 27.  As Koushall exited his car, Middleton, who had been walking away from the Club, turned around and began walking toward the Club.  ECF 89-5 at :30–:34.  She claims that she did so because one of the women in her group "stated that she left her shoes" and Middleton volunteered to retrieve them.  ECF 83-3 at 107.  As Middleton approached the Club, Stancil walked briskly in her direction, followed by Pujols.  ECF 89-5 at :32–:34.  Stancil "appear[ed] to spit" on Middleton.  ECF 83-3 at 107.  Middleton then raised her arms, *see* ECF 89-5 at :35, and said words to the effect of, "What the F, why are you spitting?"  ECF 83-3 at 107–08.  With her arms outstretched, Middleton took several quick steps toward Stancil.  ECF 89-5 at :35.

6

Koushall approached Middleton, Stancil, and Pujols.  *Id.* at :35–:36.  As Koushall drew near, he extended his arm and placed it between Middleton and Stancil.  *Id.* at :36–:37.  After Koushall placed his arm between Middleton and Stancil, Koushall stepped backward off the sidewalk.  *Id.* at :37–:38.[4]  Middleton also stepped off the sidewalk.  *Id.* at :38–:39.  Then, Koushall shoved Middleton and struck her in the face.  *Id.* at :39–:40.  After being struck, Middleton took several steps away from Koushall.  *Id.* at :39–:43.  Koushall brought Middleton to the ground.  *Id.* at :43–:44.[5]  Pujols grabbed Koushall from behind.  *Id.* at :44–:48.  According to Koushall, once Koushall "told [Pujols] that" Middleton was "under arrest," Pujols "disengaged and allowed [Koushall] to continue to effect a lawful arrest."  ECF 83-4 at 36.   During the arrest, Koushall "did not observe any weapons" in Middleton's possession.  *Id.* at 47.

According to Koushall, Middleton informed him that she was a police officer after "the use of force ended," when he was "putting her in handcuffs."  *Id.* at 55.  In contrast, Middleton states that she identified herself as a BPD officer "[a]fter [she] was struck."  ECF 83-3 at 42.

Koushall did not activate his body camera until after he completed the arrest of Middleton. ECF 83-4 at 27–28.  At his deposition, he admitted that his failure to activate his body camera was "a violation" of BPD policy.  *Id.* at 28.

During his deposition, Koushall described his encounter with Middleton, as follows, *id.* at 30–31:

> [A]s I approached Officer Pujols, Pujols was dealing with a female.  She was later identified as Ms. Stancil.  While trying to gauge as to why he's interacting with her, another female came up from my right.  So Ms. Stancil is to my left, and the other female came up from my right.  And the suspect, later identified as Ms. Middleton, attempted to strike Ms. Stancil.  At that point, I gave verbal commands to back up—

---

[4] A reasonable factfinder could conclude that Koushall stumbled and was attempting to recover his balance.

[5] A reasonable jury could conclude that Koushall tripped Middleton.

verbal commands to Middleton, Ms. Middleton, to back up.  She failed to comply. I then raised my right forearm in attempts to stop her—from assaulting Ms. Stancil. She failed to comply.

She then shoves me, causing me to go backwards off of the sidewalk.  At that point, I attempted to arrest her for the assault on police.  She then got into an aggressive stance, fists balled, hand pulled backwards, then—in the motion trying to strike me.  At that point, I defended myself.  I struck her once [i]n the left side of her face.  Then once I struck her, I attempted to place her under arrest again.  She then attempted to flee the location.  I gave chase.  I was able to grab her, perform what we call a leg sweep, take her to the ground.

Once on the ground, she continued to resist arrest.  I attempted to pry her arms behind her back.  She continued to resist.  At one point, she was able to gain her balance.  She got up.  I was able to then use the patrol vehicle as leverage, and I was able to handcuff her successfully and take her into custody.

At her deposition, Middleton described the encounter as follows, ECF 83-3 at 107–08:

We were outside Norma Jean's.  One of the females that was in our group stated that she left her shoes, I was like, I'll go and get your shoes.  As I'm walking back up, the female that is in front of me, she appears to spit.  So my hands come out with my palms up and I was like, what the F, why are you spitting?  I'm told to back up.  Before I can execute that, I'm struck three times.

I try to get away.  I'm grabbed by my hair, flung to the ground, picked up, put into handcuffs, kind of pushed against a marked patrol vehicle.  Handcuffs are placed on me.

Defendants submitted the "Expert Opinion" (ECF 83-5) of BPD Sergeant Scott Swenson, "a nineteen year veteran" of the BPD.  *Id.* at 1.[6]  In his report, Swenson addresses the reasonableness of Koushall's use of force.  In describing the incident, as depicted in the CCTV footage, Swenson states, *id.* at 10:

Ms. Stancil, upon seeing Sgt. Middleton move towards her, physically reacts by shuffling to her left, out of the line of movement of Sgt. Middleton, and starts to bend her knees and appears to brace herself.  This appears to indicate that Ms. Stancil is reacting to Sgt. Middleton being determined to continue to advance

---

[6] In his report, Swenson states that he is responsible for training about 3,000 BPD employees in the proper use of force and "de-escalation" techniques.  ECF 83-5 at 1.  He also states that he serves as the BPD's "use of force expert" and has "extensive knowledge in the field." *Id.*

towards her to assault her.  Sgt. Middleton's advance is physically stopped at this point as Sgt. Koushall steps onto the sidewalk and places his arm on Sgt. Middleton's chest to stop her.

Although Sgt. Middleton's intended target appeared to be Ms. Stancil, when Sgt. Koushall attempted to stop her by placing his arm on her chest, her active aggression transferred to Sgt. Koushall when she pushed him away.  This push caused Sgt. Koushall to turn his body a quarter turn away, causing him to stumble from the sidewalk onto the street.

After Middleton was handcuffed, then Sergeant Antwan Davis[7] walked Middleton to the Central District police station.  *Id.* at 59, 78; ECF 83-10 (Davis body camera footage) at 3:20–5:10.  Davis handcuffed Middleton's left hand to a bench in the police station lobby.  ECF 83-10 at 5:25–5:50; *see* 83-3 at 78–79.  Middleton's right hand remained free.  ECF 83-10 at 6:05–6:12.  Middleton's friend, Dominique Wiggins, was also present at the police station.  ECF 83-3 at 79; *see generally* ECF 83-10.

Davis asked Middleton if she wanted a medic.  ECF 83-10 at 6:15–7:00.  Middleton did not respond.  *See id.*  Nevertheless, Wiggins asked Davis to call a medic, *id.* at 6:24–6:35; ECF 83-3 at 80, and Davis did so.  ECF 83-10 at 6:43–6:46.  The medics arrived about eight minutes after being called.  *Id.* at 15:10.  They left about two minutes after their arrival, without providing treatment to Middleton.  *See id.* at 15:10–17:20.

"[T]o ensure that [Middleton] was being treated by medics," ECF 83-4 at 40, Koushall arrived at the Central District "within a few minutes" of the incident.  *Id.* at 39.  When Koushall arrived, Middleton "was handcuffed to the bench."  *Id.* at 41.  In an Administrative Report describing the incident, Koushall wrote:  "During my contact with Ms. Middleton she appeared to have been drinking, for I could smell the ordor [sic] of alcohol from her breath and her eyes were glassy and bloodshot red."  ECF 83-5 at 5.

---

[7] Davis is now a lieutenant with BPD.  ECF 83-3 at 82.

After Middleton had been on the station lobby bench for about twenty minutes, five other women entered the station lobby. ECF 83-10 at 24:48–24:58. Three of them gathered around Middleton. *Id.* at 24:48–25:07. Davis asked the women to move to the other side of the lobby and they complied. *Id.* at 25:00–25:15.

While Koushall was at the police station, "a walk-in shooting c[a]me[] over the radio." ECF 83-4 at 46.[8] A supervisor is "required . . . to respond" to such a call, "to ensure the integrity of . . . the crime scene and the victim." *Id.* Koushall asked Davis if Davis "would respond to that call for service." *Id.* Davis replied "no." *Id.* So, Koushall "went to Shock Trauma to investigate th[e] walk-in shooting." *Id.* After completing the call for service, Koushall "went to CitiWatch to observe the video evidence" of the incident with Middleton. *Id.* at 47; *see id.* at 48. He then returned to the Central District police station. *Id.*

By the time Koushall returned to the police station, Middleton had been moved from the station lobby to the "roll call room." *Id.* at 48. In addition, Middleton's "supervisor," Sergeant Thomas Jackson, had arrived. *Id.* at 51.[9] Jackson "attempted to persuade [Koushall] to give [Middleton] a citizen contact receipt" instead of a criminal citation. *Id.* A citizen contact receipt is "a non-punitive form" that "stat[es] who [the officer] is, who the suspect is, and what's the reason for . . . our interaction and what [the suspect's] actions were." *Id.* However, Koushall "knew that just giving [Middleton] a contact receipt was not sufficient," because "she was an arrestee." *Id.* Therefore, he issued two criminal citations to Middleton, charging her with

---

[8] A "walk-in shooting" is a reference to a shooting victim who "walks in" to a hospital to seek treatment. *See* ECF 83-4 at 47 (referring to "call for service at University Hospital").

[9] Koushall stated during his deposition that he did not recall Jackson's first name. ECF 83-4 at 53–54. However, other evidence in the record indicates that the "Sergeant Jackson" to whom Koushall referred is Sergeant Thomas Jackson. *See* ECF 83-14 at 3 (email exchange between Koushall and Thomas Jackson).

"disorderly conduct" and "failure to obey." *Id.* at 52–53, 60. By that time, Middleton had been moved "[f]rom the roll call room . . . to the supervisor's cubicle." *Id.* at 52.

Two BPD lieutenants witnessed Koushall issue the citations to Middleton. *Id.* at 53. Middleton was released "after . . . 12 p.m. on that Sunday," August 26, 2018. ECF 83-3 at 78.

At the time of the incident, Yerg was a lieutenant in the BPD's Internal Affairs unit. ECF 83-11 (Yerg deposition) at 14. He was assigned to handle the BPD's internal investigation of Koushall's encounter with Middleton. *Id.* at 12. In addition to the BPD's investigation, the Office of the State's Attorney for Baltimore City ("State's Attorney's Office" or "SAO") opened a separate inquiry into the incident. ECF 83-11 at 19–20, 31.

In 2018, BPD Policy 1115 (the "Policy") governed an officer's use of force. *See* ECF 83-5 at 8.[10] The Policy "train[ed] officers to use force that is . . . 1. Objectively reasonable; 2. Necessary [and] 3. Proportional." *Id.*

As part of the BPD's internal investigation, Yerg learned that, "[o]n the night in question . . . Koushall had filed two citations" against Middleton. *Id.* at 14. But, "[s]omething administratively was wrong with the citations." *Id.* at 15.

According to Koushall, the ink he used to write the citations had "bled through to the front of the carbon copy." ECF 83-4 at 59. As a result, BPD records administrators rejected the citations. *Id.* Koushall was "advised to rewrite or reissue the citations because of . . . that bleed-through." *Id.* Therefore, Koushall prepared a second set of citations. *Id.* at 60.

The charges in the second set of citations—"disorderly conduct, [and] failure to obey"— were "[t]he same" as the charges in the first set of citations. *Id.* The citations "needed to be

---

[10] Although Swenson and Key refer to and occasionally quote from the Policy in their respective reports (ECF 83-5; ECF 83-19), neither party provided the Court with a copy of the Policy.

signed" by Middleton before Koushall could issue them.  *Id.*  Koushall called Middleton's supervisor, Sergeant Jackson, to obtain Middleton's signature.  *Id.* at 61.  Jackson said, "I don't believe she has to make herself available to sign those," or words to that effect.  *Id.*  In an email from Jackson to Koushall on September 18, 2018, Jackson wrote:  "As I've previously responded on the original date of our conversation, it is not required that we as a command make Sgt. Henrietta Middleton available for citations that she has previously been issued & signed for.  In addition, she is also not required to make herself available."  ECF 83-14 (email exchange between Koushall and Thomas Jackson) at 3.

"[A]t that point," Koushall "handwrote unable to sign" on the citations and submitted them to the BPD records administrators.  ECF 83-4 at 61; *see* ECF 83-11 at 16.  However, Koushall was again informed that the citations were deficient, this time because they lacked "a physical signature."  ECF 83-4 at 61.  Therefore, he prepared a third set of citations.  ECF 83-11 at 16.

By that time, Middleton was represented by an attorney.  *Id.*  And, she authorized her lawyer to accept the citations on her behalf.   ECF 83-15 at 2.  In particular, in an email sent by Middleton to Yerg on October 2, 2018, Middleton stated, *id.*:

> My attorney, Latoya Francis Williams has previously informed the BPD that she is representing me, and any and all documentation regarding this case should go through her.  Sgt. Koushall can deliver these new charges to her office, she has informed the BPD that her office will accept the charges on my behalf.

Yerg obtained the signature of Middleton's attorney on the citations and submitted them. ECF 83-11 at 16.  However, the citations were again "administratively kicked back because they were not signed by" Middleton.  *Id.*

On November 13, 2018, BPD Lieutenant David Breault forwarded an email to Yerg that had been sent to him by Tiffanie Griffin, a BPD "Report Reviewer."  ECF 83-16 at 2.  The email stated, *id.*:

12

Good Morning Lt. Breault,

Per our conversation, ASA[11] Patricia Deros advised that the attorney cannot sign charging documents, only the individual being charged can sign their charging documents. At this point, Deros' recommendation is for the department to seek out a criminal summons. None of the criminal citations written are acceptable.

Also, can you remind Lt. Yerg to return the original citations that he has in his possession.

Yerg wrote to Koushall on November 30, 2018, at 10:21 a.m., stating: "Can you please obtain a criminal summons this evening." ECF 83-16 at 2; *see* ECF 83-11 at 25. At the time Yerg sent this email, he was not aware that Koushall had been "entered as a possible accused" in the SAO's investigation of the incident. ECF 83-11 at 32–33. At 10:28 a.m. that day, Koushall replied, "I can't read the email. No attachments." ECF 83-16 at 4. Then, at 1:02 p.m. on November 30, 2018, Yerg forwarded Griffin's email to Koushall. ECF 83-16 at 5; ECF 83-11 at 24–25.

On December 1, 2018, Koushall obtained a "Statement of Charges" charging Middleton with second-degree assault, in violation of Md. Code, § 3-203(c) of the Criminal Law Article ("C.L."); resisting arrest, in violation of C.L. § 9-408(b); disorderly conduct, in violation of C.L. § 10-201(c)(2); and failure to obey a reasonable and lawful order by a law enforcement officer, in violation of C.L. § 10-201(c)(3). ECF 83-17 at 2. He emailed the Statement of Charges to Yerg. ECF 83-16 at 5.

During the course of Yerg's investigation, he spoke "less than five times" with Koushall. ECF 83-11 at 30. Their discussions were "only in reference to citation filings." *Id.*

On December 26, 2018, the State's Attorney's Office entered a *nolle prosequi* with respect to the charges against Middleton. ECF 83-18 at 2. It cited a "4th Amendment violation" as the "primary reason" for doing so. *Id.*

---

[11] "ASA" is an abbreviation for Assistant State's Attorney.

Then, on February 7, 2019, the State charged Koushall with second-degree assault and misconduct in office in relation to his use of force against Middleton.  ECF 98-1 at 2; *see also Koushall v. State* (*Koushall II*), 479 Md. 124, 277 A.3d 403 (2022); *Koushall v. State* (*Koushall I*), 249 Md. App. 717, 246 A.3d 764 (2021).  Koushall elected a bench trial, "which occurred in September and October 2019 in the Circuit Court for Baltimore City."  *Koushall II*, 479 Md. at 136, 277 A.3d at 409–10.

The circuit court found Koushall guilty of second-degree assault and misconduct in office.  ECF 83-4 at 74; *see also Koushall II*, 479 Md. at 141, 277 A.3d at 412.  With respect to the assault conviction, Koushall was sentenced to three years' imprisonment, with all suspended except for time served.  *Koushall II*, 479 Md. at 141, 277 A.3d at 413.  And, with respect to the misconduct conviction, Koushall was sentenced to six years' imprisonment, with all but time served suspended, to run consecutive to his sentence for the assault conviction.  *Id.*  Koushall's convictions were affirmed on appeal.  *See Koushall I*, 249 Md. App. 717, 246 A.3d 764; *Koushall II,* 479 Md. 124, 277 A.3d 403.

Koushall subsequently filed a motion for a modification of his sentences.  ECF 83-4 at 75.  On May 10, 2022, the circuit court struck Koushall's guilty verdicts and granted probation before judgment with respect to both charges.  ECF 98-1 at 3; *see* ECF 83-4 at 75.  Therefore, "entry of judgement [sic]" against Koushall was "stayed."  ECF 98-1 at 3.

Additional facts are included, *infra*.

### III.  Legal Standards and Doctrines

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). "Applying that standard, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Aleman v. City of Charlotte*, 80 F.4th 264, 283–84 (4th Cir. 2023); *see Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990); *Dewberry Eng'rs Inc. v. Dewberry Grp., Inc.*, 77 F.4th 265, 277 (4th Cir. 2023); *Knibbs v. Momphard*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). The nonmoving party may avoid summary judgment by demonstrating that there is a genuine dispute of material fact that precludes the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp*., 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

The Supreme Court has clarified that not every factual dispute will defeat a summary

judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322–24. The nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 252; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). "Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639,

16

640 (4th Cir. 1997) (citations omitted).  In short, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403–04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Therefore, in considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations.  *Brown v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  In the face of conflicting evidence, such as competing affidavits, a court must deny summary judgment, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

"[S]elf-serving affidavits offered by the non-movant can sometimes defeat summary judgment." *Pfaller v. Amonette*, 55 F.4th 436, 450 (4th Cir. 2022); *see Harrell v. DeLuca*, 97 F.4th 180, 187 (4th Cir. March 27, 2024) (recognizing that the self-serving declarations of nonmovants "can defeat summary judgment"); *Mann v. Failey*, 578 F. App'x 267, 273 n.2 (4th Cir. 2014) (per curiam) (unpublished but orally argued) ("[T]he record could defeat summary judgment even if the evidence consisted exclusively of so-called 'self-serving' declarations from [the nonmovant]

himself."); *see also* Fed. R. Civ. P. 56(c)(1)(A), (4).  In contrast, self-serving statements made by the movant are not sufficient.  *Pfaller*, 55 F.4th at 450 ("[H]ere it is the *movant* . . . who offers his own statements as the key evidence in support of summary judgment.  That is insufficient.") (emphasis in original); *Knibbs*, 30 F.4th at 222 (stating that "the dissent, like the district court, contravenes Rule 56 by accepting [the movant's] self-serving statements and reading the evidence in the light most favorable to *him*.") (emphasis in original).

"Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (citing *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). Therefore, to the extent that evidence amounts to inadmissible hearsay, it "cannot create a factual dispute" for purposes of summary judgment. *Stanton v. Elliott*, 25 F.4th 227, 237 n.7 (4th Cir. 2022) (citing *Md. Highways Contractors Ass'n*, 933 F.3d at 1251); *see also Graves v. Lioi*, 930 F.3d 307, 326 n.15 (4th Cir. 2019) (observing that "hearsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment") (citation and internal quotation marks omitted).

### B.  Collateral Estoppel

Plaintiff claims that the doctrine of "collateral estoppel bars . . . Koushall from relitigating [the] issues of battery, false arrest, excessive force and qualified immunity," because these issues were litigated and decided in his state criminal proceedings.  ECF 89-1 at 17 (typeface altered).

Under principles of collateral estoppel, also known as issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  In other words, collateral estoppel "bars the relitigation of

specific issues that were actually determined in a prior action," *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008), as long as the "'party against whom [collateral estoppel] is asserted," or a non-party in privity with the party against whom estoppel is asserted, "had a full and fair opportunity to litigate'" the issue.  *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (quoting *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998)); *see Martin v. Am. Bancorp. Ret. Plan*, 407 F.3d 643, 654 n.18 (4th Cir. 2005).

The doctrine of collateral estoppel is founded on the demands of "[j]udicial efficiency and finality."  *In re Microsoft*, 355 F.3d at 325.  In the absence of collateral estoppel, a party would be perpetually able to relitigate issues, expending the resources of the court and the party's adversary by adding new allegations or arguments each time around, in the hope of eventually stumbling upon success. The doctrine of issue preclusion serves the salutary purpose of requiring a party to make his claim once, as best he can.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).  In contrast, "[i]n determining the preclusive effect of a state-court judgment, the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel."  *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995); *see also Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 162 (4th Cir. 2008) ("Generally, the preclusive effect of a judgment rendered in state court is determined by the law of the state in which the judgment was rendered.").

The judgment alleged by plaintiff to have preclusive effect is a judgment of a Maryland state court.  *See* ECF 89-1 at 18.  Therefore, the preclusive effect of that judgment, if any, is governed by Maryland law.

Under Maryland law, "'[t]he doctrine of collateral estoppel precludes a party from re-litigating a factual issue that was essential to a valid and final judgment against the same party in a prior action.'" *Nat'l Union Fire Ins. Co. v. Fund for Animals, Inc.*, 451 Md. 431, 463–64, 153 A.3d 123, 142 (2017) (quoting *Shader v. Hampton Improvement Ass'n, Inc.*, 217 Md. App. 581, 605, 94 A.3d 224, 238 (2014)). "There is a four-part test under Maryland law [that] must be satisfied for collateral estoppel to apply." *Nat'l Union Fire Ins. Co.*, 451 Md. at 464, 153 A.3d at 142. In particular, a court must ask, *id.* (citations omitted):

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

"Traditionally, collateral estoppel contemplate[d] a 'mutuality of parties,' meaning that an issue that was litigated and determined in one suit [would] have preclusive effect in a second suit [only] when the parties [were] the same as, or in privity with, those who participated in the first litigation." *Garrity v. Maryland State Bd. of Plumbing*, 447 Md. 359, 368–69, 135 A.3d 452, 458 (2016) (citing *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 340–41, 863 A.2d 926 (2004); *Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 516, 555 A.2d 486 (1989)). "The mutuality requirement has been relaxed, however, [as] long as the other elements of collateral estoppel are satisfied." *Garrity*, 447 Md. at 369, 135 A.3d at 459 (citing *Rourke*, 384 Md. at 349, 863 A.2d 926). Collateral estoppel that is invoked by, or against, a party that did not participate in the first litigation is called "non-mutual" collateral estoppel. *See Garrity*, 447 Md. at 369, 135 A.3d at 549.

20

Both "[m]utual and non-mutual collateral estoppel [may be] further characterized as either 'defensive' or 'offensive': estoppel is 'defensive' if applied by a defendant and 'offensive' if invoked by a plaintiff." *Id.* (citing *Shader*, 443 Md. at 162–63, 115 A.3d 185). In determining whether to apply offensive non-mutual collateral estoppel, Maryland courts consider "certain concerns attendant to" the application of offensive non-mutual collateral estoppel, as these concerns were articulated by the Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). *Garrity*, 447 Md. at 370, 135 A.3d at 459. The *Parklane* Court counseled that, in general, "in cases where a plaintiff could easily have joined in the earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Parklane*, 439 U.S. at 331. Therefore, under Maryland law, a court may allow the use of non-mutual collateral if the "four-part test" has been met, *see Nat'l Union Fire Ins. Co.*, 451 Md. at 464, 153 A.3d at 142, and the court is satisfied that applying the doctrine would not be inconsistent with the *Parklane* Court's concern for judicial economy and fairness.

## C.  Section 1983

Count VII of the SAC is styled "§ 1983 Claim For Violation of Plaintiff's Fourth and Fourteenth Amendment Rights and Privileges." ECF 43 at 15. Section 1983 of Title 42 to the United States Code allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey*, 526 U.S. at 707.

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'"  *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326,

(1941)); *see also Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

The doctrine of respondeat superior does not apply in § 1983 cases. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Indeed, "'[i]n a § 1983 suit . . . each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'" *Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)) (alteration in *Younger*). If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).

But, as the Fourth Circuit articulated in *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013), a supervisor may be held liable "for the failings of a subordinate under certain narrow circumstances." Pursuant to § 1983, liability for supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020); *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). This requires a plaintiff to allege, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994):

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit

authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

To qualify as "pervasive," the challenged conduct must be "widespread, or at least . . . used on several different occasions." *Shaw*, 13 F.3d at 799. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration inserted). But, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799.

### D. Qualified Immunity

Defendants assert that Koushall is entitled to qualified immunity with respect to plaintiff's claim that he used excessive force in violation of the Fourth Amendment. ECF 83-1 at 26.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Servs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)) (cleaned up); *see Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) (per curiam); *City of Tahlequah Okla. v. Bond*, 595 U.S. 9 (2021) (per curiam); *Taylor v. Riojas*, 598 U.S. 7, 7–10 (2020); *Reichle v. Howards*, 566 U.S. 658, 664 (2012). A legion of Fourth Circuit rulings are to the same effect. *See, e.g.*, *Atkinson v. Godfrey*, ___ F.4th ___, 2024 WL 1916760, at *3 (4th Cir. May 2, 2024); *Thurston v. Frye*, ___ F.4th ___, 2024 WL 1841939, at *3 (4th Cir. Apr. 29,

2024); *Lewis v. Caraballo*, ___ F.4th ___ , 2024 WL 1609101, at *6 (4th Cir. Apr. 15, 2024); *Hulbert v. Pope*, 70 F. 4th 726, 732 (4th Cir. 2023); *Franklin v. City of Charlotte*, 64 F.4th 419, 530, 534–35 (4th Cir. 2023); *Hicks v. Ferreyra*, 64 F.4th 156, 169 (4th Cir. 2023); *Stanton*, 25 F.4th at 233;  *Davison v. Rose*, 19 F.4th 626, 640 (4th Cir. 2021); *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, 584 U.S. 1013 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Fourth Circuit recently reiterated: "'Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023) (quoting *Davison*, 19 F.4th at 640); *see also King v. Riley*, 76 F.4th 259, 264–65 (4th Cir. 2023); *Owens*, 767 F.3d at 395.

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Atkinson*, 2024 WL 1916760, at *3; *Hicks*, 64 F.4th at 169; *Barrett*, 975 F.3d at 428–29; *Betton*, 942 F.3d at 190; *Wilson*, 893 F.3d at 219; *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).  An official who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who

commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).  In other words, the doctrine affords "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam).

Numerous cases support these principles. *See, e.g., Reichle*, 566 U.S. at 664; *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Atkinson*, 2024 WL 1916760, at *3; *Robertson v. Anderson Mill Elem. School*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray v. Roane*, 948 F.3d 222, 229–30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson*, 912 F.3d at 186; *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

To determine whether qualified immunity applies, courts generally conduct a two-step inquiry.  *Saucier*, 553 U.S. at 201; *Atkinson*, 2024 WL 1916760, at *3; *King,* 76 F.4th at 265; *Hicks*, 64 F.4th at 169.  First, courts ask whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the [official's] conduct violated a constitutional [or statutory] right." *Saucier*, 533 U.S. at 201.  Second, courts ask whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he

26

confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018); *Scinto*, 841 F.3d at 235.

"The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred . . . . [and] [t]he defendant bears the burden of proof on the second question— *i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (internal citations omitted); *see also Atkinson*, 2024 WL 1916760, at *3; *Thurston*, 2024 WL 1841939, at *3; *Stanton*, 25 F.4th at 233.  Although "'[c]ourts are no longer required to analyze these questions sequentially, . . . it is often the better approach' to 'determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 178 (4th Cir. 2018) (internal citation omitted).[12]

Qualified immunity is an affirmative defense. *Hicks*, 64 F.4th at 169; *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 305 (4th Cir. 2006). But, it does not merely provide a defense to liability. Rather, it provides "*immunity from* suit . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in *Mitchell*); *see Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019), *cert. denied,* 140 S.Ct. 2641 (2020)*; see also Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'"  *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

As indicated, if an official is shown to have violated the rights of a plaintiff, the court must "evaluate whether the right at issue was 'clearly established' at the time of the [official's] conduct."

---

[12] The Fourth Circuit has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases," *Younger*, 79 F.4th at 385 n.17, namely, cases in which the alleged "Eighth Amendment violation[] inherently include[s] knowing disregard for the law."  *Pfaller*, 55 F.4th at 445–48; *see Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022).

*Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

"The inquiry into whether a constitutional right is 'clearly established' requires defining the right at issue." *Hicks*, 64 F.4th at 170; *see Atkinson*, 2024 WL 1916760, at *4; *Pfaller*, 55 F.4th at 445; *Halcomb*, 992 F.3d at 319–20. "The Supreme Court has cautioned against defining a right with 'a high level of generality'. . . ." *Hicks*, 64 F.4th at 170 (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)); *see City of Escondido v. Emmons*, 586 U.S. ___, 139 S.Ct. 500, 503 (2019); *White v. Pauly*, 580 U.S. 73, 79 (2017); *Younger*, 79 F.4th at 385. "Defining the right at a high level of generality 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Atkinson*, 2024 WL 1916760, at *4 (citation omitted) (alteration in *Atkinson*); *see Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Therefore, the court must "define the right at issue with specificity." *Knibbs*, 30 F.4th at 223.[13]

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal quotation marks omitted); *see Thurston*, 2024 WL 1841939, at *7 ("[A] right is only clearly established if it has a 'sufficiently clear foundation in then-existing precedent.'") (quoting *Wesby*, 583 U.S. at 63); *see also Atkinson*, 2024 WL 1916760, at *4; *King*, 76 F.4th at 265; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). Put another way, the "clearly established" standard "requires that the contours of the legal rule be 'so well defined that

---

[13] Defining the right at issue is not necessarily an easy task. In *Younger*, 79 F.4th 373, which involved the brutal beating of a prisoner by correctional officers, the district court defined the right at issue as a "prisoner's 'right to be protected from malicious attack . . . from the very officials tasked with ensuring their security.'" *Id.* at 386 n.20. But, the Fourth Circuit concluded that the district court's definition was too general. *Id.* According to the Fourth Circuit, the district court "failed to heed [the] requirement" of specificity. *Id.*

it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Garrett*, 74 F.4th at 584 (quoting *City of Tahlequah*, 595 U.S. at 12 (internal quotation marks omitted)).

As the Fourth Circuit has explained, "existing precedent must have placed the statutory or constitutional question beyond debate." *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022) (internal quotation and citation omitted); *see Kisela*, 584 U.S. at 104; *King*, 76 F.4th at 265–66. "'Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract facts.'" *Atkinson*, 2024 WL 1916760, at *5 (citation omitted).  "In the end, the key inquiry is whether 'the law provided fair warning that [the officers'] conduct was unconstitutional.'" *Id.* at *4 (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017)) (additional citation and internal quotation marks omitted) (alteration in *Atkinson*).

In assessing qualified immunity, a court in Maryland is guided by cases from the Supreme Court, the Fourth Circuit, and "the highest court of the state in which the action arose." *Thompson*, 878 F.3d at 98.  In the absence of controlling authority, the court considers "whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Id.* (internal quotation marks omitted). And, "even when the facts in the record establish that the [official's] conduct violated a plaintiff's constitutional rights, the [official] still is entitled to immunity from suit 'if a reasonable person in the [official's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff],

qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 170 (4th Cir. 2016)).

Notably, "[t]here is no requirement that the 'very action in question [have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto*, 841 F.3d at 236 (second alteration in original) (quoting *Hope*, 536 U.S. at 739). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020) (internal quotation marks omitted); *see also Hope*, 536 U.S. at 741 (concluding that cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established).

Indeed, the second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

### E.  Video Evidence

In support of the Motion, defendant has filed exhibits containing CCTV footage of the incident (ECF 83-7) and footage of Middleton during her detention in the lobby of the Central

District police station, taken from the body-worn camera of Sergeant Antwan Davis.  ECF 83-10.

In support of the Opposition, plaintiff has filed an exhibit containing the same CCTV footage

submitted by defendant.  ECF 89-5.[14]  Because the record contains video evidence, I must consider

the principles governing a court's assessment of video evidence at summary judgment.[15]

The Supreme Court has stated that when "opposing parties tell two different stories" at

summary judgment, "one of which is blatantly contradicted" by video evidence, "so that no

reasonable jury could believe it, a court should not adopt that version of the facts . . . ."  *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).  In such a circumstance, rather than crediting a "visible fiction"

propounded by the party whose account is contradicted by the video evidence, a court should

"view[] the facts in the light depicted by the videotape."  *Id.* at 381; *see also United States v.*

*Kehoe*, 893 F.3d 232, 240 (4th Cir. 2018).  Nevertheless, the Fourth Circuit has made clear that a

court should not "reject a plaintiff's account" of events simply because "a video . . . offers *some*

support for a governmental officer's version of events."  *Witt v. W. Va. State Police, Troop 2*, 633

F.3d 272, 276 (4th Cir. 2011) (emphasis in *Witt*); *see also Lewis*, 2024 WL 1609101, at *5; *Aleman*,

80 F.4th at 294–95; *Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013), *abrogated on other*

*grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 396–99 (2015), *as recognized by Brooks v.*

*Johnson*, 924 F.3d 104 (4th Cir. 2019).

*Witt*, 633 F.3d 272, is illustrative.  There, the plaintiff alleged that three officers used

excessive force against him, in violation of the Fourth Amendment.  *Id.* at 273.  The district court

denied the officers' motion for summary judgment, finding that there were genuine disputes of

---

[14] As noted, Koushall did not turn on his body-worn camera until after completing the arrest of Middleton.  ECF 83-4 at 27–28.  Therefore, Koushall's body camera did not capture the incident.

[15] The parties do not discuss the law governing the Court's assessment of the video evidence.

material fact concerning whether the plaintiff "posed a threat to the safety of the [officers] and whether he resisted or attempted to evade arrest." *Id.* at 276 (citations and internal quotation marks omitted).  Although there was dashboard camera footage of the incident, in the district court's view, "the poor quality of the video did not resolve these disputes." *Id.*

On appeal, the officers contended that the footage "compel[led] adoption of [their] version of the facts and rejection of" the plaintiffs' version. *Id.*  The Fourth Circuit disagreed.  The Court explained that, unlike the video in *Harris*, the dashboard camera footage did "not 'clearly' or 'blatantly' contradict" one party's "'version of the story.'" *Id.* at 277 (quoting *Harris*, 550 U.S. at 378, 380).  In particular, the Court observed that "the video lack[ed] sound," which prevented the viewer from hearing any verbal exchange between the plaintiff and the defendants. *Witt*, 633 F.3d at 277.  And, in the Court's view, "the unreliable quality of the video" made it "difficult to decipher . . . the true sequence of events." *Id.*  Therefore, the Court concluded that the video "provide[d] little assistance in resolving the parties' disputes as to the facts." *Id.*

The Fourth Circuit's recent decision in *Aleman*, 80 F.4th 264, is also instructive.  In *Aleman*, the plaintiff, the girlfriend of a man shot and killed by a police officer, alleged, *inter alia*, that the officer's use of lethal force constituted excessive force, in violation of the Fourth Amendment. *Id.* at 269.  The district court awarded summary judgment to the police officer based, in part, on "its own interpretation of the video footage from the body cameras worn by [the defendant officer] and his colleagues." *Id.* at 282. On appeal, the Fourth Circuit vacated the award of summary judgment.  Notwithstanding the video footage of the incident, the Court concluded that there were genuine disputes of material fact relevant to the reasonableness of the officer's use of force. *Id.* at 293, 297.

In the Court's view, "one of the few important things that [were] undisputed about the video footage [was] that it is not clear in all details and did not capture everything that occurred at the shooting scene." *Id.* at 291.   Moreover, the Court's "own review of the video footage . . . confirmed that it [was] subject to different interpretations." *Id.* at 293.   Under these circumstances, the Court explained, "neither the district court nor [the Fourth Circuit] is permitted to decide at the summary judgment stage . . . what the video footage shows or what it did not capture." *Id.*

Consistent with this authority, I shall draw conclusions on the basis of the video footage only when the footage "quite clearly" establishes a certain fact. *Witt*, 633 F.3d at 276 (citation and internal quotation marks omitted).   Conversely, I shall not draw a conclusion on the basis of the video if the video merely "offers *some* support" for the conclusion. *Id.*   And, mindful of *Aleman*, 80 F.4th at 293, I shall not "render[] [my] own interpretation of the video footage" when the video footage "is subject to different interpretations" or may not be clear or complete.

## IV.   The Contentions

### A.  Defendants' Arguments

Defendants present numerous arguments in support of the Motion.   I shall review their contentions as to the counts in issue the same order in which the arguments were presented.

### 1.  Count VII

Count VII of the SAC asserts, pursuant to 42 U.S.C. § 1983, that defendants' actions "constituted an illegal search and seizure, an illegal use of prosecution and detention, as well as an unreasonable and excessive use of force," and "resulted in the deprivation of Plaintiff's life, liberty, and property without due process of law."   ECF 43, ¶ 67; *see id.* ¶¶ 66–68.   Therefore, this single "count"—Count VII—asserts several "claims." *See* ECF 83-1 at 23.   Defendants have addressed individually the various "claims" asserted in Count VII.

Defendants argue, first, that Koushall is entitled to qualified immunity with respect to Count VII, insofar as Count VII asserts that Koushall used excessive force in violation of the Fourth Amendment. *Id.* at 21–30.   According to defendants, "Koushall was not given 'fair warning' that his conduct was . . . unconstitutional because his training and governing departmental policies indicated otherwise." *Id.* at 24.  In particular, defendants assert that, "[u]nder [BPD] Policy 1115, when a subject demonstrates active aggression, an officer is authorized to use," *inter alia*, "'Hand/Foot Strikes'" if the officer "believe[s] a subject is attempting to assault them or others." *Id.* (quoting 83-5 at 10).  They argue that Koushall's use of force did not violate the Policy, and therefore that it could not have been in violation of clearly established law. *Id.* at 25–26.

In defendants view, Koushall's use of a "*single* hand strike to [plaintiff's] face" was authorized under the Policy, because (1) "Plaintiff approached . . . Koushall in an aggressive manner with her arms outstretched," (2) "Koushall instructed Plaintiff to leave the area and attempted to restrict her movement by placing his arm out," but (3) "[i]nstead of complying with the lawful request, Plaintiff responded by shoving . . . Koushall."  ECF 83-1 at 24 (emphasis in Motion).  Further, defendants assert that Koushall's use of a leg sweep to bring plaintiff to the ground was authorized under the Policy because, after Koushall struck plaintiff in the face, she "began to flee the scene." *Id.* at 25.

Defendants also argue that they are entitled to qualified immunity because Koushall did not "'violate [Middleton's] right to be free of seizures effectuated by excessive force.'" *Id.* at 26 (quoting *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013)) (additional citation and internal quotation marks omitted).  In particular, defendants contend that, when the incident is evaluated according to the factors identified in *Graham v. Connor*, 490 U.S. 386, 396 (1989)—"'the severity

of the crime at issue," the immediacy of the "threat to the safety of the officer[] or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flights'"—Koushall's use of force was justified and reasonable.  ECF 83-1 at 26–27 (quoting *Graham*, 490 U.S. at 396) (alteration in ECF 83-1).  They point out, *inter alia*, that Koushall's encounter with Middleton occurred "on the Block," which is "infamous . . . for having a high volume of crime and heavy pedestrian traffic," ECF 83-1 at 27; that plaintiff "approached in a combative manner with her hands outstretched," suggesting "an imminent assault," *id.*; "[t]here is no genuine issue of material fact that Plaintiff was resisting arrest and attempting to evade arrest by flight," *id.* at 28; and "the level of force used by . . . Koushall did not cause severe injuries to" Middleton.  *Id.* at 29.  In defendants' view, these circumstances establish the reasonableness of Koushall's use of force.

In support of their contention that Koushall's use of force was reasonable, defendants have also submitted an "internal use of force analysis" prepared by BPD Sergeant Scott Swenson "in connection with . . . Koushall's investigation," ECF 83-1 at 19, and an "Expert Opinion of Charles J. Key, Sr."  *See* ECF 83-5 (Swenson report); ECF 83-19 (Key report).  Defendants describe Swenson as an "expert in police use of force for the" BPD.  ECF 83-5 at 3.  "In this capacity," he "review[s] . . . cases at the request of departmental personnel."  *Id.*  Key is a former BPD officer who served for twenty-one years in supervisory positions at the BPD.  ECF 83-19 at 4.  He retired as the "Commanding Officer of the [BPD] Firearms Training Unit," *id.*, and is now "employed as an independent consultant and expert witness in police misconduct litigation."  *Id.* at 7.

In his report, Swenson opines that "Koushall's actions on scene were . . . reasonable" because, when Koushall got out of his car, he was "immediately confronted by Sgt. Middleton aggressively moving towards Ms. Stancil with outstretched arms."  ECF 83-5 at 9.  In Swenson's

view, "it [was] reasonable to infer that Sgt. Middleton was advancing on Ms. Stancil in an attempt to assault her . . . ." *Id.* at 10.  And, Swenson states:  "Officers are trained that they do not have to wait until a subject assaults them or someone else[;] they can use force if they believe a subject is attempting to assault themselves or others." *Id.* at 9.  In any event, Swenson asserts that, "when Sgt. Koushall attempted to stop [Middleton] by placing his arm on her chest, her active aggression transferred to Sgt. Koushall when she pushed him away." *Id.* at 10.  According to Swenson, "[t]his push caused Sgt. Koushall to turn his body a quarter turn away, causing him to stumble from the sidewalk onto the street." *Id.*  Swenson states, *id.*:

> Officers are trained that this would be 'an actual attack on an officer' (Policy 1115).  When a subject meets the threshold of active aggression, the following are authorized under Policy 1115: . . . Hand/Foot Strikes . . . .

Key opines that Koushall's strike to Middleton's face was reasonable in view of "the chaotic crowd and ongoing physical conflicts," ECF 83-19 at 28; "Middleton's failure to immediately step back as instructed by Koushall," *id.* 26; and "the active aggression demonstrated by Middleton in adopting the hands extended and fighting stances." *Id.* at 28.  Moreover, in Key's view, it was reasonable for Koushall to take Middleton to the ground after the strike because, under the circumstances, "any objectively reasonable and well trained officer would conclude Middleton posed a threat of further increasing the potential for violence in the crowd and, because of her aggressive actions, posed an imminent danger of physical injury to Koushall or others." *Id.* at 29.

Defendants argue, second, that summary judgment is appropriate with respect to Count VII, insofar as Count VII asserts that Koushall unlawfully seized plaintiff in violation of the Fourth Amendment, because there was probable cause to effect plaintiff's arrest.  ECF 83-1 at 30–32.  In particular, according to defendants, Middleton's "combative movements" as she approached Stancil and the officers, "and the hostility of the situation . . . as heard on the radio," provided

Koushall with probable cause to arrest Middleton for "assault on a civilian."  *Id.* at 31.  Moreover, defendants contend that "Plaintiff . . . commit[ted] an assault on . . . Koushall," in violation of C.L. § 3-203(c), by "push[ing] . . . Koushall while he was visibly on duty, causing his body to rotate and him to stumble from the sidewalk into the street."  ECF 83-1 at 31.  In defendants' view, "a reasonable officer" in Koushall's circumstances "could believe that probable cause existed to arrest" Middleton.  *Id.*

Third, defendants contend that both Koushall and Yerg are entitled to summary judgment with respect to Count VII, insofar as Count VII asserts a claim for illegal use of prosecution.  *Id.* at 32–37.  According to defendants, this claim, "despite the unusual phrasing[,] seems to be a claim for malicious prosecution under § 1983," which requires plaintiff to prove, *inter alia*, that an officer instituted a criminal proceeding without probable cause and with malice.  *Id.* at 32.  In defendants' view, there is no genuine dispute that Koushall had probable cause to charge Middleton with each of the four offenses alleged in the criminal summons obtained on December 1, 2018 (ECF 83-17): second-degree assault, in violation of C.L. § 3-203; resisting arrest, in violation of C.L. § 9-408(b); disorderly conduct, in violation of C.L. § 10-201(c)(2); and failure to obey a reasonable and lawful order by a law enforcement officer, in violation of C.L. § 10-201(c)(3).  ECF 83-1 at 32–36.  Moreover, defendants state that there is no evidence that Koushall's decision to charge Middleton was made with malice.  *Id.*  According to defendants, "Yerg was merely a conduit in the charging process, relaying a recommendation by the State's Attorney's Office to . . . Koushall."  *Id.* at 36; *see* ECF 83-16 at 2–5.

## 2.  Count IV

Defendants contend that they are entitled to judgment with respect to Count IV, which alleges violations of Articles 24 and 26 of the Maryland Declaration of Rights.  ECF 83-1 at 37.

According to defendants, these Articles "are construed *in pari materia* with their federal counterparts." *Id.* Therefore, defendants assert that, "for the same reasons [that Middleton] has failed to show a violation of her federal constitutional rights to freedom from excessive force, unlawful seizure, and malicious prosecution," the "[d]efendants are entitled to summary judgment on [her] identical claims under the Maryland Declaration of Rights." *Id.*

### 3. Counts I, II, VI

Defendants argue that Koushall is entitled to summary judgment with respect to Middleton's claims of common law battery (Count I), common law false imprisonment (Count II), and common law false arrest (Count VI). They argue that there was legal justification for Koushall's use of force against, and subsequent arrest of, Middleton. *Id.* at 37–41. According to defendants, it is an element of common law battery that an application of force is "'*unlawful*.'" *Id.* at 38 (quoting *Jones v. Fam. Health Centers of Balt., Inc.*, 135 F. Supp. 3d 372, 384 (D. Md. 2015)) (emphasis in ECF 83-1). And, defendants assert that it is an element of common law false arrest and false imprisonment that a detention is without probable cause. ECF 83-1 at 39–41. With respect to Middleton's claim of common law battery, defendants maintain that Koushall's use of force was not unlawful because it was sanctioned by BPD Policy 1115. *Id.* at 39. And, with respect to Middleton's claims of false arrest and false imprisonment, defendants contend that Middleton's aggressive "posturing, failure to obey commands, and the [hostile] environment" on The Block provided probable cause for her arrest. *Id.* at 40.

### 4. Count III

Defendants argue that Koushall and Yerg are entitled to summary judgment with respect to Count III, alleging common law malicious prosecution and abuse of process. *Id.* at 41–43. They posit: "The analysis for common law malicious prosecution is analogous to the analysis to a claim

for malicious prosecution under § 1983." *Id.* at 41.  Therefore, according to defendants, Koushall and Yerg are entitled to summary judgment with respect to plaintiff's claim of common law malicious prosecution for the same reasons that they are entitled to summary judgment with respect to plaintiff's claim of malicious prosecution pursuant to § 1983.  *Id.* at 41–42.

With respect to plaintiff's claim of abuse of process, defendants state that, "[t]o sustain an action for abuse of process, [a] claimant must prove (1) the willful use of process for an illegal purpose; (2) an ulterior motive underlying the use of process; and (3) damages resulting from the perverted use of process." *Id.* at 42 (citing *Humphrey v. Herridge*, 103 Md. App. 238, 243, 653 A.2d 491, 493 (1995)).  They contend that plaintiff has neither alleged nor produced evidence that Koushall or Yerg illegally used process *after* the issuance of the criminal summons on December 1, 2018.  ECF 83-1 at 42.  And, defendants claim that, even if the issuance of the defective citations on the morning of plaintiff's arrest is considered issuance of process, the record contains no evidence that, after the citations were issued, Koushall or Yerg used process "for an illegal purpose []or with an ulterior motive." *Id.* at 43.

### 5.   Counts IX and X

According to defendants, they are entitled to summary judgment with respect to Middleton's claims of conspiracy to violate her civil rights, both under the common law (Count IX) and 42 U.S.C. § 1985(3) (Count X).  *Id.* at 43–51.  Defendants offer three grounds in support of their position.  *See id.*

First, they argue that liability is foreclosed by the "intracorporate conspiracy doctrine," according to which "'employees, when acting withing the scope of their employment, cannot conspire amongst themselves.'" *Id.* at 44 (quoting *Walters v. McMahen*, 759 F. Supp. 2d 350, 358 (D. Md. 2011), *aff'd* 684 F.3d 435 (4th Cir. 2012)).  Second, defendants claim that plaintiff has

failed to adduce any evidence that Koushall and Yerg acted in concert to charge her.  ECF 83-1 at 48–50.  In particular, according to defendants, Yerg "did not advise or guide . . . Koushall as to . . . [the] charges he should seek."  *Id.* at 49.  Instead, Yerg "simply forwarded" to Koushall the recommendation of the State's Attorney's Office to seek a criminal summons against Middleton, after Koushall's unsuccessful attempts to rectify the clerical defects in the original citations.  *Id.* at 49–50; *see* ECF 83-16 at 2–5.

Third, defendants assert that a necessary element of Middleton's claim of conspiracy under § 1985(3) is that the putative conspiracy have been "'motivated by a specific class-based, invidiously discriminatory animus.'"  ECF 83-1 at 50–51 (quoting *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 550 (D. Md. 2008)).  According to defendants, plaintiff has produced no evidence that Koushall and Yerg were motivated by any such animus.  ECF 83-1 at 50–51.

### B.  Plaintiff's Opposition

In the Opposition (ECF 89-1), plaintiff argues that "collateral estoppel bars . . . Koushall from relitigating issues of battery, false arrest, excessive force and qualified immunity."  *Id.* at 17. According to plaintiff, two of the issues litigated and resolved in Koushall's prosecution in state court are identical to issues in dispute in this case.  In particular, plaintiff asserts that in state court Koushall "'was convicted of assault 'clearly of the battery variety,'"  *id.* at 18 (quoting *Koushall II*, 479 Md. at 150, 277 A.3d at 417), the elements of which "are identical to" the elements of common law civil battery.  ECF 89-1 at 19.

Plaintiff argues that Koushall should be precluded from relitigating the reasonableness of his use of force because in *Koushall II* the Maryland Court of Appeals[16] held that the evidence in

---

[16] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  The voters also approved changing the name of the Maryland Court of Special

that proceeding "was sufficient in establishing unreasonable use of force beyond a reasonable doubt." *Id.* at 20 (quoting *Koushall II*, 479 Md. at 151, 277 A.3d at 418). Plaintiff posits that all other requirements for collateral estoppel are met with respect to these two issues, because they were "actually determined in the prior proceeding," ECF 89-1 at 20, their determination was "a critical and necessary part of the decision in the prior proceeding," *id.* at 21, the state court judgment was "final and valid," *id.*, and Koushall "had a full and fair opportunity to litigate the issue[s] in the previous forum." *Id.* at 22.[17] And, in assessing whether there exists a genuine dispute of material fact on these issues, plaintiff urges the Court to consider several excerpts from the transcript of Koushall's trial in the Circuit Court for Baltimore City. *See* ECF 89-3; ECF 89-6; ECF 89-7; ECF 89-9; ECF 89-10.

Middleton also contends that summary judgment is unwarranted even if Koushall is not subject to collateral estoppel with respect to any of her claims. With regard to her claim of excessive force under § 1983 (Count VII), Middleton claims that "there is a genuine factual dispute" about the reasonableness of Koushall's use of force. ECF 89-1 at 24. In plaintiff's view, "[w]hether Koushall used excessive force is a jury question." *Id.* at 26.[18]

_____

Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, *Voter-Approved Constitutional Change Renames High Courts to Supreme and Appellate Court of Maryland*, MARYLAND COURTS (Dec. 14, 2022), https://perma.cc/K87C-UUCG. However, I shall refer to the courts by their names when the cited opinions were decided.

[17] Plaintiff introduces her argument concerning collateral estoppel by asserting that false arrest is among the claims with respect to which Koushall is estopped. ECF 89-1 at 17. But, plaintiff's estoppel argument is limited to two issues—the lawfulness and reasonableness of Koushall's use of force. These issues have no apparent bearing on the question of false arrest.

[18] As discussed, *infra*, plaintiff asserts that the question of excessive force is a question for the jury. But, "[a]t the summary judgment stage, once [a court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." *Purnell*, 652 F.3d at 531 (citing *Harris*, 550 U.S. at 381 n.8).

Moreover, Middleton claims that there are genuine disputes of material fact precluding summary judgment with respect to her claims of unlawful seizure, in violation of the Fourth Amendment (Count VII), *id.* at 27; excessive force, in violation of the Maryland Declaration of Rights (Count IV), *id.* at 29–33; common law battery (Count I), *id.* at 33–35; common law false imprisonment (Count II), *id.* at 35–38; common law false arrest (Count VI), *id.*; and common law malicious prosecution and abuse of process (Count III). *Id.* at 38–40. In particular, plaintiff maintains that there are genuine disputes of material fact concerning, at least, (1) whether plaintiff took "an aggressive stance with anyone," *id.* at 32; (2) whether plaintiff "shove[d] any person," *id.*; (3) whether "Koushall ever observed Middleton committing a misdemeanor in his presence which would warrant an immediate arrest," *id.* at 38; and (4) whether Koushall's "motivation for bringing . . . new charges [in the criminal summons] was . . . to aid him in the defense of his own case and to tarnish Middleton's standing." *Id.* at 39.

Plaintiff also suggests that there are genuine disputes of material fact precluding summary judgment with respect to her claims of common law civil conspiracy (Count IX) and conspiracy under § 1985(3) (Count X). *Id.* at 40–42. According to plaintiff, there is sufficient evidence in the record to support a reasonable conclusion that Koushall arrested and charged Middleton for an "illegal and corrupt" reason. *Id.* at 42. In this regard, plaintiff cites "Officer Pujol's [sic] sworn testimony" in the state court proceeding "that Koushall 'retroactively revised the police report to make the use of force appear more justified.'" *Id.* (quoting *Koushall II*, 479 Md. at 147, 277 A.2d at 416). And, plaintiff observes that, in the state court proceeding, "Wiggins testified that [Koushall] acted as if he had a 'vendetta' against Sgt. Middleton." ECF 89-1 at 42 (quoting *Koushall II*, 479 Md. at 156, 277 A.2d at 421). Moreover, plaintiff asserts, without citation to the

record or further explanation, ECF 89-1 at 41: "Yerg and Koushall interfered with the administration of justice in withholding *Brady*[19] material to thwart the State's criminal prosecution against Koushall, of which . . . Middleton was the crime victim."

In addition, Middleton denies that conspiracy liability is foreclosed by the intracorporate conspiracy doctrine. *Id.* at 42. She states, without elaborating, *id.*:

> [A] recognized exception to the rule permits intra-corporate conspiracy claims where the agent "has an independent personal stake in achieving the corporation's illegal objective." *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). That exception is applicable in this case.

### C. Defendants' Reply

In their Reply (ECF 98), defendants argue that Yerg is entitled to summary judgment with respect to all three theories of liability under 42 U.S.C. § 1983 advanced in Count VII: "excessive force, unlawful seizure, and malicious prosecution." *Id.* at 5. According to defendants, Yerg "could not have exercised excessive force towards or unlawfully seized" Middleton "because he was not present" at the time of her arrest. *Id.*

Further, defendants argue that Middleton has abandoned her abuse of process and malicious prosecution claims against Yerg and her illegal use of prosecution claim against both defendants by failing to address them in the Opposition. *Id.* at 4, 6. Defendants acknowledge: "Plaintiff's Opposition has a heading that reads 'DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S ILLEGAL USE OF PROSECUTION UNDER § 1983 . . . .'" *Id.* at 6 (quoting ECF 89-1 at 27). But, according to defendants, the "subsequent paragraphs under that heading repeat and reiterate [p]laintiff's basis for her *excessive*

---

[19] *See Brady v. Maryland*, 373 U.S. 83 (1963).

*force* claim" against Koushall, not Yerg. ECF 98 at 6 (emphasis in ECF 98). "In fact," defendants state, "not once does . . . Yerg's name appear under this heading." *Id.*

Moreover, defendants observe that discussion of Yerg's alleged liability is similarly absent from the argument under the heading stating "'DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S MALICIOUS PROSECUTION AND ABUSE OF PROCESS CLAIMS.'" *Id.* (quoting ECF 89-1 at 38–40). Instead, according to defendants, plaintiff's argument in this section of the Opposition concerns, exclusively, "'Koushall's Abuse of Process'" and "'Koushall's Malicious Prosecution.'" ECF 98 at 6 (quoting ECF 89-1 at 38, 39). Therefore, defendants urge the Court to conclude that Middleton has "abandoned her theory of illegal use of prosecution under § 1983 (Count VII) as to both defendants and her Malicious Prosecution and Abuse of Process claim (Count III) against Yerg. ECF 98 at 6 (citing *Lawley v. Northam*, ELH-10-1074, 2011 WL 6013279, at *24 (D. Md. Dec. 1, 2011)).

But, even "assuming *arguendo* that [Middleton] has not waived her abuse of process and malicious prosecution-based claims" against Yerg, defendants contend that Yerg is nonetheless entitled to judgment as a matter of law with respect to these claims. ECF 98 at 6–7. They posit that there is no evidence in the record to support plaintiff's allegation that Yerg and Koushall conspired to charge her "using non-recorded methods such as texting or cell phone calls . . . ." *Id.* at 7. Moreover, defendants maintain that Yerg cannot be liable for abuse of process and malicious prosecution simply for having forwarded to Koushall the recommendation of the State's Attorney's Office to seek a criminal summons against Middleton. *Id.* at 8.

Indeed, according to defendants, a "defendant is not liable for malicious prosecution 'merely because of his approval or silent acquiescence in the acts of another.'" *Id.* (quoting *Smithfield Packing Co. v. Evely*, 169 Md. App. 578, 595, 905 A.2d 845, 854 (2006)). In

defendants' view, this principle forecloses liability against Yerg, who, in instructing Koushall to obtain the summons against Middleton, "merely relied upon the independent judgment of the prosecutor." ECF 98 at 8. And, in any event, defendants contend that Yerg's reasonable reliance on the recommendation of the State's Attorney's Office to seek a criminal summons against Middleton entitles him to qualified immunity to her claim of malicious prosecution. *Id.* at 9–10 (citing *Wadkins v. Arnold*, 214, F.3d 535, 538–43 (4th Cir. 2000)).

Defendants reiterate in the Reply that summary judgment with respect to Middleton's claim of conspiracy under § 1985(3) is appropriate "because no reasonable jury could find that . . . Koushall or . . . Yerg had a discriminatory motive" in obtaining charges against Middleton, ECF 98 at 10. With respect to plaintiff's claim of common law civil conspiracy, defendants assert that summary judgment is appropriate because (1) plaintiff has failed to produce any evidence that she was injured by the supposed conspiracy, *id.* at 13; (2) there is no evidence that defendants conspired to charge plaintiff or to interfere with Koushall's criminal prosecution, *id.* at 13–14; and (3) even assuming *arguendo* that defendants did conspire to interfere with Koushall's prosecution, Middleton would have no cause of action, because "private persons do not have a constitutional right to have the police investigate and prosecutors charge an alleged perpetrator." *Id.* at 12 (citing *Hoffman v. Smart-Gittings*, RMG-18-1146, 2019 WL 8759417, at *10 (D. S.C. Aug. 26, 2019)).

In addition, defendants maintain that the intracorporate conspiracy doctrine forecloses liability against Yerg and Koushall for civil conspiracy, because "the recognized exceptions [to the doctrine] are inapplicable" in this case. ECF 98 at 11. In particular, according to defendants, plaintiff's "bald" assertion that defendants had an "'independent personal stake'" in the prosecution of Middleton is "unsupported by the evidence." *Id.* (quoting ECF 89-1 at 42).

Defendants also address plaintiff's invocation of collateral estoppel. ECF 98 at 15–21. First, defendants argue that Koushall is not subject to a final judgment that could serve as the basis of an estoppel, because his judgment of conviction in state court has been converted to a probation before judgment. *Id.* at 16–17; *see* ECF 98-1 at 2. In this regard, defendants cite *Jones v. Baltimore City Police Dep't*, 326 Md. 480, 488, 606 A.2d 214, 218 (1992), in which the Maryland Court of Appeals declined to treat "probation before judgment" as "a final judgment for purposes of issue preclusion." ECF 98 at 17. Second, defendants argue that collateral estoppel is unwarranted because Koushall did not have an opportunity to assert qualified immunity as a defense to his prosecution in state court. *Id.* at 17–18. Third, defendants assert that estoppel is inappropriate because, "under Maryland law," Baltimore City "is liable for any judgement [sic] against . . . Koushall where the conduct took place within the scope of employment and/or under color of law." *Id.* at 19 (citing *Baltimore City Police Dep't v. Potts*, 468 Md. 265, 227 A.3d 186 (2020)). In contrast, defendants state that the City had no interest in defending Koushall's state-court prosecution. ECF 98 at 20. They assert, *id.* at 20–21:

> In the underlying criminal case, there was no mechanism for the City to join the criminal matter and protect its future fiscal interests. Application of the doctrine in a case like this would deny the City of its ability to provide counsel for Sergeant's Koushall's defense, to avail itself of settlement and other resolution opportunities, and to ensure all available legal defenses were considered before being faced with a legal contention that relevant factual disputes had been fully resolved. Ultimately, the City's coffers would be opened before being presented an opportunity to act. Plaintiffs would be armed with a run-around of the statutory schemes created by the legislature for State law claims and trigger the well-establish [sic] indemnification prior to required notice.

Finally, defendants maintain that there are no genuine disputes of material fact that preclude summary judgment with respect to plaintiff's claims of excessive force and unlawful seizure, in violation of the Fourth Amendment, *id.* at 22–24; common law battery, *id.* at 24; common law false arrest and false imprisonment, *id.* at 24–25; common law abuse of process, *id.*

at 25–26; and common law malicious prosecution.  *Id.* at 26–27.  And, according to defendants, in deciding whether a genuine factual dispute exists with respect to some or all of these claims, the Court may not consider "the factual findings of the circuit court," because these findings "constitute inadmissible hearsay."  *Id.* at 21; *see id.* at 22 (citing *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993)).

## V.  Discussion

### A.

As noted, plaintiff argues that Koushall's prosecution in a Maryland state court should serve as the basis for collateral estoppel with respect to some of plaintiff's claims.  And, plaintiff argues that the Court should consider excerpts from the transcript of Koushall's trial in determining whether there are any genuine disputes of material fact.

The judgment alleged to have preclusive effect is a judgment of a Maryland state court.  As a result, Maryland law determines whether and to what extent that judgment is a proper basis for collateral estoppel.  *Laurel Sand*, 519 F.3d at 162 ("Generally, the preclusive effect of a judgment rendered in state court is determined by the law of the state in which the judgment was rendered."); *In re McNallen*, 62 F.3d at 624 ("In determining the preclusive effect of a state-court judgment, the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel.").

As indicated, after a trial in the Circuit Court for Baltimore City in the fall of 2019, a judge of that court found Koushall guilty of second-degree assault and misconduct in office.  *See* ECF 83-4 at 74; *Koushall II*, 479 Md. at 136–141, 277 A.2d at 409–412.  However, on May 10, 2022,

the court granted Koushall probation before judgment, pursuant to Md. Code (2018 Repl. Vol.), § 6-220(b) of the Criminal Procedure Article ("C.P.").[20]  ECF 98 at 16; ECF 98-1 at 3.

C.P. § 6-220(b) provides, in part:  "When a defendant pleads guilty or nolo contendere or is found guilty of a crime, a court may stay the entering of judgment, defer further proceedings, and place the defendant on probation before judgment subject to reasonable conditions . . . ."  With respect to probation before judgment, the Maryland Court of Special Appeals has explained, *Schmidt v. State*, 245 Md. App. 400, 409–10, 226 A.3d 842, 847–48 (2020):

> When a defendant pleads (or is found) guilty, in the ordinary course, he proceeds to sentencing.  In fact, until he is sentenced, he is not technically "convicted" of a crime, and there is no final judgment. . . . A defendant may seek a PBJ under CP § 6-220 to *avoid* such a final judgment. . . . [W]hen a defendant asks for a PBJ, he is seeking to stop the proceedings and *prevent* a final judgment—the final judgment of conviction that is entered upon sentencing.

In *Jones*, 326 Md. 480, 606 A.2d 214, the Maryland Court of Appeals addressed the preclusive effect of probation before judgment.  Under a provision of the now-repealed Law Enforcement Officers' Bill of Rights ("LEOBR"), *see* Acts 2021, ch. 59, § 2, a law enforcement officer was entitled to an administrative hearing before being punished, except if the officer had been "convicted of a felony."  *Jones*, 326 Md. at 481, 606 A.2d at 214.  The question for the Court in *Jones* was whether an officer who had been found guilty of a felony, but granted probation before judgment, had been "convicted of felony" within the meaning of LEOBR.  *See id.*

The *Jones* Court characterized the LEOBR provision denying an administrative hearing to an officer convicted of a felony as "a legislatively mandated form of the issue preclusion arm of res judicata—issues finally litigated adversely to the officer in the criminal litigation are to be taken as established in the subsequent administrative proceeding," thus obviating the need for such

---

[20] The Court cites the Code in effect at the time of the incident.

a proceeding. *Jones*, 326 Md. at 487, 606 A.2d at 217.   Therefore, the court applied the "principles of issue preclusion" to determine whether probation before judgment precluded subsequent litigation in a subsequent administrative proceeding.  *Id.* at 488, 606 A.2d at 217.   The court concluded that probation before judgment could not have preclusive effect.  *Id.* at 489, 606 A.2d at 218–19.  It reasoned, *id.* at 487–88, 606 A.2d at 217–18 (emphasis added):

> In utilizing principles of issue preclusion, . . . we note that the judgment serving as the basis for the subsequent preclusion ordinarily must be a final judgment. . . . Although we have held that probation before judgment may constitute a final judgment within the meaning of a statute governing appeals, we have made it clear that probation before judgment is not a final judgment of conviction for most purposes.  *See State v. Hannah*, 307 Md. 390, 400–01, 514 A.2d 16 (1986).  *We do not believe the legislature intended probation before judgment to be a final judgment for purposes of issue preclusion*.

The Maryland Court of Appeals again addressed the preclusive effect of probation before judgment in *Powell v. Maryland Aviation Admin.*, 336 Md. 210, 647 A.2d 437 (1994).  In that case, a state employee who made harassing calls to a coworker was found guilty of telephone misuse.  *See id.* at 213–14, 647 A.2d at 438–39.  He was also charged administratively pursuant to a state regulation allowing the removal of an employee who "has been convicted of a criminal offense."  *Id.* at 214, 647 A.2d at 439.  The question for the court was whether "a guilty finding in a criminal matter against a State employee, which criminal matter received a probation before judgment disposition, [could] be given preclusive effect in State administrative disciplinary actions taken against the employee regarding the same incident . . . ."  *Id.* at 217, 647 A.2d at 440.

The court determined that the administrative law judge in the administrative disciplinary proceeding "erred in giving conclusive effect to the guilty finding."  *Id.* at 219, 647 A.2d at 441.  The court explained that, when a defendant has been granted probation before judgment, "there is no judgment," and "the principle called nonmutual collateral estoppel or issue preclusion does not apply to bar relitigating the facts underlying the finding."  *Id.* at 218, 647 A.2d at 441.  Therefore,

49

the administrative "adjudicator could 'second guess' the circuit court judge in the telephone misuse case," and "was free to substitute her judgment for that of the circuit court on whether [the defendant] had engaged in the conduct alleged." *Id.*

Judges of this District have recognized that probation before judgment does not have preclusive effect. *See Smith v. Mothershed*, WMN-12-3215, 2013 WL 4501310, at *5 (D. Md. Aug. 21, 2013) ("Neither doctrine [res judicata or collateral estoppel] applies here because the trial court granted Plaintiff probation before judgment and the law is clear that probation before judgment is not a final judgment on the merits."); *Baumgarten v. United States*, CCB-09-2409, 2009 WL 3208679, at *1 (D. Md. Sept. 30, 2009) ("A probation prior to judgment is not a conviction under Maryland law, but it is counted under the criminal history provisions of the Sentencing Guidelines.") (citations omitted).

In my view, *Jones* and *Powell* compel the conclusion that the prosecution of Koushall in a Maryland state court, which culminated in probation before judgment, does not provide a basis for applying collateral estoppel with respect to the claims asserted in federal court by Middleton against Koushall.[21]

I turn to consider the extent to which, if at all, I may consider the factual findings made by the Circuit Court for Baltimore City in my assessment of whether there exists a genuine dispute of

---

[21] In *Koushall II*, 479 Md. at 153, 277 A.3d at 419, the Maryland Court of Appeals observed that, in a prosecution for second-degree assault under Maryland law, the "'fact finder . . . is the arbiter of the reasonableness of force used by a police officer to effect an arrest.'" (Quoting *Koushall I*, 249 Md. App. at 731, 246 A.3d at 772). But, in this case, the reasonableness of an officer's use of force under the Fourth Amendment is a question of law for the court. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *see Harris*, 550 U.S. at 381 n.8 (stating that "the reasonableness of [an officer's] actions . . . is a pure question of law"); *Knibbs*, 30 F.4th at 214 ("At the summary judgment stage, once [a court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law."). I need not decide whether this distinction is a factor in determining whether the claims are identical.

material fact precluding summary judgment.  This issue is distinct from the question of whether the circuit court's findings have preclusive effect.  In principle, a non-preclusive finding could still be considered *some* evidence—although not *conclusive* evidence—with respect to a question in dispute.

As noted, defendants assert that these factual findings are inadmissible hearsay under the Fourth Circuit's holding in *Nipper*, 7 F.3d 415.  ECF 98 at 21.  Hearsay is a statement that a "declarant does not make while testifying at the current trial or hearing," which "a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801.  "Hearsay is not admissible unless any of the following provides otherwise: [1] a federal statutes; [2] these rules; or [3] other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

The Fourth Circuit has squarely held that "judicial findings of fact entered in state court in a different case involving some of the same parties" are inadmissible hearsay.  *Nipper*, 7 F.3d at 416.  In *Nipper*, the plaintiffs alleged, *inter alia*, that the defendant had participated in a civil conspiracy and committed fraud "related to the sale of limited partnership interests in real estate partnerships."  *Id.*  At trial, plaintiff's counsel read "[p]ortions of the findings of fact" made by a judge in a separate case, which "repeatedly referred to factual findings of misrepresentations made by [the defendant], [the defendant's] failure to disclose material information, and [the defendant's] participation in a civil conspiracy . . . ."  *Id.*  The Fourth Circuit determined that these findings of fact were "hearsay evidence."  *Id.* at 17.  Notably, the Court concluded that Fed. R. Evid. 803(8)(C), which allows the admission of factual findings made in public records and reports, did not provide a basis for admitting the judicial findings notwithstanding their status as hearsay.  *Id.*; *see United States v. Farah*, 475 F. App'x 1, 7 (4th Cir. 2007) )("*Nipper* . . . holds that judicial *findings of fact* are not 'public records' within the meaning of the public records exception to

hearsay . . . .") (emphasis in *Farah*); *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 242

(4th Cir. 1999) (stating that *Nipper* requires "excluding the findings of judges in the judicial

branch").

As indicated, "Courts in the Fourth Circuit may not consider inadmissible evidence on a

motion for summary judgment." *Giles*, 59 F.4th at 704 (citing *Md. Highways Contractors Ass'n,*

*Inc.*, 933 F.2d at 1251). In my view, *Nipper*, 7 F.3d 415, makes clear that the judicial findings of

fact cited by plaintiff in the Opposition are hearsay, and inadmissible to prove the truth of the

matters asserted. Therefore, I must disregard these findings in my assessment of whether there are

any genuine disputes of material fact that preclude summary judgment.

In the Opposition, plaintiff also cites excerpts from testimony provided in Koushall's

criminal trial. Defendants have not objected to the Court's consideration of the testimony as part

of the summary judgment record. Instead, their objection appears limited to "the factual findings

of the circuit court." ECF 98 at 21.[22]

Although defendants do not object to the consideration of the testimony in the circuit court

proceeding, I am of the view that the transcripts of the testimony, at least in the form that they have

been submitted to the Court, do not provide a reliable basis for determining the existence of a

---

[22] "If a party fails to object to the inadmissibility of evidence submitted by its opponent in
the summary judgment proceedings, the court may consider the evidence," because "[t]he failure
to raise the issue . . . constitutes a waiver of the objection for purposes of summary judgment." 11
Moore's Federal Practice – Civil § 56.91[7] (2024); *accord Campbell v. Hanover Ins. Co.*, 457
B.R. 452, 459 (W.D.N.C. 2011) (quoting *id.*); *Munoz v. Int'l Alliance of Theatrical Stage Emp.*
*and Moving Picture Machine Operators*, 563 F.2d 205, 214 (5th Cir. 1977) ("Inadmissible material
that is considered by a district court without challenge may support a summary judgment.");
*Peterson v. State Farm Ins. Co.*, ___ F. Supp. 3d ___ , 2023 WL 8792147, at *2 (N.D. Ala. Dec.
19, 2023) (stating that, "in the absence of an objection," inadmissible "evidence could and, if
material, should be factored into a summary judgment decision") (citation and internal quotation
marks omitted); *see also Desrosiers v. Hartford Life and Acc. Co.*, 515 F.3d 87, 92 (1st Cir. 2008);
*Jones v. Owens-Corning Fiberglas Corp. and Amchem Prods., Inc.*, 69 F.3d 712, 718 (4th Cir.
1995); *Glenn v. United States*, 271 F.2d 880, 883 (6th Cir. 1959).

triable question of fact.  Plaintiff has not provided the Court with a table of exhibits, and the transcripts generally provide no basis on which to identify who is testifying.  The excerpts are preceded by cover pages, but these cover pages do not identify the witness.  In fact, in some cases, a single exhibit appears to contain the testimony of multiple witnesses.  *Compare* ECF 89-6 at 12 (question addressed to "Ms. Middleton") *with* ECF 89-6 at 19–20 (asking unidentified "Officer" to identify "Ms. Middleton" on a videotape).  In addition, the excerpts frequently omit significant amounts of intervening testimony, so that, for example, page "42" of the transcript at ECF 89-10 is followed by page "146" of the transcript.

Therefore, interpreting these transcripts would require an unacceptable and improper amount of guesswork.  An assessment of the summary judgment record cannot depend on guesswork, even if the guesswork is to some degree informed by context.  As a result, in deciding whether there exists any genuine dispute of material fact precluding summary judgment, I refer primarily to the depositions of Middleton (ECF 83-3) , Koushall (ECF 83-4), and Yerg (ECF 83-11); the CCTV video of the incident, to the extent appropriate (ECF 89-5); the camera footage of Middleton's detention in the Central District police station after her arrest, taken from the body-worn camera of Lieutenant Antwan Davis (ECF 83-10); and the reports prepared by Swenson (ECF 83-5) and Key (ECF 83-19).

**B**.

To review, defendants assert that, (1) with respect to plaintiff's claim of use of excessive force, lodged pursuant to § 1983 (Count VII), Koushall is entitled to qualified immunity and Yerg is entitled to judgment as a matter of law; (2) both defendants are entitled to summary judgment with respect to plaintiff's unlawful seizure claim, lodged pursuant to § 1983 (Count VII); (3) both defendants are entitled to summary judgment with respect to plaintiff's claim of illegal use of

prosecution, lodged pursuant to § 1983 (Count VII); (4) Koushall is entitled to summary judgment with respect to plaintiff's claims under Articles 24 and 26 of the Maryland Declaration of Rights (Count IV); (5) Koushall is entitled to summary judgment with respect to plaintiff's claims of common law battery (Count I), false imprisonment (Count II), and false arrest (Count VI); (6) both defendants are entitled to summary judgment with respect to plaintiff's claims of common law malicious prosecution and abuse of process (Count III); and (7) both defendants are entitled to summary judgment with respect to plaintiff's two conspiracy claims (Count IX; Count X).

### 1.  Excessive Force (Count VII)

Koushall contends that he is entitled to qualified immunity with respect to Middleton's § 1983 claim of use of excessive force, in violation of the Fourth Amendment.  In particular, Koushall asserts that his use of force was consistent with the BPD's Policy governing the use of force and, therefore, could not have been contrary to clearly established law.  In addition, Koushall argues that his use of force was reasonable under the circumstances, given, *inter alia*, Middleton's aggressive posture and the hostile environment near the Club.

As discussed, a court's qualified immunity inquiry involves two questions: (1) whether the facts, when considered "in the light most favorable to the party asserting the injury, . . . show [that] the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established." *Saucier*, 533 U.S. at 201.

I begin by determining whether the facts, considered in the light most favorable to Middleton, show that Koushall's conduct violated Middleton's right to be free from the use of excessive force by a police officer.  I then consider whether the right in question, when defined with appropriate particularity, was clearly established at the time of the incident.

The Fourth Amendment to the Constitution guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV.  It is made applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

By its plain text, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Illinois v. Rodriguez*, 497 U.S. 177, 183–84 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). Therefore, "'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted)); *see also Fernandez v. California*, 571 U.S. 292, 298 (2014); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *Jimeno*, 500 U.S. at 250; *United States v. Aigbekaen*, 943 F.3d 713, 719–20 (4th Cir. 2019).

The Supreme Court has interpreted the Fourth Amendment to prohibit a law enforcement officer from using excessive force to effect a seizure.  *See Graham*, 490 U.S. at 394; *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985); *see also Franklin*, 64 F.4th at 530–31; *Aleman*, 80 F.4th at 285–87; *Stanton*, 25 F.4th at 233; *Strickland*, 917 F.3d at 768; *Hupp*, 931 F.3d at 320–23; *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).  Indeed, "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment . . . rather than under [the Fourteenth Amendment's] 'substantive due process' approach."   *Graham*, 490 U.S. at 388 (emphasis in *Graham*); *see also Knibbs*, 30 F.4th at 214 (observing that a "§ 1983 claim that [an officer's] use

of force violated [a plaintiff's] Fourteenth Amendment due process rights . . . has been foreclosed by the Supreme Court since 1989") (citing *Graham*, 490 U.S  at 395).

Whether an officer's use of force was reasonable under the Fourth Amendment is "'predominantly an objective inquiry.'"  *Cybernet*, 954 F.3d at 169 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  To determine the reasonableness of an officer's actions, a court must conduct "'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Smith v. Ray*, 781 F.3d at 101 (quoting *Graham*, 490 U.S. at 396).

In particular, a court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396; *see Dolgos,* 884 F.3d at 179; *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013).  However, the three *Graham* factors are not "exclusive." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  Indeed, a court must consider "the proportionality of the force in light of *all* the circumstances." *Ray*, 948 F.3d at 226 (emphasis added).  "Those circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 467 (2021) (quoting *Kingsley*, 576 U.S. at 397).

Here, the parties present conflicting versions of events.  In my view, there are genuine disputes of material fact concerning matters essential to any decision regarding the reasonableness of Koushall's use of force.  These facts cannot be resolved on summary judgment.

Middleton claims that as she approached Stancil "with [her] palms up," Koushall struck her "three times," without affording her an opportunity to obey his instruction to back up.  ECF 83-3 at 107–108.  And, according to Middleton, Koushall "grabbed [her] by [her] hair" and "flung [her] to the ground" before placing her in handcuffs.  *Id.* at 108.   Middleton denies that she was attempting to assault Stancil when Koushall struck her.  *Id.* at 42.  And, in plaintiff's review of the incident, she does not acknowledge that she shoved or pushed Koushall.  *Id.* at 108.

In contrast, Koushall says that he struck Middleton once to "defend[] [him]self," after she "failed to comply" with multiple "verbal commands,"   "shove[d]" him "backwards off of the sidewalk," and "got into an aggressive stance, fists balled, [with her] hand pulled backwards," as if "to strike" him.  ECF 83-4 at 30; *see also* ECF 83-5 at 10 (accepting for the purpose of assessing reasonableness that Middleton "pushed [Koushall] away").   And, Koushall claims that he "perform[ed] . . . a leg sweep" to subdue Middleton after she "attempted to flee the location."  ECF 83-4 at 30, 31.  Moreover, Koushall denies pulling Middleton's hair.  *Id.* at 37.

As discussed, there is video footage of the incident.  ECF 89-5.  But, the video footage is of little help in resolving these conflicting accounts.  *Cf. Harris*, 550 U.S. at 378.  The video quality is adequate until the point at which Koushall parks his police vehicle, with emergency lights activated, at the center of the field of view.  At that point, the lights appear to overwhelm the camera and the quality of video deteriorates.  Thereafter, the quality of the footage is poor and details are difficult to discern.  Moreover, at the moment of the alleged push, Middleton is hidden from view behind Koushall, Pujols, Wiggins, and Stancil.  So, although it appears that Koushall

57

stepped off the sidewalk while close to Middleton, it is not clear that he did so because Middleton shoved or pushed him.  In addition, at the moment immediately preceding Koushall's strike, the right side of Middleton's body is hidden behind Koushall's own body.  As a result, it is difficult to evaluate Koushall's assertion that, in the moments preceding the strike, Middleton had taken an "aggressive stance," with "fists balled," in preparation to "strike him."  ECF 83-4 at 30.

In short, the "video footage . . . is subject to different interpretations." *Aleman*, 80 F.4th at 293.  Therefore, it cannot provide an authoritative account of the facts for purposes of summary judgment, and the Fourth Circuit's proscription against interpreting ambiguous video footage at summary judgment applies in full force.  *See id.*

If plaintiff's account of these disputed facts is accepted as true—as it must be at this juncture—Koushall's use of force likely "violated [Middleton's] constitutional right" to be free from excessive force.  *Saucier*, 533 U.S. at 201.  As noted, *Graham* instructs a court evaluating the reasonableness of force to consider, *inter alia*, "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

With respect to the first *Graham* factor, if Middleton's account is credited, there appears to have been no "crime at issue" in relation to which Koushall used force.  *Id.*  Instead, according to Middleton, Koushall initiated his use of force as Middleton approached him in a non-threatening manner, and he did so without giving Middleton an opportunity to obey his instruction to back up.  Moreover, accepting as true Middleton's version of the incident, she did not "pose[] an immediate threat to the safety of the officers or others" at the time Koushall began using force.  *Id.*  Indeed, it is undisputed that Koushall did not believe that Middleton was armed.  ECF 83-4 at 47.  And,

according to Middleton, she approached Stancil with her "palms up," ECF 83-3 at 107, but did not strike or attempt to assault Stancil. *Id.* at 42.

A reasonable jury could conclude that Middleton was not "combative" or "aggressive" as she approached Stancil, Pujols, and Koushall. ECF 83-1 at 27. Rather, a reasonable jury could determine that Koushall struck Middleton "[w]ithout being provoked." *See Smith*, 781 F.3d at 101.

Still assuming the truth of Middleton's version of the facts, the third *Graham* factor— whether the plaintiff resisted or attempted to evade arrest—also favors the conclusion that Koushall's use of force was excessive. Although Middleton states that she "tr[ied] to get away," she says that she did so *after* being struck three times by Koushall. ECF 83-3 at 108. Therefore, if plaintiff's account is credited, her effort "to get away" could not have justified Koushall's initial strikes. *Id.* In addition, a reasonable jury could conclude that Middleton's attempt "to get away" *after* being struck by Koushall was nothing more than an "instinctive[] attempt to pull herself from his grasp." *Smith*, 781 F.3d at 102; *see also Lewis*, 2024 WL 1609101, at *8 (determining that the plaintiff's "natural physical reaction to the officers' assault . . . did not justify [the defendant's] escalation"). As a result, a "reasonable jury could find that at that moment any perception by [Koushall] that [Middleton] had attempted or was attempting to flee [was] unreasonable." *Smith*, 781 F.3d at 103.

Because Koushall struck plaintiff in the face, an assessment of "the proportionality of the force in light of the circumstances," *id.* at 101, must also account for the "unique dangers of strikes to the head." *Lewis*, 2024 WL 1609101, at *7. As the Fourth Circuit has observed, the head "is a particularly fragile part of the human body," because "[i]t lacks a layer of muscle or fatty tissue that can absorb the impact of a blow . . . ." *Id.* And, "[b]ecause the head contains the brain, it is

commonly understood that head injuries can pose a substantial risk of serious and lasting physical harm." *Id.* In my view, if Middleton's version of the facts is credited, Koushall's use of a strike to the face, which could have caused "serious and lasting physical harm" to Middleton, was disproportionate to the threat a reasonable officer would have considered Middleton to pose. *Id.*

In sum, a reasonable jury could conclude that Koushall struck Middleton in the face without provocation and took her to the ground as she attempted to protect herself from additional blows. *Saucier*, 533 U.S. at 201. If proved at trial, these facts would provide a basis on which to conclude that Koushall's "conduct violated a constitutional right," namely, the right to be free from a police officer's use of excessive force. *Id.*

"Still, even if [Koushall] violated [Middleton's] Fourth Amendment rights, [Koushall] is nonetheless entitled to summary judgment if those rights weren't clearly established." *Amisi v. Brooks*, 93 F.4th 659, 668 (4th Cir. 2024). I begin my inquiry into whether Koushall's conduct violated clearly established law, as I must, by "defin[ing] the right at issue with specificity." *Knibbs*, 30 F.4th at 223. In particular, I define the right at issue as the right of a person who is known to be unarmed, and who approaches a police officer in a non-threatening manner, to be free of a hand or foot strike to the face and a leg sweep, or equivalent force, without having been afforded adequate time to obey the officer's instruction to back up. I readily conclude that the right, so defined, was clearly established at the time of the incident in August 2018.

*Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001), is instructive. In that case, a husband and wife entered a convenience store that, unknown to them, was closed and secured by an alarm. *Id.* at 848. The defendant officer responded and placed the husband in handcuffs. *Id.* When the wife "turned around and saw her husband pressed up against the front of the store and being handcuffed . . . she ran toward her husband." *Id.* Although the parties disputed whether the wife or the officer

initiated contact with each other, the parties did not dispute that the defendant officer "twisted [the wife's] arm behind her back, threw her up against the building, . . . handcuffed her," and "sprayed her twice in the eyes with [pepper] spray from close range." *Id.* The Court concluded that "reasonable police officers, acting under the same or similar circumstances, would [not] have twice, from close range, sprayed [the wife] with [pepper spray]," or "handcuffed and arrested [her] after throwing [her] against the wall and on the ground." *Id.*

*Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), is also relevant. There, an officer "used disabling force to gain control over" the plaintiff, who was suspected of stealing a five-dollar bill. *Id.* at 171. The parties "differ[ed], however, on who initiated the use of force and on the nature of resistance offered." *Id.* at 171–72. According to the officer, the plaintiff "shoved him in an attempt to escape, whereupon the officer grabbed [the plaintiff] by the collar." *Id.* at 172. In contrast, the plaintiff "contend[ed] that, without any provocation, [the officer] grabbed his collar and jerked him around, yelling harshly as he did so." *Id.* When the plaintiff "instinctively tried to free himself," the officer "punched him and threw him to the ground." *Id.* The officer then subdued plaintiff using a "wrestling maneuver" that caused the plaintiff's knee to "crack[]." *Id.* The Fourth Circuit determined that "no reasonable officer could have believed his conduct to be lawful in light of the circumstances . . . ."

In *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016) the Fourth Circuit characterized its holdings in *Rowland* and *Park* by stating that, in those cases, it had "held that . . . punching or pepper spraying" a "suspect[] in response to minimal, non-violent resistance . . . constitute[s] excessive force." *Id.* at 908 (citing *Rowland*, 41 F.3d at 172–74). And, in *Lewis*, 2024 WL 1609101, at *10, the Court recently recognized that "a non-

dangerous, non-actively resistant, 'at least partially subdued,' arrestee's right to be free from excessive force in the form of head strikes was clearly established by 2018."

As I see it, if Middleton's version of the facts is credited, her failure to back up before being afforded a true opportunity to do was, at worst, a form of "minimal, non-violent resistance," *Armstrong*, 810 F.3d at 908, or "non-dangerous, non-active[] resistan[ce]." *Lewis*, 2024 WL 1609101, at *10. A reasonable officer would have known that responding to minimal resistance of this kind with a hand strike to the face, leg sweep, and arrest was excessive force.

As noted, defendants claim that Koushall's use of force could not have been contrary to clearly established law because it was authorized by the BPD's Policy governing the use of force. ECF 83-1 at 25–26. I am not persuaded. Defendants' formulation of their argument is telling. They assert: "Under Policy 1115 . . . an officer is authorized to use the following force in response *if they believe a subject is attempting to assault them or others*: . . . Hand/Foot Strikes . . . ." *Id.* at 24 (Emphasis added). Elsewhere, defendants assert: "Koushall could not have possessed the requisite notice that his conduct in striking and effectuating an arrest *of an individual who assaulted an officer* violated clearly established law because such conduct was in the purview of his professional training and within departmental policy." *Id.* at 25–26 (Emphasis added). Defendants' arguments to this effect plainly depend on a particular resolution of a disputed question of fact: namely, whether Middleton assaulted or attempted to assault Stancil, Koushall, or Pujols. Before this question of fact is resolved, it is not possible to assess to what extent, if at all, BPD Policy 1115 might have justified Koushall's use of force.

In sum, I conclude that there are genuine disputes concerning facts essential to the determination of whether Koushall's use of force was reasonable. And, if all disputes of fact are

resolved in plaintiff's favor, as they must be at this juncture, there is no basis for granting qualified immunity to Koushall with respect to Middleton's claim of use of excessive force.

In contrast, I conclude that Yerg is entitled to summary judgment with respect to Count VII, insofar as that Count alleges that he used excessive force against Middleton.  There is no evidence in the record suggesting that Yerg was involved in Middleton's arrest or otherwise used force against her.  Indeed, "at the time the incident . . . occurred," Yerg was "out of the state . . . in New Jersey at a horse show."  ECF 83-11 at 12.[23]  In short, the claim against Yerg is completely unfounded.

### 2.  Unlawful Seizure (Count VII)

Defendants contend that they are entitled to summary judgment with respect to plaintiff's § 1983 claim that Koushall unlawfully seized her, in violation of the Fourth Amendment.  ECF 83-1 at 30.  In particular, defendants argue that Middleton's "combative movements" and her alleged "assault on . . . Koushall" provided probable cause for her arrest.  *Id.* at 31.

As discussed, the Fourth Amendment guarantees, in part, "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."  *See*, *e.g.*, *Jimeno*, 500 U.S. at 250.  The "test of reasonableness under the Fourth Amendment is an objective one."  *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham*, 490 U.S. at 397).

---

[23] As noted, by Memorandum and Order of August 18, 2022 (ECF 50; ECF 51), I dismissed the claims against Yerg for battery (Count I); false imprisonment, Count II); violation of Articles 24 and 26 of the Maryland Declaration of Rights, (Count IV); and § 1983, Count VII), insofar as it asserted a claim for denial of medical care.  Curiously, defendants did not move to dismiss the suit against Yerg as to Count VII, insofar as it asserts claims of excessive force and unlawful seizure in violation of the Fourth Amendment, even though they moved to dismiss the suit against Yerg as to Count IV, which asserts substantially identical claims under the Maryland Declaration of Rights.  *See* ECF 41 at 43–44, 53; ECF 45-2.

As a result of this apparent oversight, Yerg has remained subject to suit with respect to the excessive force and unlawful seizure claims asserted in Count VII, despite having been dismissed from the equivalent claims asserted under the Maryland Declaration of Rights.

Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990). The Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam): "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see also United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018) ("The magnitude of the intrusion relative to the seriousness of any offense 'is of central relevance to determining reasonableness[.]'") (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

In *Santos v. Frederick County Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013), the Fourth Circuit summarized "three categories of police-citizen encounters," each requiring a different degree of justification, *id.* at 460–61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434[] (1991). Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]). This inquiry is objective, [*United States v.*] *Weaver*, 282 F.3d [302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting *Mendenhall*, 446 U.S. at 553 [ ]). An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989); *see*

*also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

A "warrantless arrest is reasonable [only] if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Wesby*, 583 U.S. at 56 (citing *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001)). But, the Supreme Court has said that "even a very minor criminal offense" committed in the presence of a law enforcement officer may provide probable cause for arrest. *Atwater*, 532 U.S. at 354; *accord McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019). Whether there was probable cause for an arrest is a question of law. *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

Probable cause is "'defined in terms of facts and circumstances sufficient to warrant a prudent [person] in believing that the suspect had committed or was committing an offense.'" *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)); *see Thurston*, 2024 WL 1841939, at *4; *United States v. Gondres-Medrano*, 3 F.4th 708, 714 (4th Cir. 2021). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

"In assessing whether probable cause exists, [a court] must examine the totality of the circumstances." *Wadkins*, 214 F.3d at 539; *see also Wesby*, 583 U.S. at 57; *Allen*, 631 F.3d at 172. And, "to determine whether an arrest was backed by probable cause, [the court must] ask whether the facts known to the officer could make a prudent officer believe that the suspect's conduct satisfies the elements of a criminal violation." *Thurston*, 2024 WL 1841939, at *4; *see Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019). But, "[p]robable cause need not be tailored to the offense the arresting official suspected at the time of arrest." *Thurston*, 2024 WL 1841939, at *4, n.4.

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court explained, *id.* at 370–71 (citations and internal quotation marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

Defendants maintain that the facts, even when viewed in the light most favorable to plaintiff, establish that there was probable cause to effect Middleton's arrest. ECF 83-1 at 30–31. They contend that Koushall had probable cause to believe that Middleton had assaulted Stancil, in violation of C.L. § 3-203(a), by "approach[ing] . . . Stancil in an aggressive manner with her hands outstretched" and "continu[ing] towards . . . Stancil in an effort to hit her," "[d]espite . . . Koushall's commands to back up." ECF 83-1 at 30. In addition, defendants argue that Koushall had probable cause to believe that Middleton assaulted a police officer, in violation of C.L. § 3-203(c), when she "pushed . . . Koushall while he was visibly on duty, causing his body to rotate and him to stumble from the sidewalk into the street." ECF 83-1 at 31.

Defendants' assertions of probable cause are based on material facts that are in dispute. For example, the parties dispute whether Middleton approached Stancil "in an aggressive manner." *Id.* at 30. They also disagree as to whether plaintiff disobeyed Koushall's order to back up and whether Koushall struck Middleton before giving her an opportunity to comply. *See id.* And, assuming that Koushall did afford Middleton an opportunity to obey his order, the parties dispute

whether Middleton "continued towards . . . Stancil *in an effort to hit her*." *Id.* (emphasis added). It is also not clear if Middleton, in fact, "pushed" Koushall. *Id.* at 31.

At this juncture, I must resolve these factual questions in plaintiff's favor. In this light, Koushall's arrest of Middleton would not have been based on probable cause. Therefore, I cannot accept defendants' contention that Koushall is entitled to summary judgment with respect to Middleton's unlawful seizure claim "because there was probable cause to arrest" her. *Id.* at 30 (typeface altered).

Seemingly as an afterthought, defendants suggest that Koushall is entitled to qualified immunity with respect to Middleton's claim of unlawful seizure. *Id.* at 31–32. However, defendants provide no argument that the law of probable cause was in any relevant respect unclear at the time of the incident. *See id.* This is a significant omission, because a "defendant bears the burden of proof" with regard to his "entitlement to qualified immunity." *Purnell*, 501 F.3d at 377–78 (internal citations omitted); *see also Thurston*, 2024 WL 1841939, at *3; *Stanton*, 25 F.4th at 233.

In any event, I am satisfied that, if the disputed facts are resolved in plaintiff's favor, Koushall is not entitled to qualified immunity with respect to Middleton's claim of unlawful seizure. To be sure, an officer's entitlement to qualified immunity with respect to an allegedly unlawful seizure "turns not on 'whether there actually was probable cause . . . but whether an objective law officer could reasonably have believed probable cause to exist.'" *Thurston*, 2024 WL 1841939, at *6 (quoting *Gomez v. Atkins*, 296 F.3d 253, 261–62 (4th Cir. 2002)). But, as I see it, if the disputed facts are resolved in Middleton's favor, "'an objective law officer'" could not "'reasonably have'" believed that there was probable cause to arrest Middleton. *Thurston*, 2024 WL 1841939, at *6 (citation omitted).

In particular, a jury resolving all factual disputes in Middleton's favor could conclude that Koushall arrested Middleton despite being aware of "facts establishing . . . [her] innocence." *Id.* at *7. And, as the Fourth Circuit recognized in *Thurston*, 2024 WL 1841939, at *7, the effectuation of an arrest, despite knowledge of innocence, has been contrary to clearly established law since at least 2012, when the court decided *Merchant v. Bauer*, 677 F.3d 656.

In sum, I conclude that Koushall is not entitled to summary judgment with respect to plaintiff's claim of unlawful seizure. However, Yerg was not involved in Middleton's arrest. Accordingly, he is entitled to summary judgment with respect to plaintiff's claim of unlawful seizure.

### 3.   Illegal Use of Prosecution and Detention (Count VII)

Defendants assert that both Koushall and Yerg are entitled to summary judgment with respect to plaintiff's § 1983 claim that defendants "'illegal[ly] use[d] . . . prosecution and detention.'" *Id.* at 32 (quoting ECF 43, ¶ 32) (alterations added). As noted, defendants claim that the undisputed facts establish that Koushall had probable cause to charge plaintiff; that Koushall's decision to charge plaintiff was not made with malice; and that, in any event, Yerg was not responsible for the decision to charge plaintiff. ECF 83-1 at 32. In their Reply, defendants assert that plaintiff failed to respond to these arguments in her Opposition. ECF 98 at 6. For that reason, according to defendants, the Court should treat plaintiff's claim of illegal use of prosecution as abandoned. *Id.*

I agree with defendants that the section of plaintiff's Opposition nominally addressed to her claim of illegal use of prosecution consists exclusively of irrelevant argument concerning the reasonableness of Koushall's use of force. *See* ECF 89-1 at 27–29. To be sure, plaintiff elsewhere in the Opposition provides argument concerning her claim of common law malicious prosecution.

*See id.* at 38–40.  To the extent that the elements of an "illegal use of prosecution" cause of action under 42 U.S.C. § 1983 are identical to those of a common law malicious prosecution claim, plaintiff's defense of the viability of her common law claim could be treated as an indirect defense of her claim under § 1983.  *See Thompson v. Clark*, 596 U.S. 36, 43 (2022) ("To determine the elements of a constitutional claim under § 1983, this Court's practice is to first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted . . . .").

Nevertheless, there is a meaningful difference between charitably interpreting a party's arguments and inventing for a party an argument it did not in fact make.  And, in my view, to interpret plaintiff's argument concerning common law malicious prosecution as a *sub silentio* defense of the viability of her "illegal use of prosecution" claim would be more invention than interpretation.  This is especially so because, to the Court's knowledge, there is no claim under § 1983 for "illegal use of prosecution and detention," at least so named.  And, although courts have recognized a claim for malicious prosecution under § 1983, the contours of that claim remain to some extent uncertain, because they depend on a court's conclusions about "the elements of the most analogous tort" recognized in the common law "as of 1871."  *See Thompson*, 596 U.S. at 43.

Indeed, in *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000), the Fourth Circuit stated:

> [T]here is no such thing as a "§ 1983 malicious prosecution" claim.  What we termed a "malicious prosecution" claim in *Brooks* [*v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996)] is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff.  *See Brooks*, 85 F.3d at 183.[ ]  It is not an independent cause of action.

Plaintiff did not identify, in either the SAC or the Opposition, the elements of the "illegal use of prosecution and detention" claim that she believes she alleged against Koushall and Yerg.

Plaintiff's failure to identify these elements impedes the Court's ability to evaluate whether the record creates a triable issue of fact with respect to that claim.

It is also notable that plaintiff could have requested leave to file a surreply addressed to the issue of abandonment. *See* Local Rule 105.2(a). However, plaintiff did not do so, even though defendants had squarely raised the issue in their Reply. ECF 98 at 4–6.

Under these circumstances, I conclude that plaintiff has abandoned her claim for "illegal use of prosecution and detention" pursuant to § 1983. *See Rodgers v. Eagle Alliance*, 586 F. Supp. 3d 398, 448 (D. Md. 2022) ("A party who fails to respond to an argument for summary judgment is deemed to have abandoned the claim.") (citing *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997)); *Mincey v. State Farm Ins. Co.*, 672 F. Supp. 3d 59, 62 (D. Md. 2023) ("[A] plaintiff who fails to respond to an argument raised in a dispositive motion is deemed to have abandoned the claim.") (citations omitted).

### 4.  Articles 24 and 26 of the Maryland Declaration of Rights (Count IV)

Defendants assert that Koushall is entitled to summary judgment with respect to plaintiff's claims under Articles 24 and 26 of the Maryland Declaration of Rights "for the same reasons" that entitled him to summary judgment with respect to plaintiff's claims of "excessive force, unlawful seizure, and malicious prosecution" under the Fourth Amendment. ECF 83-1 at 37.

 Article 24 contains the State's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003). That is, it "is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted).

Article 24 is ordinarily interpreted *in pari materia* with its federal analog.  *See, e.g.*, *Lewis*, 2024 WL 1609101, at *6 n.4; *Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Tyler v. City of College Park*, 415 Md. 475, 499–500, 3 A.3d 421, 435 (2010) (recognizing that Maryland courts "interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution."); *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (same).   "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment."  *Hawkins,* 955 F. Supp. 2d at 496; *accord Frey v. Comptroller of Treasury,* 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 941 (1981)).

Article 26 is the State's analog to the Fourth Amendment.  *Padilla v. State*, 180 Md. App. 210, 225, 949 A.2d 68, 77 (2008) (Hollander, J.); *see Dent*, 745 F. Supp. 2d at 661 ("Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . .")   It, too, is construed *in pari materia* with its federal equivalent, *i.e.,* the Fourth Amendment.  *Lewis*, 2024 WL 1609101, at *6 n.4; *Padilla,* 180 Md. App. at 226, 949 A.2d at 78; *see, e.g., Parker v. State,* 402 Md. 372, 400, 936 A.2d 862, 878 (2007); *Patterson v. State,* 401 Md. 76, 113, 930 A.2d 348, 372 (2007); *Byndloss v. State,* 391 Md. 462, 465 n. 1, 893 A.2d 1119, 1121 n. 1 (2006); *Davis v. State,* 383 Md. 394, 408, 859 A.2d 1112, 1120 (2004); *Scott v. State,* 366 Md. 121, 139, 782 A.2d 862, 873 (2001); *Richardson v. McGriff,* 361 Md. 437, 452–53, 762 A.2d 48, 56 (2000); *Purnell v. State,* 171 Md. App. 582, 607, 911 A.2d 867, 882

(2006), *cert. denied,* 398 Md. 315, 920 A.2d 1060 (2007).  Therefore, Article 26 "'does not accord [a litigant] any greater protection than the Fourth Amendment to the United States Constitution.'"  *Blasi v. State,* 167 Md. App. 483, 511 n. 12, 893 A.2d 1152, 1168 n. 12 (2006) (citation omitted), *cert. denied,* 393 Md. 325, 900 A.2d 751 (2007).[24]

Because Articles 24 and 26 are interpreted *in pari materia* with their federal constitutional counterparts, *see Lewis*, 2024 WL 1609101, at *6 n.4, my analysis of Middleton's federal constitutional claims controls my disposition of her claims under the Maryland Declaration of Rights.  I determined, *supra*, that Koushall was not entitled to summary judgment with respect to Middleton's claims of excessive force and unlawful seizure in violation of the Fourth Amendment. It follows that Koushall is not entitled to summary judgment with respect to Middleton's claims of excessive force and unlawful seizure in violation of the Maryland Declaration of Rights.  In contrast, Koushall is entitled to summary judgment with respect to plaintiff's claim of "illegal use of prosecution and detention" under the Maryland Declaration of Rights, to the extent that plaintiff asserts such a claim.[25]

5. **Common Law Battery (Count I), False Imprisonment (Count II), and False Arrest (Count VI)**

Defendants assert that Koushall is entitled to summary judgment with respect to Middleton's claims of common law battery, false imprisonment, and false arrest because his use

---

[24]  Although Articles 24 and 26 are interpreted *in pari materia* with their federal constitutional counterparts, the federal doctrine of qualified immunity is not a defense to claims brought under the Maryland Declaration of Rights.  *See, e.g.*, *Littleton*, 502 F. App'x at 274 n.2; *Richardson v. Orangeburg Sch. Dist. No. 1*, 53 F.3d 329 (table), 1995 WL 255941, at *3 n.2 (4th Cir. 1995); *Okwa v. Harper*, 360 Md. 161, 201, 757 A.2d 118, 140 (2000); *Thacker v. City of Hyattsville*, 135 Md. App. 268, 290, 762 A.2d 172, 183–84 (2000).

[25]  As noted, by Memorandum and Order of August 18, 2022 (ECF 50; ECF 51), Yerg was previously dismissed with respect to Count IV.

of force against plaintiff and his subsequent arrest of Middleton were legally justified.  ECF 83-1 at 37–41.

"Battery [in Maryland] is commonly defined as a harmful, unlawful, or offensive touching."  *Claggett v. State*, 108 Md. App. 32, 47, 870 A.2d 1002, 1009 (1996) (Hollander, J.) (citing *Ford v. State*, 330 Md. 682, 699, 625 A.2d 984, 992 (1993)).  "An officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest."  *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citing *Ashton v. Brown*, 339 Md. 70, 119 n.24, 660 A.2d 447, 471 n.24 (1995); *Busch v. State*, 289 Md. 669, 426 A.2d 954, 958 (1981); *Hines v. French*, 157 Md. App. 536, 549–553, 852 A.2d 1047, 1055–56 (2004)).

"However, if during a valid arrest 'an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable' for battery."  *Stutzman*, 350 F. Supp. 3d at 383 (quoting *French v. Hines*, 182 Md. App. 201, 266 957 A.2d 1000,1037 (2008) (Hollander, J.)).  Therefore, "[t]o the extent that [a plaintiff] has stated a claim against a defendant for excessive force under the Fourth Amendment," he also has "stated a claim for battery" under Maryland law.  *Stutzman*, 350 F. Supp. 3d at 383.

Under Maryland law, "the intentional torts of false arrest and false imprisonment are separate causes of action," but "they share the same elements."  *Okwa v. Harper*, 360 Md. 161, 189–90, 757 A.2d 118, 133 (2000).  A plaintiff alleging false imprisonment or false arrest must show (1) a deprivation of liberty, (2) "without consent," and (3) "without legal justification."  *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000).  "The test of legal justification, in the context of false arrest and false imprisonment, is judged by the principles applicable to the law of arrest."  *Id.* (Internal quotation marks and citations omitted).  "Therefore, 'where the basis of a false imprisonment action is an arrest by a police office, the liability of the police officer for false

imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest." *Id.* at 264–65 (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916, 925 (1995)).   Under Maryland statutory law, a warrantless arrest for a felony or misdemeanor is legally justified if supported by probable cause.  *See* C.P. § 2-202.

I conclude that Koushall is not entitled to summary judgment with respect to plaintiff's claims of common law battery, false arrest, and false imprisonment.  Previously, I determined that the evidence, if viewed in the light most favorable to Middleton, provides a basis for concluding that Koushall used excessive force in violation of the Fourth Amendment.  It follows that the evidence, viewed in Middleton's favor, also provides a basis for concluding that Koushall committed battery under Maryland law.  *See Stutzman*, 350 F. Supp. 3d at 383.

In addition, I determined that the evidence, when viewed in Middleton's favor, provides a basis for concluding that Koushall arrested Middleton without probable cause, in violation of the Fourth Amendment.  It follows that the evidence, viewed in Middleton's favor, also provides a basis for concluding that Koushall committed false arrest and false imprisonment under Maryland law.

Therefore, Koushall is not entitled to summary judgment with respect to Middleton's claims of common law battery, false arrest, or false imprisonment.

### 6.   Common Law Malicious Prosecution and Abuse of Process (Count III)

Defendants assert that both Koushall and Yerg are entitled to summary judgment with respect to plaintiff's claims of malicious prosecution and abuse of process.  ECF 83-1 at 41–43.

"Abuse of process, under . . . Maryland . . . law, is a species of tort action distinct from malicious prosecution . . . ."  *Tomai-Minogue v. State Farm Mut. Auto. Ins. Co.*, 770 F.2d 1228, 1237 (4th Cir. 1985); *see also Walker v. American Sec. & Trust Co.*, 237 Md. 80, 87, 205 A.2d

302, 306 (1964) ("A tort action for abuse of process, on the one hand, and . . . malicious prosecution . . . on the other hand, are essentially different and independent actions."). "While malicious prosecution concerns institution of process for its ostensible result but without probable cause, abuse of process is the improper use of otherwise regularly issued process in a manner not contemplated by law after its issuance." *Tomai-Minogue*, 770 F.2d at 1237–38 (citing *Ross v. Peck Iron & Metal Co.*, 264 F.2d 262, 267 (4th Cir. 1959); *Herring v. Citizens Banks & Trust Co.*, 21 Md. App. 517, 528–30, 321 A.2d 182, 189 (1974)).

"A plaintiff must show the following to establish the tort of malicious prosecution: 1) the defendant instituted a criminal proceeding against the plaintiff; 2) the criminal proceeding was resolved in the plaintiff's favor; 3) the defendant did not have probable cause to institute the proceeding; and 4) the defendant acted with malice or a primary purpose other th[a]n bringing the plaintiff to justice." *Okwa*, 360 Md. at 183, 757 A.2d at 130.[26]

"Malice is defined as 'conduct "characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud."'" *Lewis*, 2024 WL 1609101, at *12: (quoting *Barbre v. Pope*, 402 Md. 157, 182, 935 A.2d 699, 714 (2007), in turn quoting *Lee v. Cline*, 384 Md. 245, 268, 863 A.2d 297, 311 (2004)). Ordinarily, "the question of whether an officer acted with . . . malice is 'subjective,' and thus is 'generally a question for the jury.'" *Lewis*, 2024 WL 1609101, at *12 (quoting *Purnell*, 652 F.3d at 536) (cleaned up).

Although malice "is seldom admitted," it "need not be proven by direct evidence" and may be "inferred from acts and circumstantial evidence." *Dolgos*, 884 F.3d at 187 (cleaned up).

---

[26] A plaintiff asserting a malicious prosecution claim pursuant to 42 U.S.C. § 1983 need not prove malice. *Thurston*, 2024 WL 1841939, at * 3. Instead, a plaintiff need only "show that (1) the defendant seized him pursuant to legal process but without probable cause and (2) the criminal proceedings terminated in the plaintiff's favor." *Id.* (citing *Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014)).

Moreover, malice "'may be inferred from a lack of probable cause.'" *Okwa*, 360 Md. at 188, 757 A.2d at 133 (quoting *Montgomery Ward*, 339 Md. at 717, 664 A.2d at 924). Nonetheless, the inference of malice from lack of probable cause "is merely a permissible one, sometimes loosely characterized as prima facie evidence, subject to negation by proof that there was no actual malice on the defendant's part." *Exxon Corp. v. Kelly*, 281 Md. 689, 699–700, 381 A.2d 1146, 1152–53 (1978) (citation and internal quotation marks omitted).

Moreover, "[m]ere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element." *Montgomery Ward*, 339 Md. at 719, 664 A.2d at 925. The Maryland Court of Appeals has cautioned, *id.* at 735, 664 A.2d at 932–33:

> Under certain circumstances, the validity of inferring a wrongful motive from lack of probable cause may be questionable. Since lack of probable cause to institute a prosecution might result from negligence, the lack of probable cause does not necessarily indicate a wrongful motive.[] In the present case, for example, the plaintiff's theory regarding [the defendant's] lack of probable cause was that his investigation was inadequate. Inadequacy of investigation does not mean that [the defendant's] motive was anything other than bringing a thief to justice.

As noted, the Statement of Charges charged Middleton with second-degree assault, in violation of C.L. § 3-203; resisting arrest, in violation of C.L. § 9-408(b); disorderly conduct, in violation of C.L. § 10-201(c)(2); and failure to obey a reasonable and lawful order by a law enforcement officer, in violation of C.L. § 10-201(c)(3). ECF 83-17. Defendants claim that Koushall is entitled to summary judgment with respect to plaintiff's malicious prosecution claim because the undisputed facts establish that all four charges contained in the Statement of Charges obtained on December 1, 2018, were supported by probable cause. ECF 83-1 at 32–36; *see* ECF 83-17.

But, as explained, there are genuine disputes concerning material facts pertinent to whether there was probable cause to arrest Middleton for assault. In particular, there are genuine disputes

concerning whether Middleton approached Stancil in an aggressive manner; whether Middleton intended or attempted to strike Stancil; and whether Middleton shoved Koushall. If these disputes of fact are resolved in Middleton's favor, as they must be for purposes of assessing Koushall's motion for summary judgment, the evidence provides a basis for concluding that Koushall did not have probable cause to arrest Middleton for assault.

The evidence, viewed in Middleton's favor, also provides a basis to conclude that Koushall did not have probable cause to charge Middleton with the other offenses set forth in the Statement of Charges: resisting arrest, disorderly conduct, or failure to obey a reasonable and lawful order by a law enforcement officer.

In Maryland, in order to convict a defendant of resisting arrest, the prosecution must prove the following elements: "(1) that a law enforcement officer arrested or attempted to arrest the defendant; (2) that the officer had probable cause to believe that the defendant had committed a crime, *i.e.*, that the arrest was lawful; and (3) that the defendant refused to submit to the arrest [and] resists the arrest by force." *Rich v. State*, 205 Md. App. 227, 240, 44 A.3d 1063, 1071 (2012). Thus, it is an element of the offense of resisting arrest that the arrest was based on probable cause.

As noted, defendants claim that Koushall's arrest was justified by probable cause because Middleton assaulted Stancil and Koushall. ECF 83-1 at 30–31. But, the evidence, when viewed in Middleton's favor, provides a basis for concluding that Koushall's attempted arrest of Middleton was not founded on probable cause. In particular, the evidence, viewed in Middleton's favor, provides a basis for concluding that Middleton did not assault Stancil or Koushall. Therefore, if the evidence is viewed in Middleton's favor, the arrest she allegedly resisted was unlawful, and she could not have committed the crime of resisting arrest. *Cf. Att'y Grievance Comm'n v.*

*Mahone*, 435 Md. 84, 106, 76 A.3d 1198, 1211 (2013) ("It is well settled that a person has the right to resist an unlawful arrest.").

Of course, the question whether a person committed the offense of resisting arrest is distinct from the question of whether an officer had probable cause to believe that the person committed the offense.  Nonetheless, I conclude that the evidence, viewed in Middleton's favor, supports the conclusion that Koushall's attempted arrest of Middleton was unlawful, *and* that there was no "reasonable ground for belie[ving]" that the arrest of Middleton was lawful, such as would support a determination of probable cause to charge her with resisting arrest.  *See Pringle*, 540 U.S. at 371.

Defendants assert that Koushall had probable cause to charge Middleton with a violation of C.L. § 10-201(c)(2), which prohibits a person from "willfully act[ing] in a disorderly manner that disturbs the public peace."  "[T]he gist of the crime of disorderly conduct . . . is the doing or saying, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area."  *Spry v. State*, 396 Md. 682, 691–92, 914 A.2d 1182, 1187–88 (2007) (citation and internal quotation marks omitted).  A reasonable jury could conclude that, as Middleton approached Stancil in a non-aggressive manner, Koushall struck her without provocation, took her to the ground with a leg sweep, and placed her under arrest.  I do not consider Middleton's actions, so characterized, equivalent to "the doing or saying, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area."  *Id.*  Therefore, the evidence, viewed in Middleton's favor, provides a basis for concluding that Koushall did not have probable cause to arrest Middleton for, or charge her with, disorderly conduct.

Defendants also assert that Koushall had probable cause to arrest Middleton for disobeying a lawful order.  C.L. § 10-201(c)(3) provides: "A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public

peace."  In *Scriber v. State*, 437 Md. 399, 412, 86 A.3d 1260, 1267 (2014), the Maryland Court of Appeals said:  "The offense of disobeying a lawful order requires proof [that] . . . (1) a person willfully (2) disobeys a (3) lawful (4) order or direction (5) of a police officer."

According to Middleton, Koushall struck her before she had an opportunity to obey his order to back up.  A person who is struck, taken to the ground, and arrested by an officer without receiving an opportunity to obey that officer's instruction cannot be considered to have "willfully fail[ed] to obey" that instruction.  C.L. § 10-201(c)(3).  Therefore, the evidence, viewed in Middleton's favor, provides a basis to conclude that Koushall did not have probable cause to arrest Middleton for, or charge her with, failure to obey a reasonable and lawful order by a police officer.

In sum, the evidence, viewed in the light most favorable to Middleton, provides a basis to conclude that Koushall lacked probable cause to arrest Middleton for, or charge her with, the offenses alleged in the Statement of Charges.  *See* ECF 83-17.  Nonetheless, defendants argue that the record is devoid of evidence on the basis of which a reasonable factfinder could conclude that Koushall acted with malice. ECF 83-1 at 35.  This argument is unavailing.

Malice and lack of probable cause are distinct elements of the tort of malicious prosecution. *Okwa*, 360 Md. at 183, 757 A.2d at 130.  However, as noted, "'the "malice" element of malicious prosecution may be inferred [by a jury] from a lack of probable cause.'"  *Okwa*, 360 Md. at 188, 757 A.2d at 133 (quoting *Montgomery Ward*, 339 Md. at 717, 664 A.2d at 924).  Therefore, insofar as the evidence, viewed in Middleton's favor, provides a basis for concluding that Koushall lacked probable cause for the charges contained in the Statement of Charges, it also provides a basis on which to infer that he acted with malice.

It is uncontested that Koushall instituted proceedings against Middleton and that these proceedings terminated in Middleton's favor.  Having determined that the evidence in the record

is also sufficient to support a finding that Koushall charged Middleton without probable cause and with malice, I conclude that Koushall is not entitled to summary judgment with respect to Middleton's claim of malicious prosecution.

I turn to consider defendants' assertion that Yerg is entitled to summary judgment with respect to Middleton's malicious prosecution claim, because the record contains no evidence that he acted with malice in directing Koushall to obtain the Statement of Charges.  ECF 83-1 at 36. As noted, the "malice" element requires proof of "a wrongful or improper motive in initiating legal proceedings against the plaintiff."  *Montgomery Ward*, 339 Md. 701, 718, 664 A.2d 916, 924. Proof of negligence does not suffice as proof of malice.  *Id.* at 719, 664 A.2d at 925.  Nonetheless, in some circumstances, a factfinder may reasonably infer an improper motive from the absence of probable cause.  *Id.* at 717, 664 A.2d at 924.

There is no evidence of impropriety in Yerg's rather peripheral involvement in obtaining the charges against Middleton. The undisputed evidence establishes that, "at the direction of [Yerg's] supervisors," who initially believed that "Koushall's actions were within departmental policy," Yerg made "the focus of the [internal] investigation . . . the actions of Sergeant Middleton," ECF 83-11 at 20–21; that although Yerg informed Koushall that there was a clerical defect in the citations Koushall wrote, Yerg "[a]t no point . . . direct[ed] him what charges to file," *id.* at 17; and that, after it became clear that Koushall was unable to procure Middleton's signature on the citations, Yerg forwarded to Koushall the recommendation of the State's Attorney's Office that Koushall "seek out a criminal summons."  *Id.* at 24.

Nor does the evidence permit a reasonable factfinder to infer malice from the fact that Yerg directed Koushall to obtain charges allegedly not founded on probable cause. "[T]he inference [of malice from lack of probable cause] is merely . . . permissible"—not mandatory—and is "subject

to negation by proof that there was no actual malice on the defendant's part." *Exxon Corp.*, 281 Md. at 699, 381 A.2d at 1152. In other words, an inference of malice from a lack of probable cause is *not* permissible if the evidence establishes that the defendant did not procure the unfounded charge with an improper motive.

In my view, no reasonable factfinder could conclude that Yerg procured the charges with an improper motive. There is no evidence that Yerg was aware of facts tending to establish that the charges against Middleton were unsupported by probable cause. Indeed, Yerg's understanding of the incident was determined by Koushall's account of it. Even assuming, *arguendo*, that Yerg should have independently verified Koushall's account of the incident, Yerg was, at most, negligent. But "[m]ere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element." *Montgomery Ward*, 339 Md. at 719, 664 A.2d at 925.

In sum, no reasonable factfinder could conclude that Yerg acted with malice in helping Koushall obtain charges against Middleton. Therefore, Yerg is entitled to summary judgment with respect to Middleton's claim of malicious prosecution.

Defendants assert that Yerg is entitled to summary judgment with respect to Middleton's malicious prosecution claim on the additional basis that he was not responsible for initiating criminal proceedings against her. ECF 83-1 at 36–37, 41–42. "One who instigates or aids and assists in a criminal prosecution may be liable [for malicious prosecution] regardless of whether he swears out a warrant." *Wood v. Palmer Ford, Inc.*, 47 Md. App. 692, 701, 425 A.2d 671, 677 (1981) (citation and internal quotation marks omitted). However, "mere passive knowledge and consent to the acts of another, is not sufficient to render a party liable . . . ." *Id.* (citations and internal quotation marks omitted).

In my view, a reasonable jury, applying this standard, could conclude that Yerg aided or assisted in the procuring of charges against Middleton when he requested, in accordance with the advice of the SAO, that Koushall obtain the Statement of Charges against Middleton.  Therefore, Yerg's asserted lack of involvement in instituting proceedings against Middleton does not provide an additional basis for granting him judgment as a matter of law with respect to Middleton's malicious prosecution claim.

It remains to address defendants' assertion that both Koushall and Yerg are entitled to judgment as a matter of law with respect to Middleton's claim of abuse of process.  In contrast to an action for malicious prosecution, "in an action for abuse of process it is unnecessary for the plaintiff to prove that the proceeding terminated in his favor, or that the process was obtained without probable cause or in the course of a proceeding begun without probable cause."  *Wood*, 47 Md. App. at 706, 425 A.2d at 680 (citation and internal quotation marks omitted).

"The essential elements of abuse of process are (1) an ulterior motive, and (2) a wil[l]ful act in the use of process not proper in the regular conduct of the proceeding."  *Id.*  "If a party invoking civil or criminal process is 'content to use the particular machinery of the law for the immediate purpose for which it was intended, he is ordinarily not liable, notwithstanding a vicious or vindictive motive.'"  *Metro Media Ent., LLC v. Steinruck*, 912 F. Supp. 2d 344, 350 (D. Md. 2012) (quoting *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 512, 471 A.2d 297, 311 (1984))).  "'But the moment he attempts to attain some collateral objective, outside the scope of the operation of the process employed, a tort has been consummated.'"  *Metro Media*, 912 F. Supp. 2d at 350 (quoting *Palmer Ford*, 298 Md. at 512–13, 471 A.2d at 311).

The evidence, even when viewed in Middleton's favor, does not provide a basis to conclude that Koushall or Yerg engaged in abuse of process.  As noted, "abuse of process is the improper

use of *otherwise regularly issued process* in a manner not contemplated by law *after its issuance*."

*Tomai-Minogue*, 770 F.2d at 1237–38 (emphasis added).  With respect to plaintiff's abuse of

process claim against Koushall, plaintiff states, ECF 89-1 at 39:

> Koushall did not initially charge Middleton with assault and resisting arrest for the events of August 26, 2018. Those charges were not brought until December 1, 2018 when he learned that he was going to be charged. He had previously announced in an email to multiple persons, including Defendant Yerg, that he was "not issuing any new charges in reference to the incident." [ECF 89-11 at 5].
>
> A reasonable inference was that his motivation for bringing these new charges was not to bring Middleton to justice for her alleged criminal acts, but to aid him in the defense of his own case and to tarnish Middleton's standing.

As Middleton acknowledges, Koushall's misconduct, if any, consisted of the wrongful

procurement of "new charges," not in the abuse of charges already procured.  ECF 89-1 at 39.

Middleton does not contend, and there is no evidence to indicate, that either Koushall or Yerg

made "improper use of otherwise regularly issued process in a manner not contemplated by law

after its issuance." *Tomai-Minogue*, 770 F.2d at 1237–38 (emphasis added).  Therefore, I conclude

that both Koushall and Yerg are entitled to summary judgment with respect to plaintiff's claim of

abuse of process.

In sum, I conclude that Yerg is entitled to summary judgment with respect to Count III.

And, I conclude that Koushall is entitled to summary judgment with respect to Count III, insofar

as it alleges that he committed abuse of process.  However, Koushall is not entitled to summary

judgment with respect to Count III, insofar as it alleges malicious prosecution.

### 7.  Conspiracy (Count IX; Count X)

I next consider defendants' assertion that both Koushall and Yerg are entitled to summary

judgment with respect to plaintiff's claims of common law civil conspiracy and conspiracy in

violation of 42 U.S.C. § 1985(3).  ECF 83-1 at 43–51; ECF 98 at 10–14.

"[T]o establish a . . . 'conspiracy to deny equal protection of the laws' under section 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995) (citations omitted); *see also Griffin v. Breckenridge*, 403 U.S. 88 (1971).

The Fourth Circuit "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion." *Simmons*, 47 F.3d at 1377. "Indeed," the Court has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.* In short, a plaintiff must meet a "weighty burden to establish a civil rights conspiracy." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 412 (4th Cir. 1996).

I readily conclude that both defendants are entitled to summary judgment with respect to Middleton's claim that they conspired to deprive her of her civil rights, in violation of 42 U.S.C. § 1985(3). The record is devoid of evidence suggesting that Koushall and Yerg were "motivated by a specific class-based, invidiously discriminatory animus" in their procurement of charges against Middleton. *Simmons*, 47 F.3d at 1376. Because plaintiff's claim of conspiracy in violation of 42 U.S.C. § 1985(3) is utterly unsupported by the evidence in the record, I need not consider to what extent, under the circumstances attendant here, the intracorporate conspiracy doctrine might foreclose liability under § 1985(3).

I turn to the conspiracy claim under Maryland law. "Under Maryland law, civil conspiracy is defined as the 'combination of two or more persons by an agreement or understanding to

accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper*, 385 Md. 1, 25, 867 A.2d 276, 290 (2005)). "In addition to proving an agreement, 'the plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury.'" *Marshall*, 758 F.3d at 541. In sum, "civil conspiracy requires an agreement, and an overt act in furtherance of the agreed-to unlawful conduct that causes injury, as well as the legal capacity of the conspirators to complete the unlawful conduct." *Id.*

There is no evidence in the record that would permit a reasonable jury to conclude that Koushall and Yerg had an "agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish" a lawful act. *Id.* (citation and internal quotation marks omitted). There is no genuine dispute that, after Koushall made three unsuccessful attempts to issue procedurally correct citations to Middleton, the State's Attorney's Office "recommend[ed]" that Koushall "seek out a criminal summons." ECF 83-16 at 2; ECF 83-4 at 59–61. Yerg forwarded this recommendation to Koushall and asked him "to obtain a criminal summons." ECF 83-16 at 2.

The extent of Yerg's interaction with Koushall was to "e-mail[] him specific to . . . an issue with" the citations Koushall attempted to issue to Middleton, ECF 83-11 at 17, and to speak with Koushall "two" times, but "only in reference to citation filings." *Id.* at 30. There is no basis in the record to find that Koushall and Yerg had any other interactions on the matter. Yerg's professional interactions with Koushall in no way suggest an unlawful conspiracy. Therefore, plaintiff's claim that Koushall and Yerg conspired to obtain false charges against her "amounts to nothing more than rank speculation and conjecture." *Hinkle*, 81 F.3d at 422.

In sum, I conclude that Koushall and Yerg are entitled to summary judgment with respect to Count IX and Count X.

## V.    Conclusion

For the foregoing reasons, I shall grant the Motion in part and deny the Motion in part.

In particular, as to both defendants, I shall grant the Motion with respect to Count IX (civil conspiracy) and Count X (§ 1985(3) conspiracy).

With regard to Koushall, I shall grant the Motion with respect to Count III (malicious prosecution and abuse process), insofar as Count III asserts a claim for abuse of process, and Count VII (§ 1983), insofar as Count VII asserts a claim for "illegal use of prosecution and detention." I shall otherwise deny the Motion as to Koushall.  Therefore, Koushall remains subject to suit with respect to Count I (battery); Count II (false imprisonment); Count III (common law malicious prosecution and abuse of process); Count IV (Articles 24 and 26 of the Maryland Declaration of Rights); Count VI (false arrest); and Count VII (§ 1983 claims for excessive force and unlawful seizure).

As to Yerg, I shall grant the Motion with respect to Count III (malicious prosecution and abuse of process), in its entirety, and Count VII (§ 1983), in its entirety.  Because no claim against Yerg remains, he shall be dismissed from the suit.

An Order follows, consistent with this Memorandum Opinion.


Date: May 3, 2024                                    _____/s/_____

                                                     Ellen Lipton Hollander
                                                     United States District Judge